**13 CIV 2551**

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| NEW YORK CITY EMPLOYEES' RETIREMENT SYSTEM, TEACHERS' RETIREMENT SYSTEM OF THE CITY OF NEW YORK, NEW YORK CITY POLICE PENSION FUND, NEW YORK CITY FIRE DEPARTMENT PENSION FUND, NEW YORK CITY BOARD OF EDUCATION RETIREMENT SYSTEM, TEACHERS' VARIABLE ANNUITY FUNDS, and NEW YORK CITY GROUP TRUST, | JUDGE ENGELMAYER |
| Plaintiffs, | No._____ |
| v. | JURY TRIAL DEMANDED |
| BP p.l.c., BP AMERICA INC., BP EXPLORATION & PRODUCTION INC., ANTHONY B. HAYWARD, DOUGLAS J. SUTTLES, ANDREW G. INGLIS, ROBERT MALONE, DAVID RAINEY, H. LAMAR McKAY, and ROBERT W. DUDLEY, | |
| Defendants. | |

RECEIVED
APR 17 2013
U.S.D.C. S.D. N.Y.
CASHIERS

**REDACTED**
**COMPLAINT**

## TABLE OF CONTENTS

I.     NATURE OF THE ACTION ................................................................................1

II.    JURISDICTION AND VENUE .........................................................................7

III.   THE PARTIES.....................................................................................................7

       Plaintiffs...............................................................................................................7

      A.    Defendants ................................................................................................11

IV.   NON-PARTIES ................................................................................................18

V.     CONFIDENTIAL WITNESSES .....................................................................18

VI.   BP PURPORTEDLY TOOK EXTENSIVE MEASURES TO RECTIFY ITS
       OPERATIONAL HISTORY RIFE WITH SAFETY VIOLATIONS...............19

      A.    BP's Relevant Operations........................................................................19

      B.    BP Is No Stranger to Catastrophic Industrial Incidents .........................20

VII.  DEFENDANTS' SCIENTER REGARDING THEIR MISREPRESENTATIONS
       AND OMISSIONS ABOUT BP's PRE-SPILL SAFETY IMPROVEMENTS
       AND ITS POST-SPILL ASSESSMENTS .......................................................46

      A.    Defendants' Scienter Regarding Their Misrepresentations and Omissions
           About BP's Operational Safety And Its Deepwater Drilling Operations .............46

          1.    Faulty Cementing Jobs and Other Stability Issues Were Known as
              the Most Frequent Causes of Well Control Problems ...............................47

          2.    Defendants Knew or Recklessly Disregarded That BOPs Were
              Known to Fail, Yet Did Not Adjust Their Process Safety
              Procedures Accordingly...........................................................................48

          3.    BP Received No Less Than One Hundred Safety Warnings for its
              Safety Protocol Lapses in its North Sea Deepwater Drilling
              Operations ................................................................................................52

          4.    BP's Internal Reporting Structures Mandated that the CEO and
              Board Review Process Safety and Risk ....................................................55

          5.    SEEAC Approved BP's Publications Regarding Safety ...........................57

          6.    Defendants Consciously Limited The Scope of Safety &
              Operations Audits So As Not To Apply To The Majority Of BP's
              Deepwater Drilling Fleet..........................................................................60

i

B.    Defendants' Scienter Is Further Established By Their Disregard of Safety
      and Operational Concerns.....................................................................................61

      1.    Defendants Knew of, or Recklessly Disregarded, Significant
            Process Safety Problems with Third-Party Rigs and, in Particular,
            Rigs Leased From Transocean..................................................................62

      2.    Concerns about the Integrity of Safety Processes in Alaska.....................63

      3.    Afraid-a-spill E-mail Raises Complaints about Alyeska's
            Operations..................................................................................................65

      4.    Aftermath of BP's 2007 Criminal Plea.....................................................67

C.    Defendants' Scienter Is Further Established By BP's Retaliation Against
      Individuals Who Raised Concerns About Its Operational Safety and
      Integrity...............................................................................................................69

      1.    Whistleblower Retaliation in the Gulf of Mexico......................................69

      2.    Whistleblower Retaliation in Alaska .......................................................72

D.    Defendants' Scienter In Making Post-Spill Misrepresentations And
      Omissions To Congress, Law Enforcement, Emergency Responders, and
      Investors, Including Plaintiffs, About The Oil Flow Rate Into The Gulf Of
      Mexico From The Blown Macondo Well.............................................................75

      1.    Defendants' Publicly Stated Estimates Of Oil Spilling Into The
            Gulf Were Contradicted By Contemporaneous Internal BP
            Documents, Data, Estimates, and Calculations .......................................75

      2.    Defendants Misrepresented the Scope of the Leak in a Brazen
            Attempt to Whittle Down the Amount BP Would Owe in Fines .............79

      3.    BP Agreed To Pay The Third-Highest Civil Fine In The SEC's
            History - $525 Million – To Settle The SEC's Well-Pled
            Allegations That It And Its Executives Hid From Investors,
            Including Plaintiffs, Critical Information About the Spill.........................79

      4.    BP Pled Guilty to Felony Manslaughter, Environmental Crimes
            and Felony Obstruction of Congress And Agreed to Pay The
            Largest Criminal Fine in U.S. History – $4 Billion – To Resolve A
            DOJ Investigation That Revealed Defendants' Concealment Of
            Critical Spill Information From Congress And The Public.......................81

      5.    The U.S. EPA Barred BP From New Contracts With The U.S.
            Government................................................................................................91

VIII.   THE MATERIALIZATION OF THE UNDISCLOSED RISKS – DEEPWATER
        HORIZON OIL SPILL AND ITS AFTERMATH ............................................................92

        A.     BP's Systematic Failures Caused the Explosion on and the Sinking of the
               *Deepwater Horizon Rig* ........................................................................................92

        B.     BP Was Wholly Unprepared to Contain the Oil Spill .........................................110

IX.     DEFENDANTS MADE MATERIALLY FALSE AND MISLEADING
        STATEMENTS AND OMITTED MATERIAL FACTS DURING THE
        RELEVANT PERIOD ......................................................................................................124

        A.     The January 16, 2007 False and Misleading Statements .....................................126

        B.     The May 9, 2007 False and Misleading Statements ............................................127

        C.     May 16, 2007 False and Misleading Statements .................................................128

        D.     The October 25, 2007 False and Misleading Statements.....................................129

        E.     The November 8, 2007 False and Misleading Statements [Sustained per
               NY/Ohio Order (Misrepresentation #11)] ..........................................................131

        F.     The February 22, 2008 False and Misleading Statements [Portions
               sustained per NY/Ohio Amended Order (Misrepresentation #13)] .....................131

        G.     The February 27, 2008 False and Misleading Statements [Sustained per
               NY/Ohio Order (Misrepresentation #14)] ..........................................................132

        H.     The March 4, 2008 False and Misleading Statements .........................................135

        I.     The April 17, 2008 False and Misleading Statements [Sustained per
               NY/Ohio Order (Misrepresentation #16)] ..........................................................136

        J.     The December 17, 2008 False and Misleading Statements [Portions
               Sustained per NY/Ohio Order (Misrepresentation #18)].....................................137

        K.     The February 24, 2009 False and Misleading Statements [Sustained as to
               falsity and scienter per SCAC Order (Misrepresentation I-2)]............................138

        L.     The March 4, 2009 False and Misleading Statements [Portions sustained
               as to scienter per SCAC Order (Misrepresentations J-1 and J-2); conceded
               as to falsity by Defendants in SCAC Order (Misrepresentation J-2)] ................140

        M.     The March 10, 2009 False and Misleading Statements [Sustained per
               NY/Ohio Order (Misrepresentation #26)]; Ludlow Order as to
               Particularity/Falsity/Materiality (Misrepresentation # L1 6)]..............................144

iii

N.     The April 16, 2009 False and Misleading Statements [Sustained as to scienter per SCAC Order (Misrepresentation L)].................................148

O.     The June 30, 2009 False and Misleading Statements [Sustained per NY/Ohio Order (Misrepresentation #30)] ..........................................................149

P.     The November 19, 2009 False and Misleading Statements.................................150

Q.     The February 26, 2010 False and Misleading Statements [Portions sustained as to particularity/falsity per Ludlow Order (Misrepresentation 18); as to scienter per SCAC Order (Misrepresentation N)]................................153

R.     The March 5, 2010 False and Misleading Statements [Portions sustained per NY/Ohio Order (Misrepresentation #35); as to scienter per SCAC Order (Misrepresentation O)] ..............................................................................156

S.     The March 22, 2010 False and Misleading Statements [Sustained as to particularity/falsity/materiality per Ludlow Order (Misrepresentation #8)]........158

T.     The March 23, 2010 False and Misleading Statements [Sustained per NY/Ohio Order (Misrepresentation #38)] ..........................................................160

U.     The April 15, 2010 False and Misleading Statements [Portions sustained as to particularity/ falsity/materiality per Ludlow Order (Misrepresentations #5, #30 and #3 2); as to falsity and scienter per SCAC Order (Misrepresentation R-1)] ...........................................................................161

V.     The April 28 - 29, 2010 False and Misleading Statements [Sustained per NY/Ohio Order (Misrepresentations #42 and 43)] .............................................173

W.     BP's False and Misleading Misstatements In SEC Filings Made on April 29 - 30, 2010 and on Its Corporate Website on April 30, 2010...........................175

X.     Additional Reasons Why The Statements On April 28 - 30, 2010 Were False And Misleading And Were Made With Scienter .......................................176

Y.     BP's False and Misleading Statements in Its SEC Filing on May 4, 2010..........178

Z.     The May 5, 2010 False and Misleading Statements [Sustained per NY/Ohio Order (Misrepresentation #45)] ..........................................................179

AA.     The May 10, 2010 False and Misleading Statements .........................................180

BB.     The May 14, 2010 False and Misleading Statements .........................................181

CC.     The May 17, 2010 False and Misleading Statements .........................................183

DD.     The May 20, 2010 False and Misleading Statements .........................................184

EE.   The May 21, 2010 False and Misleading Statements ...........................................185

FF.   The May 22, 2010 False and Misleading Statements ...........................................186

GG.   The May 24, 2010 False and Misleading Statements ...........................................187

HH.   Additional Reasons Why The Statements During April 30 – May 24, 2010 Were False And Misleading And Were Made With Scienter..............................188

II.   ████████████████████████████████████████████ ......192

X.   DEFENDANTS' CONDUCT CAUSED PLAINTIFFS' LOSSES...................................199

XI.   NO SAFE HARBOR APPLIES TO DEFENDANTS' FALSE AND MISLEADING STATEMENTS.....................................................................................210

XII.   PLAINTIFFS' RELIANCE IS PRESUMED THROUGH THE FRAUD-ON-THE-MARKET DOCTRINE ...................................................................................211

XIII.   PLAINTIFFS' DIRECT RELIANCE ON DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND MATERIAL OMISSIONS...............................211

XIV.   PLAINTIFFS' INDIRECT RELIANCE ON DEFENDANTS' MISSTATEMENTS THROUGH THEIR DIRECT RELIANCE ON THE PRICE INTEGRITY OF BP COMMON STOCK......................................................................219

XV.   PLAINTIFFS' CLAIMS ARE TIMELY ......................................................................220

XVI.   PLAINTIFFS' CLAIMS, PRAYER FOR RELIEF, AND DEMAND FOR JURY TRIAL.......................................................................................................................221

Plaintiffs New York City Employees' Retirement System, Teachers Retirement System of the City of New York, New York City Police Pension Fund, New York City Fire Department Pension Fund, New York City Board of Education Retirement System, Teachers' Variable Annuity Funds, and New York City Group Trust (collectively, "Plaintiffs" or the "New York City Funds") make the following allegations upon personal knowledge as to their own acts and upon information and belief as to all other matters.  Plaintiffs' information and belief are based on their counsel's ongoing investigation. The investigation of counsel is predicated upon, among other things, a review of public filings by BP plc ("BP" or the "Company"), and its subsidiaries and affiliates, with the United States Securities and Exchange Commission ("SEC"), including, among other things, reports filed on Forms 6-K and 20-F; press releases and public statements issued by the Company and its subsidiaries and affiliates; media reports about the same entities; publicly available data relating to the prices and trading volumes of BP shares; reports issued by securities analysts who followed BP; factual allegations in pleadings and other documents filed in the criminal action and plea deal between the U.S. Department of Justice ("DOJ") and BP, in the enforcement action and settlement between the SEC and BP, and in other civil lawsuits; the Court's orders denying in part Defendants' motion to dismiss the claims in No. 4:10-md-02185 (S.D. Tex.); and testimony and documents produced in *In re Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010*, MDL 2179 (E.D. La.).  Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.    NATURE OF THE ACTION

1.    This action is brought on behalf of five public pension systems and a variable annuity fund of the City of New York that directly purchased BP securities, as well as a group trust through which some of these entities purchased BP securities, during the period starting

November 29, 2006 through June 25, 2010 (the "Relevant Period"). Each Plaintiff purchased BP ordinary shares on the London Stock Exchange ("LSE") and/or BP American Depositary Shares ("ADSs") on the New York Stock Exchange ("NYSE") (collectively "BP shares") during the Relevant Period. One ADS is equal to six ordinary shares.

2.     Plaintiffs collectively lost tens of millions of dollars as a result of BP's misleading statements regarding: (i) the extent of BP's commitment to a "safety first" approach to oil drilling, which Defendants claimed to have implemented in the wake of catastrophic prior safety lapses caused by a "profits first" corporate culture; (ii) the size of the oil spill that followed the April 20, 2010 explosion on one of BP's Gulf of Mexico (the "Gulf") oil rigs (the "April 20 Explosion") and BP's ability to contain the spill; and (iii) the extent of BP's likely responsibility for the catastrophe once it occurred.

3.     Notably, in addition to the fact that all Plaintiffs are U.S. entities, the majority of Defendants reside in the U.S., specifically in Texas. Two of the three corporate Defendants, BP Exploration and Production, Inc. and BP America, Inc., are based in Texas. Four of the seven Individual Defendants reside in Texas, and a fifth was the CEO of Texas-based BP Exploration (the other two regularly travelled to Texas in the course of their business and did so immediately following the Deepwater Horizon explosion and the start of the oil spill). The vast majority of the false and misleading statements at issue were issued in the U.S., often by Texas-based U.S. Defendants, and concerned events that transpired in the U.S., in particular the Gulf of Mexico and the Gulf Coast states including Texas. Indeed, of the 51 total statements at issue, 32 of them were made in the U.S. The statements at issue all were made in Texas, were made by Texas residents, and/or concerned the deepwater drilling operations of BP's Houston-based subsidiaries in the Gulf of Mexico. Throughout the Relevant Period, Defendants directly met with Plaintiffs'

investment advisors, to whom Plaintiffs had delegated investment authority, including at a meeting with one of Plaintiffs' investment advisors that BP hosted in its New York offices.

4.     On April 20, 2010, as the crew aboard BP's Deepwater Horizon oil rig drilled the exploratory Macondo well 3.5 miles under the waters of the Gulf, high-pressure gas from the well shot up through the pipe that led to the surface. The gas was released onto the rig, ignited, and engulfed the rig in flames. The fire killed 11 workers, critically injured seven others, and sank the rig.

5.     This tragic April 20 Explosion was the manifestation of a much deeper problem that lay at the bottom of the Gulf. BP had cut so many safety corners constructing the Macondo well that it was now spewing 2.3 million gallons of oil, *every day*, into the Gulf. In just five days, the well spilled more oil than was released during the entire Exxon Valdez disaster. Worse yet, BP had no plan or ability to quickly stop the spill. By the time the well was capped almost three months later, 206 million gallons had been released into the Gulf, blackening the southern U.S. shoreline and crippling the local tourism and fishing economy. It was the worst environmental disaster in the history of marine oil exploration.

6.     This catastrophic spill, and its causes, was no surprise to Defendants. Long before the Relevant Period, BP's corporate culture consistently placed cutting costs above protecting lives and the environment as evidenced by a rash of oil spills, accidents, and governmental warnings from the year 2000 to 2006.

7.     In the wake of these accidents and at the insistence of federal regulators, BP established an independent panel to review and improve its safety procedures. Former U.S. Secretary of State James Baker, III was selected to chair the panel (the "Baker Panel"). After completing its investigation, the Baker Panel issued a report on January 16, 2007 (the "Baker

Report"), finding, in the words of a Presidential Commission that subsequently investigated the spill (the "Presidential Commission Report"), that "*BP management had not distinguished between occupational safety – concern over slips, sprains, and other workplace accidents – and process safety: hazard analysis, design for safety, material verification, equipment maintenance, and process-changing reporting.* And the [Baker P]anel further concluded that BP was not investing leadership and other resources in managing the highest risks." More specifically, the Baker Panel found that: "*from the top of the company, starting with the Board and going down . . . BP has not provided effective process safety leadership and has not adequately established process safety as a core value.*"

8. The Baker Panel singled out organizational problems as the root cause of BP's failure to learn from, and respond to, major incidents, finding "a lack of operating discipline, toleration of serious deviations from safe operating practices, and apparent complacency toward serious process-safety risks." The Baker Panel identified 10 specific recommendations that BP could implement "*to help bring about, sustainable improvements in process safety performance.*"

9. Defendants immediately professed their commitment to implementing the Baker Panel's recommendations. Lord Edmund John Philip Browne, BP's then CEO, mirroring his repeated prior mantra about BP's commitment to improving safety, responded to the Baker Panel's recommendations with the following statements, among others: "*BP gets it. And I get it too.*" He continued: "*BP's workforce is ready, willing and able to participate in a sustained Group-wide effort to move BP towards excellence in process safety. BP's safety lapses have been chronic.*"

4

10. Lord Browne's acknowledgement, in the wake of the Baker Panel's report, of BP's troubled past – and his pledge to investors that BP would be a different company going forward – signaled a purported sea change in BP's operations. Throughout the Relevant Period, Defendants repeatedly returned to this pledge and the recommendations of the Baker Panel, assuring investors that BP had learned its lesson, that its operations were now safe and reliable, and that it was prepared to address an oil spill in the Gulf. They went so far as to say that BP strived to be an industry leader in process safety and managing risk.

11. Unfortunately, none of this was true. For example, an internal BP strategy document dated December 2008, not known to Plaintiffs or other BP investors, specifically warned BP executives of serious process safety "gaps" in the Gulf:

*It's become apparent that process-safety major hazards and risks are not fully understood by engineering or line operating personnel. Insufficient awareness is leading to missed signals that precede incidents and response after incidents, both of which increases the potential for and severity of process-safety related incidents.*

The document concluded that BP employees needed "major hazard awareness" training.

12. Indeed, the Presidential Commission Report concluded that BP had no adequate process safety procedures in place with regard to well testing in deep sea drilling. The first conclusion of the Presidential Commission Report was simple yet powerful: "*[t]he explosive loss of the Macondo well could have been prevented.*" As the commission explained, "*the blowout was not the product of a series of aberrational decisions made by rogue industry or government officials that could not have been anticipated or expected to occur again. Rather, the root causes are systemic*" to BP.

13. Equally damning, the Presidential Commission Report found that, contrary to defendants' representations, defendants had not implemented the recommendations made by the

Baker Panel: BP's *"approach to managing safety has been on individual worker occupational safety but not on process safety. These incidents and subsequent analyses indicate that the company does not have consistent and reliable risk-management processes – and thus has been unable to meet its professed commitment to safety."*

14.     Throughout the Relevant Period, Defendants' misrepresentations deceived Plaintiffs as to BP's true risk profile in deep sea drilling causing them to purchase BP securities at prices artificially inflated by those misrepresentations.

15.     The April 20 Explosion and oil spill at the Macondo well partially revealed the falsity of Defendants' prior representations about these matters.  It also presented Defendants with a moment of truth.  On the one hand, they could immediately come clean about their prior misrepresentations, tell investors everything they knew about the Company's actual commitment to safety, disclose all the information they had about the scope and seriousness of the disaster, and admit that BP had little to no plan or ability to contain the situation.  On the other hand, they could continue misrepresenting the facts in an effort to prop up the Company's stock price, which was under enormous pressure as investors worried about the impact of the spill on the Company's profitability.  Defendants chose the latter course of conduct, doubling down on their campaign of deceit.

16.     Defendants minimized the magnitude of the oil spill, overstated BP's ability to control it, and understated the amount of money BP would have to pay to clean it up.  In a string of post-spill emails, for example, a BP official urged lower level employees to conceal the Company's internal flow-rate projections – which were sixty times or more higher than the 1,000 barrels/day projection Defendants had initially released to Plaintiffs and the public at large.  As Defendants knew, but concealed, containing the spill was like trying to toss a hat on a fire hose.

6

17.     As the truth slowly emerged, BP Shares plunged in value. From the date of the April 20 Explosion through June 25, 2010, BP Shares fell in value by over 48%. This lawsuit seeks to hold Defendants accountable for the misrepresentations they made to Plaintiffs and the tens of millions of dollars in losses they caused Plaintiffs to suffer on their BP investments.

## II.      JURISDICTION AND VENUE

18.     Plaintiffs' federal claims arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. § 78j(b) and 78t(a), and Rule 10b-5, 17 C.F.R. 240.10b-5. The Court has subject matter jurisdiction over such claims pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well 28 U.S.C. §§ 1331 and 1337. Venue is proper in this District pursuant to Section 27 of the Exchange Act, and 28 U.S.C. § 1391(b) for the same reasons.

19.     Plaintiffs' state law claims arise under the law of Texas or, alternatively, New York. The Court has subject matter jurisdiction over such claims pursuant to 28 U.S.C. § 1367.

20.     In connection with the challenged conduct, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate telephone and data communications and the facilities of the national securities markets.

## III.     THE PARTIES

### Plaintiffs

21.     The New York City Funds are pension systems of the City of New York, which collectively have over $121 billion in assets. The New York City Funds were shareholders of BP during the Relevant Time Period.

22.     Plaintiff New York City Employees' Retirement System ("NYCERS"), established under Section 12-102 of the Administrative Code of the City of New York, is a public employee retirement system that provides retirement, disability, and death benefits to over

300,000 active and retired New York City employee participants. NYCERS purchased BP ordinary shares on the LSE and/or BP ADSs on the NYSE during the Relevant Period and was damaged by defendants' misconduct. NYCERS, as of November 28, 2006, held BP securities. NYCERS, acting through its investment managers, engaged in least 176 transactions in BP common stock and/or ADSs during the Relevant Period, including 119 purchases during the following months: May 2007, July 2007, December 2007, January 2008, March 2008, May 2008, July 2008, August 2008, October 2008, November 2008, December 2008, January 2009, February 2009, March 2009, April 2009, July 2009, August 2009, September 2009, October 2009, November 2009, December 2009, January 2010, February 2010, March 2010, May 2010, and June 2010.

23. Plaintiff Teachers' Retirement System of the City of New York ("TRS") provides retirement benefits for approximately 195,000 current and former employees of the New York City Department of Education, participating New York City Charter Schools, or the City University of New York. TRS administers a basic qualified pension plan and a tax-deferred annuity program. TRS purchased BP ordinary shares on the LSE and/or BP ADSs on the NYSE during the Relevant Period and was damaged by defendants' misconduct. TRS, as of December 31, 2006, held BP securities. TRS, acting through its investment managers, engaged in least 106 transactions in BP common stock and/or ADSs during the Relevant Period, including 72 purchases during the following months: July 2007, December 2007, January 2008, May 2008, June 2008, August 2008, October 2008, November 2008, December 2008, March 2009, April 2009, May 2009, June 2009, July 2009, September 2009, November 2009, December 2009, January 2010, and May 2010.

24.     Plaintiff New York City Police Pension Fund ("Police"), created pursuant to New York Local Law 2 of 1940, provides pension benefits for full-time uniformed employees of the New York City Police Department and currently serves over 75,000 active and retired members. Police purchased BP ordinary shares on the LSE and/or BP ADSs on the NYSE during the Relevant Period and was damaged by defendants' misconduct. Police, as of November 28, 2006, held BP securities. During the Relevant Period, Police, acting through its investment managers, engaged in least 5 transactions in BP common stock and/or ADSs (in addition to its transactions made via the New York City Group Trust), including 4 purchases during the following months: July 2009 and August 2009.

25.     Plaintiff New York City Fire Department Pension Fund ("Fire") is a single-employer public employee retirement system serving full-time uniformed employees of the New York City Fire Department. Fire serves over 27,500 active and retired members, including widows and beneficiaries. Fire purchased BP ordinary shares on the LSE and/or BP ADSs on the NYSE during the Relevant Period and was damaged by defendants' misconduct. Fire, as of November 28, 2006, held BP securities. During the Relevant Period, Fire, acting through its investment managers, engaged in least 17 transactions in BP common stock and/or ADSs (in addition to its transactions made via the New York City Group Trust), including 13 purchases during the following months:   November 2007, December 2007, August 2009, October 2009, November 2009, December 2009, March 2010, and May 2010.

26.     Plaintiff New York City Board of Education Retirement System ("BERS") provides pension benefits to approximately 32,000 active and 14,000 retired members, primarily non-pedagogical employees of the New York City Department of Education. BERS purchased BP ordinary shares on the LSE and/or BP ADSs on the NYSE during the Relevant Period and

was damaged by defendants' misconduct. BERS, as of December 18, 2007, held BP securities. During the Relevant Period, BERS, acting through its investment managers, engaged in least two transaction in BP common stock and/or ADSs (in addition to its transactions made via the New York City Group Trust), including one purchase in December 2007.

27.    Plaintiff Teachers' Variable Annuity Funds ("TVF") are funds administered for the benefit of New York City teachers pursuant to New York City Administrative Code Section 13-567. The Funds are investment vehicles for certain contributions to Teacher member defined benefit program accounts and contributions to Teacher member tax-deferred annuity accounts. TVF purchased BP ordinary shares on the LSE and/or BP ADSs on the NYSE during the Relevant Period and was damaged by defendants' misconduct. TVF, as of March 7, 2008, held BP securities. TVF engaged in least 221 transactions in BP common stock and/or ADSs during the Relevant Period, including 17 purchases during the following months: March 2008, April 2008, May 2008, March 2009, April 2009, May 2010, and June 2010.

28.    Plaintiff New York City Group Trust ("NYCGRP") is a pass-through entity through which Police, Fire, and BERS owned BP common stock and/or BP ADS. NYCGRP purchased BP ordinary shares on the LSE and/or BP ADSs on the NYSE during the Relevant Period and was damaged by defendants' misconduct. NYCGRP, as of December 31, 2006, held BP securities. NYCGRP, acting through its investment managers, engaged in least 220 transactions in BP common stock and/or ADSs during the Relevant Period, including 121 purchases during the following months:  July 2007, December 2007, February 2008, March 2008, May 2008, June 2008, July 2008, August 2008, October 2008, November 2008, December 2008, March 2009, April 2009, May 2009, July 2009, August 2009, September 2009, October

10

2009, November 2009, December 2009, January 2010, February 2010, March 2010, May 2010, and June 2010.

### A.    Defendants

### Corporate Defendants

29.    Defendant BP plc ("BP" or the "Company") is a U.K. corporation with long-running and extensive contacts in the United States.  As BP's corporate website boasts:

> BP's roots in the United States go deep, starting in 1866 with the founding of the Atlantic Petroleum Storage Company in Pennsylvania oilfields.  Since then, our heritage has come to embody some of the most famous names in American energy: Amoco, ARCO, and Standard Oil.

> BP's portfolio of US business functions is extremely broad, encompassing virtually all aspects of the company's global business: onshore and offshore exploration and production of oil and gas, refining, marketing, retailing, alternative energy and more.

30.    Indeed, BP's corporate website makes clear that "The US is vital to BP."  BP's extensive U.S. contacts include: (a) BP is the largest oil and gas producer in the U.S. and both the largest leaseholder and largest producer in the deepwater U.S. Gulf of Mexico; (b) BP has invested $52 billion in U.S. energy development since 2007, more than BP invested in any other country and $20 billion more than any competitor invested here; (c) BP employs 23,000 people in the U.S., representing nearly 30% of its global workforce and more than it employs in any other country; (d) BP's current CEO, Defendant Dudley, is an American; (e) BP produces over 770,000 barrels of oil equivalent every day in the U.S., representing more than 20% of BP's global daily production; (f) BP operates 13 fields on Alaska's North Slope, which together equate to roughly two-thirds of Alaskan oil production; (g) BP's North America Gas business is the sixth-largest natural gas producer in the U.S., operating in seven of the U.S.'s leading gas basins; (h) BP operates five modern refineries in the U.S., processing up to 1.5 million barrels of crude oil daily; (i) BP markets over 17 billion gallons of gasoline annually in the U.S. coast-to-

coast through more than 11,000 BP-branded service stations (BP and ARCO); (j) BP owns and operates CASTROL, which it touts as being "one of the world's most recognized lubricant brands"; (k) BP Pipelines North America is the U.S.'s second-largest liquids pipeline company, transporting over 1.6 million barrels daily of oil and refined products, natural gas liquids, carbon dioxide, and chemicals; (l) BP operates three chemical plants in the U.S., including one at Texas City; (m) owns and operates significant energy infrastructure throughout the U.S., including thousands of oil and gas wells, wind farms and refineries in Texas; and (n) BP has spent more than $4 billion in the U.S. on alternative energy projects.

31.     BP also has a massive impact on U.S. investment markets. Nearly 40% of BP shareholders are based in the U.S. BP is subject to the informational requirements of the Exchange Act, and in accordance therewith, files annual reports, periodic financial statements, and other information with the SEC.

32.     During the Relevant Period, in particular following the Macondo well oil spill, BP's top executives and senior engineers, including the Individual Defendants, worked and made statements from the Gulf states in the U.S., including Texas. Throughout the Relevant Period, BP controlled, directly or indirectly, Defendants BP Exploration & Production, Inc. and BP America, Inc.

33.     Defendant BP America, Inc. ("BP America"), a wholly-owned subsidiary of BP, is a Delaware corporation with its principal place of business in Houston, Texas. BP America produces oil and natural gas products in the U.S. Throughout the Relevant Period, BP America controlled Defendant BP E&P and that entity's issuance of material information to the public.

12

34.     Defendant BP Exploration & Production, Inc. ("BP E&P" or "BP Exploration"), a wholly-owned subsidiary of BP, is a Delaware corporation with its principal place of business in Houston, Texas.

35.     Defendants BP, BP America and BP E&P are collectively referred to hereinafter as "BP."

**Individual Defendants**

36.     Defendant Anthony B. Hayward ("Hayward") served as the Company's Chief Executive Officer ("CEO") from May 2007 until October 2010, and served as an executive director of the Company from 2003 to November 2010. From 2002 to 2007, Hayward served as the CEO of BP E&P's business segment, which oversaw exploration and drilling in the Gulf, among other places. Defendant Hayward was a member of BP's executive management, and was responsible for the day-to-day running of BP. Starting in 2006, Hayward headed the Group Operations Risk Committee ("GORC"), an executive committee that reviewed the Company's safety protocols, including BP's Operating Management System ("OMS"), and responded to safety incidents in BP's operations. Hayward also was the executive liaison to the Safety and Ethics & Environment Assurance Committee ("SEEAC"), which is BP's Board of Directors' committee responsible for ensuring that BP's safety protocols are implemented and followed, including the implementation of the Baker Panel's recommendations. GORC prepared regular safety reports for SEEAC, including quarterly reports called the Health Safety Environment & Operations Integrity Report, otherwise known as the "Orange Book." During the Relevant Period, Hayward signed certain BP Annual Reports, and made many of the other false and/or misleading statements as alleged herein. Defendant Hayward's conduct as alleged herein is attributable to Defendant BP throughout the Relevant Period and to BP E&P from the outset of

13

the Relevant Period through May 2007. Defendant Hayward directly or indirectly controlled BP, BP E&P, and BP America throughout the Relevant Period.

37.     Defendant Douglas Suttles ("Suttles") served as Chief Operating Officer for BP E&P from January 2009 until at least January 2011. In January 2007, he was named President of BP Exploration (Alaska) Inc. During the Relevant Period, Suttles made false and/or misleading statements as alleged herein. Defendant Suttles's conduct as alleged herein is attributable to Defendants BP and BP E&P throughout the Relevant Period. Defendant Suttles directly or indirectly controlled BP E&P from at least January 2009 through the end of the Relevant Period.

38.     Defendant Andrew G. Inglis ("Inglis") served as the CEO of BP E&P and as an executive director of the Company from February 2007 until October 2010. Beginning in July 2004, Inglis was Executive Vice President and Deputy Chief Executive Officer of BP E&P. Inglis was a member of BP's executive management. As CEO of BP E&P, Inglis attended SEEAC meetings to report on topics specific to BP E&P. Inglis also served as GORC member, provided special reports on BP E&P to the Chairman of GORC (defendant Hayward), and received quarterly Orange Book reports that monitored the progress of OMS implementation across BP. Inglis considered himself at the apex of responsibility during the Relevant Period (with the possible exception of defendant Hayward) for BP E&P's activities worldwide.

Q:     Do you feel any responsibility, sir, at all for what happened on April 20th of 2010?
A:     As the CEO of the exploration and production company, I am responsible for the safe and reliable operations across all of the E&P operations globally.

* * *

Q:     And that, of course, would include Gulf of Mexico, correct?
A:     Again, as I said, I was responsible for the—safety and reliability of—of our operations globally. So that would include the Gulf of Mexico operations.

* * *

14

Q:     All right.   And in terms of safety for drilling and exploration in the Gulf of Mexico and worldwide insofar as safety is concerned, other than perhaps Dr. Hayward, you would have been the highest in line of authority; is that true?

A:     In terms of the—the responsibility for their safe and reliable operations, yes.

Inglis Dep. at 75:24-76:5; 79:18-24; 80:13-22.  Defendant Inglis's conduct as alleged herein is attributable to Defendants BP and BP E&P throughout the Relevant Period.  Defendant Inglis directly or indirectly controlled BP E&P throughout the Relevant Period.

39.     Defendant Robert "Bob" Malone ("Malone") served as Chairman and President of BP America from July 2006 until February 2009, and as an Executive Vice President of BP until March 2009.  Malone served on BP's executive management team, which is responsible for the day-to-day running of BP.  Malone holds a degree in Petroleum Engineering and has worked for BP for 34 years.  During the Relevant Period, Malone made knowing or recklessly false and misleading statements as alleged herein.      Defendant Malone's conduct as alleged herein is attributable to BP throughout the Relevant Period and to BP America from the start of the Relevant Period through February 2009.  Defendant Malone directly or indirectly controlled BP America and BP E&P from the start of the Relevant Period through February 2009.

40.     Defendant David Rainey ("Rainey") is BP America's Vice President of Exploration for the Gulf of Mexico.  Rainey was the person within BP who had "ultimate accountability" for implementing OMS in the Gulf of Mexico and he participated in the Gulf of Mexico gap assessment in 2009 that identified significant risks to BP in the Gulf of Mexico.  Rainey was also a member of BP's executive management.  In the days after the *Deepwater Horizon* disaster, Rainey served on behalf of BP as Deputy Incident Commander at Unified Command, headquartered in Robert, Louisiana, in the Eastern District of Louisiana.  Unified Command consisted of representatives from the U.S. government as well as BP and Transocean Ltd., the designated "responsible parties" for purposes of responding to the spill.  Led by the

15

United States Coast Guard, Unified Command coordinated the oil spill response. Rainey was BP's second highest-ranking representative at Unified Command. Defendant Rainey's conduct as alleged herein is attributable to BP and BP America throughout the Relevant Period. Defendant Rainey directly or indirectly controlled BP America and BP E&P during the Relevant Period.

41.     Defendant H. Lamar McKay ("McKay") has served as Chairman and President of BP America since January 2009. McKay began his career in 1980 at Amoco Production Company. Since 1998, he has worked for BP in various capacities, including as the Head of Strategy and Planning for Worldwide Exploration and Production, the Business Unit Leader for the Central North Sea in Aberdeen, Scotland, and the Chief of Staff for worldwide Exploration and Production. In May 2007, McKay became the Senior Group Vice President of BP and Executive Vice President of BP America, in which capacity he led BP's negotiations on the settlements for both the Texas City refinery disaster and Alaska pipeline oil spills. McKay is a member of BP's executive management. He holds a degree in Petroleum Engineering and is based in Houston, Texas. Defendant McKay's conduct as alleged herein is attributable to BP and BP America throughout the Relevant Period. Defendant McKay directly or indirectly controlled BP America and BP E&P since at least January 2009.

42.     Defendant Robert W. (Bob) Dudley ("Dudley") became Group Chief Executive of BP p.l.c. on October 1, 2010 and has served as an Executive Director on BP's Board of Directors since April 6, 2009. Between June 23, 2010 and September 30, 2010, Dudley served as the President and CEO of BP's Gulf Coast Restoration Organization in the U.S. From April 6, 2009 until June 22, 2010, Dudley was an Executive Vice President and a member of the executive management team with responsibility for the group's activities in the Americas and

Asia. Prior to that, Dudley served a variety of top roles at BP, including from 2003-2008 at President and CEO of TNK-BP, the joint venture between BP and Russian partners. During the facts at issue surrounding the Deepwater Horizon explosion and the Macondo well oil spill, Dudley was BP's Managing Director and one of the top BP officials coordinating BP's spill response. Defendant Dudley's conduct as alleged herein is attributable to Defendant BP throughout the Relevant Period. Defendant Hayward directly or indirectly controlled BP, BP E&P, and BP America since at least April 6, 2009.

43.     Defendants Hayward, Suttles, Inglis, Malone, Rainey, McKay, and Dudley are collectively referred to hereinafter as the "Individual Defendants." The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of BP's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, i.e. the market. Each Individual Defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information, each of the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made regarding BP's operations were then materially false or misleading when made. Each Individual Defendant herein made materially false or misleading statements, or omitted to disclose material facts, to investors in the U.S. and disseminated such material misstatements through the use and means of interstate commerce within the U.S. and caused U.S. investors to purchase BP securities at artificially inflated prices.

44.     The Defendants are collectively referred to as "Defendants."

17

## IV.  NON-PARTIES

45.    Lord Edmund John Philip Browne, Baron Browne of Madingley ("Lord Browne" or "Browne") served as the Company's CEO from 1995 until April 2007, during which time he made repeated false and misleading statements about BP's commitment to improving the safety of its operations, which are attributable to BP.  Lord Browne joined BP as an apprentice in 1966 and held various positions, including Managing Director and CEO of BP E&P.  Lord Browne was a member of BP's executive management.

46.    William Castell ("Castell") joined BP's Board of Directors in 2006 as the chairman of SEEAC.  At each SEEAC meeting, Castell and other SEEAC members were provided a report from GORC, usually presented in person by defendant Hayward, and each quarter SEEAC received the Orange Book.  Additionally, SEEAC was provided with regular reports on the implementation of the Baker Panel's recommendations and reports on the development and implementation of OMS.

## V.   CONFIDENTIAL WITNESSES

47.    As alleged in the Second Consolidated Amended Class Action Complaint for All Purchasers of BP ADS Securities (the "Class Complaint") in No. 4:10-md-02185 (S.D. Tex.), Confidential Witness # 1 ("CW1") is a confidential witness on process safety and risk assessment and management.  Through 2005, CW1 consulted directly with the BP Board of Directors and executive management.  Specifically, CW1 acted as a safety systems and risk assessment consultant for, among other things, deepwater platforms and offshore drilling, including but not limited to the Gulf of Mexico.  Subsequent to the consultation, through the present, CW1 has been apprised of information related to BP's process safety and risk assessment and management in the Gulf of Mexico operations.

48.     As alleged in the Class Complaint, Confidential Witness # 2 ("CW2") is a former BP senior manager and an expert in the offshore oil and gas drilling and completions.  CW2 possessed information related directly to BP's Gulf of Mexico deepwater exploration, including but not limited to process safety implementation.  Prior to separating from BP in 2009, CW2 reported directly to senior BP executives and indirectly to defendant Inglis.

49.     As alleged in the Class Complaint, Confidential Witness #3 ("CW3") is an oil industry operational safety expert and former consultant to the BP Board of Directors.  CW3 presented information and analyses directly to non-party Lord Browne and Defendant Hayward on issues, including but not limited to implementation of process safety and risk management practices.

## VI.     BP PURPORTEDLY TOOK EXTENSIVE MEASURES TO RECTIFY ITS OPERATIONAL HISTORY RIFE WITH SAFETY VIOLATIONS

### A.     BP's Relevant Operations

50.     BP is a global oil and gas company and is the third-largest energy company in the world. BP is active in every area of the oil and gas industry, including drilling exploration and production, refining, distribution and marketing, petrochemicals, power generation and trading. With operations in over 80 countries, BP produces around 3.8 million barrels of oil equivalent per day. Its largest division is BP America, which is the biggest producer of oil and gas in the U.S.

51.     BP's exploration and production segment, BP E&P, includes oil and natural gas exploration, field development and production, and marketing and trading of natural gas. It has exploration and production activities in Angola, Azerbaijan, Canada, Egypt, Libya, the Russian Federation, Trinidad and Tobago, Norway, the United Kingdom, and the U.S. (including the

Gulf of Mexico), as well as in the Asia Pacific, Latin America, North Africa, and the Middle East.

52.    Throughout the Relevant Period, BP touted its Exploration and Production business and, more specifically, its operations in the deepwater Gulf of Mexico, a region BP hailed as a "profit centre" and a "high margin" production area. BP described the Gulf of Mexico as "an important source of domestic energy, and offshore deepwater developments" and told investors that oil from that region accounted for one-sixth of all oil produced in the U.S.

53.    Specifically, in the 2008 Annual Report filed on Form 20-F on March 4, 2009, BP highlighted the safety and success of its operations in the Gulf of Mexico, emphasizing the fact that it was one of the largest deepwater operators in the world.  At the same time, BP failed to disclose that it had not implemented safety measures for its Gulf of Mexico operations, and BP also failed to disclose that it had disregarded safety warnings about its operations and that it lacked robust risk management processes that left the Company dangerously exposed to a catastrophic accident.

**B.    BP Is No Stranger to Catastrophic Industrial Incidents**

54.    BP is no stranger to catastrophic industrial incidents, including incidents related to its off shore drilling operations.

*BP's Flawed Process Safety Controls Cause Grangemouth Incidents*

55.    Between May 29 and June 10, 2000, BP's Grangemouth storage and refining complex in Scotland experienced three major incidents.  These included a power failure leading to the emergency shutdown of the oil refinery; the rupture of a key steam pipe; and a fire in the refinery's catalytic cracker unit, which produces gasoline. The UK Health and Safety Executive "HSE" investigated the incidents and issued a report in 2003 finding in all three incidents "weaknesses in [BP's] safety management systems on-site over a period of time."  BP carried out

20

an internal investigation, which concurred in many of the UK HSE's findings. BP later pled guilty to criminal charges stemming from the incidents and paid over £1 million in fines.

### Unsafe Deepwater Drilling Operations

56. In 2002, the *Ocean King,* a drilling rig under BP's operational control in the Gulf of Mexico, experienced two separate blowout incidents within a three-month span, raising questions about BP's process safety and well design procedures and practices.

57. The first incident occurred in August 2002, when the *Ocean King* suffered a gas blowout while drilling a well in the Gulf of Mexico's Grand Isle block near Louisiana. The crew's efforts to contain the well failed, and they soon evacuated the rig because of the high level of airborne gas. The flow of gas and other material exploded, causing a fire on the rig and $2 million in damage.

58. During its investigation of BP's safety practices, the U.S. Department of the Interior's Minerals Management Services ("MMS") discovered that BP had inexplicably installed a non-compliant blowout diverter system, which contributed to the explosion and fire, rather than the one specifically designed and approved for the rig. MMS also found that the fire's effects were intensified because BP personnel had stored pressurized containers of flammable gas too close to the diverter output. Worse still, the investigation revealed that BP engineers, because of a nearby well drilling project, knew that there was a shallow gas pocket at 2,700 feet beneath the sea floor surface, the precise depth which the rig had reached when the well blew out. The incident was both caused by and revealed a host of systemic safety issues involving BP's failures to build and execute wells as designed, ensure the proper design of the drill rig, and keep accurate up-to-date designs of their equipment.

59. Just three months later, in November 2002, after the *Ocean King* had undergone major repairs and returned to the Grand Isle block, a second incident occurred, similar to the

first. After cementing the steel casing in another newly drilled well hole, mud and gas began to flow onto the rig, indicating a failed cementing job. After an unsuccessful effort to contain the well, the crew evacuated. The MMS issued a harsh critique of the second incident, noting the flawed attempt to bring the well under control, and serious deficiencies in BP's safety protocols and knowledge of equipment.

60.    The two incidents in 2002 resulted in MMS issuing a special "Safety Alert" to all drilling companies in the Gulf of Mexico regarding the serious risk of a blowout in the event of a failed cementing job. The Safety Alert specifically mentioned MMS's findings about BP during the *Ocean King* incident, cautioning others in the industry about "erroneous chain of decisions, inadequate training of personnel or knowledge of the diverter system, and inadequate planning."

61.    In May 2003, BP suffered a near blowout not far from the Macondo well. In that incident, the Transocean *Discoverer Enterprise,* on contract with BP, drifted off its drill site just as a well was being completed, breaking the riser pipe linking the rig to the ocean floor. The breaking of the riser was strikingly similar to what occurred on the *Deepwater Horizon* after it exploded. Fortunately for BP, the backup "deadman" switch on the rig's blowout preventer ("BOP") worked: the BOP's rams closed, preventing the flow of oil or gas into the Gulf of Mexico from the damaged riser. A subsequent inspection, however, showed that pieces of broken riser pipe were leaning up against the BOP, close to its control lines, and that the BOP itself was partially damaged – demonstrating that the "fail safe" BOP device, regardless of its immediate effectiveness, was subsequently vulnerable to damage or incapacitation by a falling riser pipe – an outcome which in fact occurred during the *Deepwater Horizon* incident.

62.    In August 2004, BP experienced a blowout in the Nile delta, off the coast of Egypt, when the *GSF Adriatic IV,* a gas drilling rig leased from Global Santa Fe (which, in 2007,

merged with Transocean) exploded while completing a well for a joint consortium, which included BP. The fire raged for over a week before the well was brought under control. Analysts later said that Egypt's natural gas production was reduced by 10-15 percent because of the incident. As with the *Deepwater Horizon* incident, the blowout occurred after a final cementing job failed.

### BP's Thunder Horse PDQ Operated With Pipeline Cracks That Could Have Been Catastrophic

63. In July 2005, BP's massive and newly-deployed production and drilling rig in the Gulf of Mexico, *Thunder Horse PDQ* ("Thunder Horse"), was evacuated for a passing hurricane and almost capsized after a key internal valve, which had been installed backwards, allowed ballast water to accumulate in one section of the rig, causing a dangerous tilt. When the rig was later put in dry-dock for repairs, cracks were discovered in the underwater pipelines beneath the rig. A senior engineering consultant who worked on the Thunder Horse project later told *The New York Times* that the pipeline cracks: "could have been catastrophic." He continued by noting that: "You would have lost a lot of oil a mile down before you would have even known. It could have been a helluva spill – much like the *Deepwater Horizon*." The Thunder Horse repairs took three years to complete.

### Safety Lapses Cause an Explosion at BP's Texas Refinery

64. On March 23, 2005, an explosion occurred at BP's Texas City refinery. Fifteen people were killed and approximately 170 were injured. The U.S. Environmental Protection Agency's ("EPA") criminal investigative division launched a criminal investigation, as did the U.S. Occupational Safety and Health Administration ("OSHA"), EPA civil inspectors, the CSB, and the Texas Environmental Quality Commission ("TCEQ").

65. The next day, Lord Browne flew to Texas City and held a press conference at which he acknowledged the gravity of the incident, saying, "Yesterday was a dark day in BP's history. It is the worst tragedy I have known during my 38 years with the company." While asserting that BP believed that the Texas City explosion was unrelated to previous incidents, he pledged to "leave nothing undone in our effort to determine the cause of the tragedy" and to carry out any reforms necessary.

66. In April 2005, OSHA placed BP under its Enhanced Enforcement Program for employers who are "indifferent to their obligations under the OSHA Act." EPA civil inspectors entered into a settlement with BP, laying out a timeline and plan to bring the refinery's operations into compliance with EPA regulations. TCEQ reached a similar agreement with BP in mid-2006.

67. On April 15, 2005, Lord Browne referred to Texas City as "the saddest and most moving day of my entire career at BP." Later, in May 2005, he told the Houston Chronicle, "BP takes responsibility for what happens at its sites. We want BP to be a safe place to work. So as well as mourning for those we have lost, we are determined to learn from this tragedy and improve our safety record."

68. In mid-2005, the CSB recommended that BP appoint an independent commission to investigate the Company's internal safety culture and uncover the causes of the incident as well as to investigate other general concerns with BP's safety environment. Lord Browne issued a statement saying that BP would comply with the recommendation. He added, "The Texas City explosion was the worst tragedy in the recent history of BP, and we will do everything possible to ensure nothing like it happens again. Today's recommendation from the CSB is a welcome development, and we take it seriously."

69.     In response to the CSB's recommendation, in October 2005, BP announced the formation of the "U.S. Refineries Independent Safety Review Panel," chaired by former Secretary of State James Baker. Lord Browne said in a prepared statement, "The panel will have BP's full support and cooperation. We are determined to do everything possible to prevent a tragedy like this from ever happening again by ensuring that safety practices at our operations are effective and comprehensive." The Baker Panel began conducting investigations in October 2005 and issued its final report on January 16, 2007.

70.     While the Baker Panel's work was underway, on October 24, 2006, Lord Browne stated, "The fire and explosion at Texas City have forever heightened our awareness of safety."

71.     In March 2007, CSB completed its investigation of the Texas City incident and issued its report on March 22, 2007. The report flagged weaknesses in BP's safety culture. It criticized BP's management for its lack of "focus on controlling major hazard risk," finding that managers provided "ineffective corporate leadership and oversight." CSB's report also identified the Company's failures to heed warning signs and internal concerns raised by its own staff, writing that BP's managers "provided ineffective leadership and oversight" and "did not implement adequate safety oversight, provide needed human and economic resources, or consistently model adherence to safety rules and procedures." The CSB found a direct correlation between the blast and BP's cuts in safety and staffing budgets, concluding: BP "did not effectively evaluate the safety implications of major organizational, personnel, and policy changes." Finally, the CSB report criticized BP for failing to learn from its earlier, similar mistakes.

### *Widespread Corrosion Causes Leaks in BP's Alaskan Pipeline Operations in Prudhoe Bay*

72.     In early 2006, an oil spill of 210,000 to 260,000 gallons occurred on BP's Prudhoe Bay pipelines on Alaska's North Slope, facing the Arctic Sea. The pipeline had been

leaking for weeks and was first discovered on March 2, 2006. Joint federal and state investigations, encompassing both criminal and civil matters, began in March 2006. The investigations ultimately addressed not only the March 2006 leak, but also addressed weaknesses in other parts of the pipeline, and a subsequent leak that occurred on another part of the pipeline in August 2006.

73.     On July 25, 2006, Lord Browne told analysts and investors that Texas City and the oil spill in Alaska had caused "great shock within BP." He took personal responsibility, stating, "These are things I want to apologize for. These caused a lot of stress and distress to people, and to some families irreparable damage." He stated, "First and foremost, we are committed to safety, integrity and the environment. We're redoubling our efforts in this sphere, notably in North America." He added that BP did not want to wait for the outcome of governmental investigations before acting, and that it would devote another $1 billion, in addition to $6 billion already committed over four years, to upgrade safety at BP's U.S. refineries and to replace infield pipelines in Alaska. As regards Texas City and the Alaskan pipeline spill, he said, "We have to get the priorities right, and Job 1 is to get these things that have happened, get them fixed and get them sorted out. We don't just sort them out on the surface, we get them fixed deeply." He also underscored the importance of BP's having safe operations in the U.S., stating, "BP has some 40 percent of its assets and its staff in the United States... We are the largest indigenous producer of oil and gas combined. It is of vital importance to BP and to Americans who depend significantly on us for secure energy supplies that our U.S. businesses operate to the highest standards of safety and integrity."

74.     An EPA criminal investigation concluded that widespread corrosion in the pipelines had led to the March and August leaks (and other points of corrosion uncovered in the

investigation) and that BP could have prevented the leaks by maintaining and inspecting its pipelines. It further concluded that the duration of the spill revealed BP's criminal neglect of the pipeline.

75.     In 2007, BP pled guilty to a criminal charge in connection with the March 2006 spill, admitting that BP's "criminal negligence" caused the corrosion – and thus the spill itself. BP was sentenced to three years of probation and fined 22 million dollars.

76.     The 2006 spill was BP's second criminal plea in the U.S. in a decade: in the late 1990s BP had been indicted because its engineers were injecting dangerous materials into a well casing to dispose of the materials. In response, BP had pled guilty in 2000, had been put on five years of probation, and had entered into a compliance agreement with the EPA's debarment division.

77.     In March 2007, the Company received warnings about the deficiencies in its safety-related corporate governance from the consulting firm Booz Allen Hamilton ("Booz Allen"). In the wake of the 2006 spill on its Prudhoe Bay pipeline, BP retained Booz Allen to "identify potential organizational, process, and governance issues" that related or contributed to the incident. The Booz Allen report found that BP's executive management and Board of Directors had created a culture focused on cost-cutting and ensuring that budget targets were met, while ignoring safety issues and critical maintenance. Among other findings, Booz Allen found major shortcomings in the Company's internal communications culture noting, in particular, that "critical risk data" and concerns about major risks were not properly communicated within BP. More specifically, the report noted that "[r]isk-related vertical and horizontal communications do not elevate critical risk data to senior leadership." Booz Allen effectively put Defendants on notice that they could not rely on the Company's internal reporting

mechanisms to receive "critical risk data" and thus understand the risk of catastrophic operating failure.

78.     In May 2007, the CSB chairman, Carolyn Merritt, testified before Congress about similarities between the Booz Allen report on Alaska and the CSB's report on Texas City, noting that "[v]irtually all of the seven root causes identified for the Prudhoe Bay incidents have strong echoes in Texas City," and identified "common findings" that included "flawed communication of lessons learned, excessive decentralization of safety functions and high management turnover. BP focused on personal safety statistics but allowed catastrophic process safety risks to grow."

### BP Purports to Adopt the Baker Panel Recommendations

79.     In 2005, at the CSB's urging, BP established its own independent panel to review and improve its safety procedures, chaired by former U.S. Secretary of State James Baker, III (the "Baker Panel"). After completing its investigation, the Baker Panel issued a report on January 16, 2007 (the "Baker Report"), finding, in the words of the Presidential Commission, that "*BP management had not distinguished between occupational safety – concern over slips, sprains, and other workplace accidents – and process safety: hazard analysis, design for safety, material verification, equipment maintenance, and process-changing reporting*. And the [Baker P]anel further concluded that BP was not investing leadership and other resources in managing the highest risks." More specifically, the Baker Panel found that: "*from the top of the company, starting with the Board and going down . . . BP has not provided effective process safety leadership and has not adequately established process safety as a core value*." Indeed, even then-BP CEO Lord John Browne admitted that BP had failed to adequately address process safety issues prior to the Texas City disaster and that it was those failures that led to the explosion. For example, Lord Browne stated, in part, that:

28

We had emphasized that individuals had to be safe as they went about their daily work – "personal safety." That led to dramatic improvements. *But we had not emphasized that processes and equipment had to be safe under all circumstances and operated in a safe way at all times – "process safety."*

80.     The Baker Panel singled out organizational problems as the root cause of BP's continued failure to learn from, and respond to, major incidents, finding "a lack of operating discipline, toleration of serious deviations from safe operating practices, and apparent complacency toward serious process-safety risks."

81.     On January 16, 2007, the Baker Panel released its Report which contained 10 recommendations "*to help bring about, sustainable improvements in process safety performance.*"

RECOMMENDATION #1 – PROCESS SAFETY LEADERSHIP – The Board of Directors of BP p.l.c., BP's executive management (including its Group Chief Executive), and other members of BP's corporate management must provide effective leadership on and establish appropriate goals for process safety. Those individuals must demonstrate their commitment to process safety by articulating a clear message on the importance of process safety and matching that message both with the policies they adopt and the actions they take.

RECOMMENDATION #2 – INTEGRATED AND COMPREHENSIVE PROCESS SAFETY MANAGEMENT SYSTEM – BP should establish and implement an integrated and comprehensive process safety management system that systematically and continuously identifies, reduces, and manages process safety risks at its U.S. refineries.

RECOMMENDATION #3 – PROCESS SAFETY KNOWLEDGE AND EXPERTISE – BP should develop and implement a system to ensure that its executive management, its refining line management above the refinery level, and all U.S. refining personnel, including managers, supervisors, workers, and contractors, possess an appropriate level of process safety knowledge and expertise.

RECOMMENDATION #4 – PROCESS SAFETY CULTURE – BP should involve the relevant stakeholders to develop a positive, trusting, and open process safety culture within each U.S. refinery.

RECOMMENDATION #5 – CLEARLY DEFINED EXPECTATIONS AND ACCOUNTABILITY FOR PROCESS SAFETY – BP should clearly define expectations and strengthen accountability for process safety performance at all

levels in executive management and in the refining managerial and supervisory reporting line.

RECOMMENDATION #6 – SUPPORT FOR LINE MANAGEMENT – BP should provide more effective and better coordinated process safety support for the U.S. refining line organization.

RECOMMENDATION #7 – LEADING AND LAGGING PERFORMANCE INDICATORS FOR PROCESS SAFETY – BP should develop, implement, maintain, and periodically update an integrated set of leading and lagging performance indicators for more effectively monitoring the process safety performance of the U.S. refineries by BP's refining line management, executive management (including the Group Chief Executive), and Board of Directors. In addition, BP should work with the U.S. Chemical Safety and Hazard Investigation Board and with industry, labor organizations, other governmental agencies, and other organizations to develop a consensus set of leading and lagging indicators for process safety performance for use in the refining and chemical processing industries.

RECOMMENDATION #8 – PROCESS SAFETY AUDITING – BP should establish and implement an effective system to audit process safety performance at its U.S. refineries.

RECOMMENDATION #9 – BOARD MONITORING – BP's Board should monitor the implementation of the recommendations of the Panel . . . and the ongoing process safety performance of BP's U.S. refineries. The Board should, for a period of at least five calendar years, engage an independent monitor to report annually to the Board on BP's progress in implementing the Panel's recommendations . . . . The Board should also report publicly on the progress of such implementation and on BP's ongoing process safety performance.

RECOMMENDATION #10 – INDUSTRY LEADER – BP should use the lessons learned from the Texas City tragedy and from the Panel's report to transform the company into a recognized industry leader in process safety management. The Panel believes that these recommendations . . . can help bring about sustainable improvements in process safety performance at all BP U.S. refineries.

82.    Following the release of the Baker Panel recommendations, BP consistently stated

that it would implement the mandates across all lines of its business. In a January 16, 2007 press

conference responding to the findings of the Baker Report, Lord Browne announced:

If I had to say one thing which I hope you will all hear today it is this 'BP gets it.' And I get it too. This happened on my watch and, as Chief Executive, I have a responsibility to learn from what has occurred. *I recognise the need for improvement and that my successor, Tony Hayward, and I need to take a lead*

*in putting that right by championing process safety as a foundation of BP's operations.*

\*\*\*

The list of what we have done since the accident *shows how seriously we take process safety.*

83.     Yet the truth, as described herein, is not only that BP did not "get it," but that Defendants knew of or recklessly disregarded their continued failure to implement the process safety programs and procedures either as promised or necessary to avoid the recurrence of similarly preventable deep sea drilling incidents. The occurrence of the worst industrial incident in history, along with the Presidential Commission's finding that BP has not met "it's professed commitment to safety" belied BP ' s public representations concerning its professed commitment to ensuring the safety of its deep sea drilling operations.

### BP Creates the Group Operations Risk Committee and the Safety, Ethics and Environment Assurance Committee to Implement and Monitor Process Safety Systems

84.     As part of the Company's professed commitment to process safety, BP told investors that OMS was designed to address the Baker Panel's recommendation to establish and implement an integrated and comprehensive system that would systematically identify, reduce and manage process safety risks. In connection with this public mandate, BP set up a committee called GORC – Group Operations Risk Committee – tasked with oversight and implementation of OMS, among other responsibilities. GORC met monthly and included sectional CEOs, with Defendant Hayward as Committee Chair. GORC's role was to educate Defendant Hayward, the CEOs, and to insure that operational risks were identified and properly managed. ▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮

31

85.     Defendants Hayward and Inglis both testified that they were knowledgeable about

the scope and implementation of OMS through their participation in GORC.  Defendant Inglis

testified:

A.      The group operations – Group Operations Risk Committee was set up by –
        by Tony Hayward to monitor our safety and integrity performance. It was
        there to act as a vehicle for continuing to improve our performance. That
        was through OMS. So part of it was to actually look at how OMS was
        being implemented. It connected into the OMS audit function, so that
        reported in to GORC.

Inglis Dep. at 279:21-280:4.

86.     Similarly, as the CEO of BP and Chairman of GORC, Hayward was responsible

for overseeing OMS development and implementation, which gave him detailed knowledge in

these areas:

Q.      And you are very familiar with process safety because of your position as
        Chair of the Group Operating Risk Committee, aren't you?

A.      I am.

                                    ***

Q.      And one of the responsibilities you had . . . as Chair of [GORC] . . . tell
        me whether I read this correctly, quote, "Oversight of development and
        implementation of BP's Operating Management System . . ."

A.      That's correct.

Hayward Dep. at 149:10-13; 163:14-21.

87.     Defendants Hayward, Inglis, and other members of GORC received regular status

updates concerning the scope and implementation of OMS via the "Orange Book."  As described

by Defendant Inglis, the purpose of the Orange Book was to provide members of GORC with

key performance indicators concerning implementation of OMS:

Q.      What was the purpose of the Orange Book?

A. The Orange Book actually started in the upstream [synonymous with "Exploration & Production"]. It was sort of under my leadership, and then it got introduced as something that would apply across the whole of the – of the group, but, in essence, it was to provide a – a performance monitoring in – performance monitoring information around safety and operational integrity. So it had in it key performance indicators, indicators of progress on various initiatives, whether they be the six-point plan, the implementation of OMS. So it was a – a compendium of all the information that you could use to assess progress on our safety and operation integrity agenda.

Inglis Dep. at 286:24-287:15.

88.     Inglis testified that he monitored the implementation of OMS through the Orange Book: "There was then a very rigorous process for [OMS'] implementation, as I've described to you. I monitored the implementation of that through the – the Orange Book and the three stages of [g]ap assessment, prioritization, and MOC [Management of Change]." Inglis Dep. at 379:11-16.

89.     Defendant Hayward further admitted that the Orange Book provided a clear indication of what areas of BP's operations had or had not implemented OMS:

Q. And what other areas would not have had OMS fully implemented until the end of 2010, other than the Gulf of Mexico?

A. I can't remember the list, but, you know, we have a list that's in many of these reports, that – that document – if you refer to the thing called the Orange Book, it's very clear which areas are complete, which areas are in – in transition.

Hayward Dep. at 791:7-11.

### *SEEA C Closely Monitored BP's Safety Performance In eluding OMS Implementation*

90.     BP's Safety, Ethics and Environment Assurance Committee ("SEEAC") was a board-level committee. SEEAC was created to ensure that company publications concerning environmental, safety, and ethical matters were accurate. It purportedly carried out that purpose by obtaining reports from Defendant Hayward, a Special Liaison to SEEAC, who regularly

reported to SEEAC concerning issues within the purview of GORC, including the status of OMS implementation. SEEAC also independently monitored progress in BP's process safety efforts. Defendant Inglis also reported to SEEAC, from time to time, concerning matters relating to his Exploration and Production unit. SEEAC met regularly (more than quarterly) – eight times in 2008, seven times in 2009, and nine times in 2010 – and was continuously updated with respect to BP's implementation of OMS. Indeed, Hayward attended each of these meetings up until the time of the blowout.

91.     William Castell, the chairman of SEEAC, testified that "the duties and obligations [of SEEAC] are set out in [BP's] Annual Report." BP's 2008 Annual Report, published on March 4, 2009, defined SEEAC responsibilities as including: "[r]eviewing material to be placed before shareholders that addresses environmental, safety and ethical performance and make [*sic*] recommendations to the Board about their adoption and publication." It defined "the main tasks and requirements for SEEAC" to include "monitoring and obtaining assurance that the management or mitigation of material non-financial risks [was] appropriately addressed by the group chief executive." Castell testified that non-financial risks include safety-related risks.

92.     The 2008 Annual Report also discussed the types of information received by SEEAC: "[SEEAC] receives information on agenda items from both internal and external sources, including internal audit, the safety and operations function, the group compliance and ethics function, and Ernst & Young. Like other board committees, SEEAC can access independent advice and counsel if it requires, on an unrestricted basis."

93.     Moreover, Castell testified that SEEAC members received the Orange Book on a quarterly basis, and that it contained detailed data concerning BP's safety performance:

Q.     Now, the Reports you get, that's the Orange Book; is that right?

A.     We receive an Orange Book on a quarterly basis, sir.

34

Q.     Yes. And tell us what that is. What is the Orange Book?

A.     The Orange Book is a compilation of Operations and Risk data which is – which is received by the Group Operations Risk Committee, which is the mechanisms of formal reporting to the GORC Committee as to the level of safety achieved, the lead and lag factors, the major incidents reported. These are all consolidated. So on a quarterly basis, there is a consolidated document that refers to the last quarter's performance.

***

Q.     Is it metrics?

A.     It's metrics, and it's – well, it goes beyond metrics, sir. There are Reports that highlight where there have been major incidents. There are verbal Reports from Upstream and Downstream, and there are Reports on Audit, so not always metrics. There are also, you know, comments on audits, audit closeouts, et cetera.

***

Q.     I'm trying to understand at what level the seriousness of an incident would come to your Committee, the SEEAC Committee. How – how bad does it have to be before your Committee finds out about it?

***

A.     I think you've seen from the data, sir, that we have the data that comes to us. When you say, "How bad does it have to be," the – the data in the Orange Book goes down to lost days of work. So if they lost days at work, we can see it.

Castell Dep. at 377:23-378:12, 378:15-22, 380:22-381:1, 381:4-8.

94.     ███████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

***BP Launches OMS to Purportedly Implement the Baker Panel's Recommendations, but Exempts OMS's Application from Rigs that BP Did Not Fully-Own***

95.     In 2007, BP introduced OMS at 12 representative pilot sites and by early 2008 BP purportedly sought to implement OMS company-wide. OMS was supposedly the cornerstone of BP's efforts at improving its process safety protocols and preventing major accidents in the wake of the Texas City disaster. According to Ellis Armstrong, CFO of BP Exploration and Fed. R. Civ. P. 30(b)(6) witness in the MDL 2179 action, BP's executive management made the determination to extend the Baker Panel process safety recommendations across the entire panoply of the BP Group, including Exploration and Production in the Gulf of Mexico, rather than limiting implementation to its refineries. Armstrong Dep. at 57:1-13. Defendant Hayward repeatedly and publicly referred to OMS as the means by which BP would improve its process safety performance.

96.     BP's 2006 Sustainability Report, made publicly available on May 9, 2007, represented that "OMS is a comprehensive system that covers *all aspects* of our operations . . . ." The Report further represented that "[t]he new OMS will apply to *all operations*" and BP stated in its 2007 Annual Review that "OMS is the foundation for a safe, effective, and high-performing BP."

97.     On September 25, 2007, Defendant Inglis spoke at the Sanford Bernstein 4th Annual Strategic Decisions Conference and misleadingly stated: "One aspect of our focus on safe and reliable operations that I mentioned earlier is our new standardised Operating Management System (OMS). This will provide a blueprint for safety and *all aspects of operations* throughout BP."

98.     On May 20, 2008, BP released its 2007 Sustainability Report. In the "Group chief executive's introduction" to that report, Defendant Hayward noted that BP was "still learning lessons from" Texas City and had "agreed to implement all [the Baker Panel's] recommendations and we are now working to do so." Describing BP's efforts in that regard, Hayward stated, "[w]e are also now introducing our new operating management system (OMS), designed to bring greater consistency to our operations. My executive team continues to monitor closely our safety performance." In that regard, the 2007 Sustainability Report further noted that the Hayward-led GORC met 14 times in 2007.

99.     On February 24, 2009, BP released its 2008 Annual Review. In the section titled, the "Group Chief Executive's Review," Defendant Hayward noted that "[t]he BP operating management system (OMS) turns the principle of safe and reliable operations into reality by governing how *every BP project, site, operation, and facility is managed."* Similarly, on March 4, 2009, BP released its 2008 Annual Report filed on Form 20-F, which was signed by Defendant Hayward. According to the 2008 20-F, OMS was a *"framework for operations across BP* that is integral to improving safety and operating performance in *every site."*

100.     Contrary to Defendants' representations, however, and as admitted by BP, OMS did not apply to BP's operations on rigs unless the rig was fully-owned by BP. This included six out of seven wells in the Gulf of Mexico during early 2010, among them the Transocean-owned

*Deepwater Horizon. See* MTD Hr'g Tr. (Dkt. No. 304), No. 4:10-md-02185 (S.D. Tex.) at 66:6-68:20.

101. Indeed, BP never intended for OMS to apply to the entirety of BP's operations and OMS was specifically not applicable to drilling rigs that BP did not fully-own. Massive portions of BP's riskiest and potentially most profitable exploration and production projects were largely exempt from OMS because the well sites were physically drilled by contracted drilling rigs. Indeed, BP used contracted rigs to drill the majority of wells in the deepwater Gulf of Mexico. Armstrong Dep. at 247:18-248:4. This practice and the intent to exclude contracted drilling rigs from OMS coverage meant that OMS did not apply to the vast majority of BP's deepwater drilling operations in the Gulf of Mexico, including the Transocean-owned *Deepwater Horizon.*

102. The deposition testimony of several key BP personnel in the MDL 2179 action confirms this reality. John Mogford ("Mogford"), BP's former Global Head of Safety & Operations and a GORC member testified that "OMS was designed for BP owned and operated institutions, so the focus was on BP production facilities where BP had people . . . according to the guidance for where it was to be applied, on – OMS was not designed to be implemented on contractor sites or vessels." Mogford Dep. at 150:13-19. According to Mogford, this key limitation of the OMS was known to GORC, including Defendants Hayward and Inglis, because the "OMS document, it was approved, and the scope was approved . . . at the GORC." *Id.* at 461:18-19. Mogford testified that GORC held "a discussion that the scope was that [OMS] applied to BP owned and operated and controlled sites." *Id.* at 461:23-25.

103. Likewise, in his deposition in MDL 2179, Defendant Hayward testified that BP's

OMS and safety systems did not apply to third-party contractors in the Gulf of Mexico, including

the *Deepwater Horizon:*

> Q. And, again, the effective well control system, is that something that is both part [Transocean]'s and part BP's?
>
> A. Yes, *very largely Transocean, because it is a Transocean Drilling Team that implement the well control procedures. There's no one from BP involved in implementing well control procedures.* So what we have to do is determine that the well control procedures that Transocean has and that are documented as their well control procedures are appropriate, and, of course, that they're . . . followed.
>
> Q. Okay. But if there are well control procedures and process procedures in place in the gulf of Mexico, BP procedures, those are applicable as well as the [Transocean] procedures?
>
> A. Well, I don't want to be pedantic, *but BP doesn't have well control procedures to manage a well that is beginning to flow, because we're not actually drilling any of the wells that our contractors are.* So what we want to verify is that those procedures are in place, and they're deemed to be appropriate, and people have been trained such that they know them, and when a situation occurs, that they implement and follow them to control the well.

Hayward Dep. at 668:7-669:5.

104. John Baxter, Group Head of Engineering for BP and member of GORC, testified

that OMS did not apply to the *Deepwater Horizon,* and that as a result numerous safety and risk

management procedures instituted in direct response to the Baker Panel recommendations were

not applicable to the majority of BP's drilling fleet in the Gulf of Mexico, including the

*Deepwater Horizon.* Baxter Dep. at 175:14-15. For example, BP did not apply its Integrity

Management, Major Accident Risk ("MAR") analysis, Safety & Operations Audits, or Control

of Work to the majority of its drilling rig fleet, including the *Deepwater Horizon,* because OMS

was limited to rigs that were fully owned by BP. *Id.* at 175:11-12; 186:24-187:8; 191:20-192:23;

2 10:3-10. This was confirmed by Pat O'Bryan, Vice President of Drilling & Completions, who

testified that "[t]he only drilling rig that we had in our fleet [in the Gulf of Mexico] that would fall under the BP OMS is the BP-owned rig the PDQ on Thunderhorse." O'Bryan Dep. at 413:6-9.

105. Several BP employees familiar with BP's drilling and completions in the Gulf of Mexico revealed that upstream operations – *i.e.* drilling rigs, including the *Deepwater Horizon* – did not receive information on OMS. For instance, John Guide, Wells Team Leader for the *Deepwater Horizon,* testified that he had no formalized training on OMS until January 2011. Guide Dep. at 433:5-8. Ronnie Sepulvado, Well Site Leader on the *Deepwater Horizon* since 2003, stated that he didn't know what the Gulf of Mexico local OMS was, that he had only "heard" of process safety, and he was completely unfamiliar with 13 policies that were ostensibly part of the Gulf of Mexico Local OMS. Sepulvado Dep. at 357:16-20, 391:6-394:10. Additionally, Cheryl Grounds, Chief Engineer of Process and Process Safety, stated that "[m]y understanding is it was frequently stated in the company is [*sic]* that drilling managed their own work. And we had a lot of work to do in process safety elsewhere, so that was prioritized. So I focused on producing assets and major capital projects[.]" Grounds Dep. at 88:18-24. These statements confirm that the scope of OMS was never intended to apply to some of BP's most critical projects involving drilling rigs that were not fully-owned by BP.

### *Defendant Hayward Knew That Drilling in the Gulf of Mexico Itself Was Highly Risky and That a Deepwater Blowout Was the Highest Risk Facing BP in the Gulf of Mexico*

106. Defendant Hayward stated that BP's cornerstone process safety program (OMS) in the Gulf of Mexico, would apply "across all of BP's operations," that BP had "completed the transition to OMS in" the Gulf of Mexico and that OMS "turns the principle of safe and reliable operations into reality by governing how every BP project, site, operation and facility is managed." These and other similar statements were, at a minimum, severely reckless,

considering his knowledge that a deepwater blowout was the highest risk facing BP in the Gulf of Mexico. Not only did Defendant Hayward know that his misrepresentations concerning OMS implementation were false, but he also knew that those misrepresentations concerned the highest risk that BP faced in the Gulf of Mexico, and one of the highest risks facing the company. As Hayward testified in his deposition in the MDL 2179 Action:

> Q. Well, what you did know, though, was that DEEP WATER blowout was the highest risk across the entire corporation and that it was the highest risk for your Exploration and Production Unit, wasn't it?

> A. It was certainly one of the highest risks for the corporation. It was the highest risk in the Gulf of Mexico and one of the highest risks for the Ex – for the Exploration and Production Unit.

Hayward Dep. at 196:10-18.

### *Contrary To Defendants' Assertions, the Gulf of Mexico Had Not Completed The Transition to OMS At The Time Of The Deepwater Horizon Disaster*

107. BP's 2008 and 2009 Annual Reports on Form 20-F included Defendants' representations that OMS was in place at BP's exploration and production projects in the Gulf of Mexico. BP stated unequivocally that, "[e]ight sites completed the transition to OMS in 2008," including "the Gulf of Mexico." In reality, however, as BP conceded at oral argument, this statement was false when made. MTD Hr'g Tr. (Dkt. 304), No. 4:10-md-02185 (S.D. Tex.) at 58: 15-2 1 ("The statement here that the Gulf of Mexico completed the transition to OMS in 2008, that that is a statement of specific fact . . . that the plaintiffs have alleged and that I will admit to the Court is not accurate").

108. During the Relevant Period, BP and Defendants presented specific information about OMS, including the number of sites in which the program was supposedly implemented, specific sites where it was supposedly already implemented, and statistical percentages demonstrating that the Company was supposedly on track with implementation. BP presented

41

this hard data on OMS implementation – and the benefits that OMS had allegedly already begun to achieve – alongside the Company's expectations for continued success in its Gulf of Mexico operations.  However, the transition to OMS in the Gulf of Mexico was not complete in 2008 and was not even complete at the time of the *Deepwater Horizon* disaster.

109.    As Defendant Hayward testified at his deposition in the MDL 2179 action, he knew that OMS was not fully implemented in the Gulf of Mexico as of April 2010:

> Q.    Go back to an old familiar subject, the OMS. Did you know in April of 2010, that the OMS had not been fully implemented in the Gulf of Mexico?
>
> A.    I – yeah. I believe I was aware that it had not been fully implemented. It was in the process of being implemented as it was in other parts of BP.
>
> Q.    But specifically with respect to the Gulf of Mexico, that's your answer?
>
> A.    Yes.
>
> Q.    Okay. When did you come to learn that?
>
> A.    I would have been aware of it prior to the – you know, in the course of doing my – my job.
>
> Q.    Okay.
>
> A.    Because we had a – as I've explained a number of times through this deposition, the Group Operations Risk Committee was looking at the progress of implementation.
>
> Q.    So you were getting reports as to where it was implemented, where it was not yet implemented?
>
> A.    And where it – where it was entrained, so to speak.

Hayward Dep. at 662:25-663:20.

110.    Hayward further testified that BP did not even begin to implement OMS in the Gulf of Mexico until the Fall of 2009 and that he did not expect implementation to be complete until the end of 2010:

> Q.     [Y]ou said that you were on target to implement OMS in the Gulf of Mexico in 2009?
>
> A.     I – my recollection is that we began the process of cutover to OMS in the Fall of 2009.
>
> ***
>
> Q.     And your recollection also is that you would have completed that implementation in the Gulf of Mexico by the end of 2010?
>
> A.     That's correct.

Hayward Dep. at 789:11-14, 789:17-20.

111.    BP's failure to complete implementation of OMS in the Gulf of Mexico had enormous repercussions.  Hayward testified that the *Deepwater Horizon* tragedy potentially could have been avoided if OMS had been fully implemented in the Gulf and/or applicable to the *Deepwater Horizon.*

> Q.     If OMS had been implemented in the Gulf of Mexico before April 20, 2010, is there not the potential for having avoided this terrible catastrophe?
>
> ***
>
> A.     There is possible potential –
>
> ***
>
> A.     Undoubtedly.

Hayward Dep. at 793:25-794:8.

112.    Likewise, SEEAC Chairman Castell fully understood that implementation of OMS had not been completed in the Gulf of Mexico by 2008.  Castell testified, "I believe OMS started its integration in the Gulf in 2009. I would be personally surprised – and I don't know, but I'd be surprised if it had been fully integrated with all the legacy systems [as of April 20, 2010]."

Castell Dep. at 71:11-14.

113. Moreover, ████████████████████████████████

████████████████████████████████████████████

████████████████████

114. Indeed, according to CW2, BP's OMS lagged far behind its peers (*e.g.* Chevron and Exxon) in 2009, and by 2010, the program was still in its pilot phase and yet to be fully implemented in the Gulf of Mexico.

115. According to CW1, there was a company failure to implement an OMS protocol that would have ensured that the individual decision makers at the rig level understood how cost-savings and corner-cutting could affect the process safety of the *Deepwater Horizon*.

116. In the fourth quarter of 2009 and in January 2010, BP, as part of a global cost-cutting restructuring, reorganized the drilling operations unit for the Gulf of Mexico. According to CW2, the global reorganization was attributable to decisions made by Defendants Inglis and Suttles. A consequence of the restructuring was the termination or forced transfer for those chiefly responsible for BP's Gulf of Mexico Operations, including but not limited to safety processes and the implementation of BP's OMS in the Gulf of Mexico. Indeed, the people charged with implementing OMS in the Gulf of Mexico were transferred or terminated in Q4 2009 and Q1 2010.

117. Further as described below, the individuals brought in to implement BP's OMS and manage BP's Gulf of Mexico Operations lacked the knowledge, experience and expertise of those they were replacing. In fact, in September 2009 a non-public BP rig audit of the *Deepwater Horizon* found that safety goals were not commonly known or properly communicated to employees and not all relevant rig personnel were knowledgeable about drilling and well operations practices.

118.   According to CW2, the restructuring of BP's Gulf of Mexico operations was undertaken despite concerns raised by CW2 and other senior BP employees to top-level management with direct reporting responsibilities to BP's board of directors. These concerns related to BP's ability to operate safely in the Gulf.

119.   Ian Little was the Gulf of Mexico wells manager for BP. Little was replaced by David Sims who, according to CW2, lacked Little's knowledge and expertise. Despite this, Sims was required to make decisions regarding not only management of the well, but also the response to the *Deepwater Horizon's* explosion.

120.   Prior to becoming Vice President of Drilling and Completions, London in December 2009, Harry Thierens served from 2006-2009 as the well director for the Gulf of Mexico. He managed the engineering and operations group in the Gulf of Mexico. Thierens was replaced by David Rich, who according to CW2 lacked the expertise of Thierens.

121.   Kevin Lacy was the vice president of Drilling and Completions for BP until December 15, 2009 when he left the Company. Lacy, who worked in exploration and production for thirty years, was replaced by Patrick O'Bryan.

122.   According to CW1 and CW2, O'Bryan lacked Lacy's experience and expertise. According to CW2, by 2009 and 2010, BP still had not implemented a robust operations management system to ensure offshore processes could be managed effectively for both exploration and risk. Given the difficulties of Gulf of Mexico exploration, this invited disaster.

**VII.   DEFENDANTS' SCIENTER REGARDING THEIR MISREPRESENTATIONS AND OMISSIONS ABOUT BP's PRE-SPILL SAFETY IMPROVEMENTS AND ITS POST-SPILL ASSESSMENTS**

**A.   Defendants' Scienter Regarding Their Misrepresentations and Omissions About BP's Operational Safety And Its Deepwater Drilling Operations**

123.   Throughout the Relevant Period, Defendants were aware, or recklessly disregarded, that their statements to investors regarding BP's commitment to safety were not true and that their statements touting the importance of deepwater drilling in the Gulf of Mexico omitted material information regarding BP's highly risky and unsafe practices in its deep sea operations.   When they spoke, Defendants knew or recklessly disregarded that BP's process safety procedures did not adequately address the known risks of deepwater drilling – risks that materialized at the Macondo well when the *Deepwater Horizon* rig exploded and sank.

124.   The Presidential Commission found that there was no "comprehensive and systematic risk-analysis, peer-review, or management of change process" for any of the following key decisions, amongst others:

- Failing to wait for the correct amount of centralizers;
- Failing to wait for the foam stability test results and/or redesigning slurry; Failing to run a cement evaluation log;
- Failing to use the correct spacer to avoid disposal issues;
- Failing to recognize the dangers inherent in displacing the mud from the riser before the surface cement plug had been set;
- Failing to properly place the cement plug at the appropriate level and instead placing it 3,000 feet before the mud line;
- Failing to install additional physical barriers during the temporary abandonment procedure;
- Failing to perform further well integrity diagnostics in light of the troubling and unexplained negative pressure test failures; and
- Failing to monitor the mud pits and conducting other simultaneous operations during mud displacement.

125.   The Presidential Commission then concluded that:   *"The evidence now available does not show that the BP team members (or other companies' personnel) responsible for these*

46

*decisions conducted any sort of formal analysis to assess the relative riskiness of available alternatives."*

### 1. Faulty Cementing Jobs and Other Stability Issues Were Known as the Most Frequent Causes of Well Control Problems

126.    As early as 2003, BP knew or recklessly disregarded risks associated with oil spills in offshore drilling related to the failure of cementing at various stages of well development, from the cementing around well casings and annuluses to the cementing of plugs, or shoes, to block pressure during the process of "temporary well abandonment."

127.    BP was aware – though it failed to disclose its awareness to the investing public – that as early as 2003, MMS had determined that failed cement jobs were associated with 33 blowout or well kick incidents in the Gulf of Mexico since 1973, some of which involved "well loss" and "rig and platform destruction by fire." Indeed, an October 22, 2003 MMS alert noted that *"[a]nnual flow related to cementing surface casing has been identified as one of the most frequent causes of loss of control incidents in the Gulf of Mexico."*

128.    Lord Browne knew of these developments and the others alleged herein which arose during his tenure as CEO and concerned BP's extensive, dangerous record of repeated safety violations and incidents, which cost the company billions of dollars from fines, lawsuits, and lost productivity costs and, in the case of the Texas City refinery explosion, cost the lives of 15 workers in addition to the roughly 200 more who were injured.

129.    BP had experienced cementing failures and knew of similar failures on other companies' rigs prior to and during the Relevant Period. Additionally, BP experienced, but did not disclose, its own problems with a faulty cement job on one of its deepwater wells in the Caspian Sea, off the coast of Azerbaijan, in September 2008.

130.    More specifically, on or around September 17, 2008, BP experienced a gas leak at one of its central production platforms in the Azeri-Chirag-Guneshi ("ACG") field in the Caspian Sea – which is the largest of BP's deepwater drilling operations in Azerbaijan. Shortly thereafter, another rig in the field, called *B-i 7,* suffered a blowout, causing gas, water, and mud to shoot onto the rig floor, raising the possibility of an explosion. *B-i 7* was evacuated and its well was sealed, either by annular rams or because the well simply "bridged" (collapsed on itself or otherwise stopped flowing on its own). As a result, BP shut down most of the entire field's operations, cutting daily production by over 600,000 barrels per day ("barrels per day" or "bopd"). In later communications, BP told U.S. officials that they suspected that numerous wells had a "bad cement job."

131.    BP made no announcement or disclosure of this incident at the time it occurred. In fact, BP's Form 20-F for 2008 merely mentioned a "subsurface gas release" on September 17, 2008 and notably omitted references to the blowout on *B-i 7,* the fact that gas alarms went off on the field's central production platform, and the possibility that cementing jobs on other wells were faulty as well. As noted by *The Wall Street Journal* on December 17, 2010: "BP had been 'exceptionally circumspect in disseminating information' about the [ACG gas] leak, both to the public and [to] its partner." Moreover, according to the same article, several of BP's partners "were upset with BP for allegedly withholding information from them about the incident."

2. **Defendants Knew or Recklessly Disregarded That BOPs Were Known to Fail, Yet Did Not Adjust Their Process Safety Procedures Accordingly**

132.    As early as 2000, and on a continuous basis throughout the Relevant Period, Defendants were aware of or recklessly disregarded the substantial and known risks associated with relying on a single blind shear ram in a BOP to prevent an uncontrolled oil or gas release.

48

Indeed, Defendants were well aware that blind shear rams were highly untrustworthy and failed nearly 50% of the time.

133.    A BOP is a large, five-story device typically set on the ocean floor at the so-called "mud line," beneath the riser connecting the rig to the sea floor and on top of the cement surface casing that seals around the "annulus," which runs down further into the earth toward the "pay sands" in which oil and gas are found.

134.    More specifically, Defendants knew, or recklessly disregarded, that, in the event the BOP needed to be activated, the following should occur:

- Closure of the "variable rams," which would seal the area around the drill pipe in the well (or, with "annular rams" or "blind rams," if no pipe lay in the well), thereby sealing oil and gas in the annulus below the BOP; and then attempting to pump drilling mud into the annulus to outweigh and balance the pressure of rising oil and gas; or:

- In a worse scenario, and if the method described above did not work, activate the BOP's "blind shear rams," which are intended to cut through drill pipe in the well and then seal the oil down in the annulus below the BOP; or

- In an emergency setting, set the BOP to activate all of its rams – variable, annular, and blind shear – and disconnect from the riser, preventing further gas or oil from rising to the rig above.

135.    As set forth below, as early as 2000, and on a continuous basis throughout the Relevant Period, Defendants knew, or were reckless in not knowing, that various components of BOPs in use (both on their own rigs and Transocean-owned rigs) had high probabilities of failure, especially in deepwater and ultra-deepwater settings, where drill piping is thicker and more difficult to cut and where hydrostatic pressures affect hydraulic systems which control the BOP rams.

136.    In July 2001, the analyst group SINTEF, the largest independent research organization in Scandinavia, provided the MMS with a report recommending that all deepwater and ultra-deepwater drilling rigs in operation in the Gulf of Mexico be equipped with not one,

but *two* separate blind shear rams, because of the significant risk that one might fail. The SINTEF report, while not publicly released, was shared with BP and other industry operators.

137. In both December 2002 and September 2004, MMS provided to BP and other industry operators several reports written by West Engineering Services revealing serious deficiencies with blind shear rams. In particular, the reports mentioned:

- The incapacity of shears to cut through many newer types of drill pipe, which tend to be thicker than older pipes;

- The certainty with which the shears that close on the thick joints that connect the sections of pipe together (rather than simply closing on the pipe itself) fail; and

- The significantly lower capabilities of shears to cut pipe at extreme depths, for instance, in excess of 5,000 feet, because of the effect of hydrostatic pressure on BOPs' hydraulic systems.

138. The studies noted above, although not known to the general public and Plaintiffs, were shared with and made available to industry members, including senior BP managers and directors involved in drilling operations, and were discussed at industry conferences that occurred during the Relevant Period, including, but not limited to, conferences held by the Society of Petroleum Engineers ("SPE") and the International Association of Drilling Contractors ("IADC") in New Orleans, February 2-4, 2010, and in Amsterdam in 2009. Senior BP drilling managers routinely attended SPE and IADC conferences, including those noted above.

139. In April 2000, an independent expert report by EQE International, a risk and insurance consulting group, conducted an extensive analysis of the BOP to be installed on the *Deepwater Horizon*. The report, which was not publicly disclosed until June 20, 2010, identified a serious flaw in the BOP's design – despite extensive back-up systems, or so-called "redundancies," in the BOP's layout – there was a particular component in the unit's hydraulic

system, a single "shuttle valve," which had no backup. In response, EQE noted the potential for a "single point failure" of the shuttle valve and explained that if the shuttle valve failed, the remaining redundancies built into the BOP would be rendered irrelevant.

140. Significantly, throughout the Relevant Period, BP actually utilized the services of West Engineering, the company that carried out the research for MMS on BOP reliability, to carry out specific studies for the Company on risk issues relating to BOP testing. In both 2008 and early 2010, BP specifically requested, as a member of the joint industry group focused on deepwater drilling issues, that West Engineering carry out research projects on BOP reliability and testing, and integrate past studies analyzing BOPs and their device failures.

141. A July 2009 report also put BP on notice that BOPs were unreliable. BP's partner, Transocean, commissioned the report, which analyzed past BOP performance (including in the Gulf of Mexico) as part of a risk assessment for deepwater drilling in the Beaufort Sea, north of Alaska. The report, written by the consultant group Det Norske Veritas, which was subsequently contracted by the U.S. government to perform an extensive investigation into the *Deepwater Horizon*'s BOP in the wake of the April 2010 blowout and explosion, found that, in practice, blind shear rams on offshore BOPs had a failure rate of 45 percent.

142. Defendant Hayward acknowledged in his deposition that he was aware that problems had been identified with BOPs and that those problems were generally known throughout the industry. Hayward Dep. at 774:9-780:20. Nevertheless, the existence of this report and its findings were not disclosed to the investing public or Plaintiffs until June 20, 2010.

143. BP exacerbated the risk of BOP failure by permitting rigs operating in the Gulf of Mexico to be equipped with just one single blind shear ram. In addition, BP contracted with Transocean in 2004 to replace one of the variable bore rams on the Deepwater *Horizon*'s BOP

with a test ram in order to speed up subsea testing procedures. Yet, the installation of this test ram lowered the unit's reliability even further. Indeed, in an agreement between BP and Transocean executed in October 2004, Transocean noted BP's awareness that the removal of the variable bore ram would "reduce the built-in redundancy" of the BOP and raise the rig's "risk profile." The existence of this agreement was not made public until June 20, 2010.

144. Thus, despite all the knowledge and information about difficulties with cementing and BOPs, Defendants either knew, or recklessly disregarded, that BP failed to establish uniform process safety features for rig operators to follow during off shore drilling to address cementing issues and BOPs.

### 3. BP Received No Less Than One Hundred Safety Warnings for its Safety Protocol Lapses in its North Sea Deepwater Drilling Operations

145. Defendants knew of the significant risks in its deepwater drilling operations during the Relevant Period that were pervasive across BP's deepwater operations. Yet, Defendants knew, or recklessly disregarded, that BP's process safety protocols failed to properly and sufficiently address these known risks.

146. Unknown to the investing public and Plaintiffs, the UK HSE levied extensive citations and fines on BP, sending no fewer than 100 letters or notices to BP between 2006 and 2010, and citing the Company for safety or environmental violations related to exploration or production rigs, pipeline or storage systems, or other facilities. Many of the communications related to offshore deepwater rigs operated by BP in the North Sea around Scotland, including the *Schiehallion, Unity, Bruce, Hutton, Magnus, Clair,* and *Miller* vessels. Some of these rigs and the ships that serviced them were decades old, and the safety issues, in many cases, concerned a failure to properly maintain and inspect equipment.

147. According to UK HSE records, the *Schiehallion,* an aging floating production storage and offloading ("FPSO") ship in the far North Sea, experienced a 2005 engine room fire and a 2006 "mooring chain failure," resulting in special UK HSE inspections and meetings with BP officials, and notifications concerning various violations of safety and environmental violations during the Relevant Period.

148. In correspondence in 2006, UK HSE strongly urged BP to dry-dock the *Schiehallion* for repairs. BP refused, arguing that they would instead prioritize efforts to improve the ship's condition through a focus on maintenance. UK HSE, in a letter to BP on February 2, 2007, strongly criticized BP's decision, noting several areas of maintenance backlog and numerous cases in which past UK HSE notices were not addressed, and listing various continuing operations which were not in compliance with "relevant statutory provisions" ("RSPs"):

> Finally, it is HSE's view that *the overall magnitude of the various categories of maintenance backlog [on the Schiehallion] is such that BP does not have sufficient control of the situation. . . .* [T]he situation means that there are concerns for BP's continued ability to comply with the fundamental duties under Sections 2 and 3 of the HASWA [Health and Safety at Work Act]. At the meeting of 29th January, we discussed with BP the issues associated with drydocking, shutting down production and prioritizing integrity management (i.e., the latter being BP's current approach) as a means of addressing the overall maintenance backlog. *We listened to BP's opinions on the issues associated with the various options, but remain unconvinced that BP's proposed course of actions to remain on station, with an increased focus on integrity, is compatible with achieving compliance with the RSPs given the historic susceptibility of the FPSO Schiehallion to events or conditions that exacerbate ongoing maintenance backlogs* (e.g., 2005 Compressor Fire, 2006 Mooring Chain Failure).

149. The February 2, 2007 UK HSE letter continued, laying out concerns that were prescient of the *Deepwater Horizon* incident:

> [UK HSE maintains] the view that *major accidents result when a series of failings with several critical risk control systems materialize concurrently.... The*

53

*number and relatedness of backlogs on the Schiehallion is such that it appears as though there is a significant risk of such a series of failings arising.*

150.    The February 2, 2007 UK HSE letter concluded with criticism of BP's larger problem with its lax safety culture and inability to avoid a major incident that echoed the MMS's findings about BP in 2002: "BP's decisions on the *Schiehallion* have not in any way been informed by a systematic assessment [by independent safety inspectors] of the adequacy of the management system to achieve compliance with those RSPs . . . that are intended to avoid the failings that might align to cause major accidents."

151.    According to a 2009 UK HSE letter, BP again suffered a "significant Hydrocarbon Release" (*i.e.,* an oil spill or gas release) on the *Schiehallion* rig on August 4, 2008. The UK HSE said the release was attributable to a "failure to comply" with BP's own process safety procedures.

152.    Several other UK HSE letters were sent to BP between 2007 and 2010 as well. These letters outlined safety and maintenance problems on other rigs that could create a serious risk of hydrocarbon release:

- A March 5, 2009 UK HSE letter discussed inspections of BP's *Harding* rig, criticizing BP's failure to inspect several "high risk" systems for corrosion, as requested in previous notices. The inspector wrote: "This lack of progress is unsatisfactory. It is important that the condition of these systems is ascertained in a timely manner, in order to reduce the risk of loss of containment incidents" (*i.e.,* spills); and

- Additional letters to BP Exploration Operating Company Ltd. on March 25, 2008, March 5, 2009, and July 7, 2009 relating to the *Bruce, Magnus, Unity,* and *ETAP* platforms criticize BP for failing to conduct maintenance programs compatible with the intended lifespan of its rigs – suggesting, in other words, that BP was running its own equipment into ruin.

### 4. BP's Internal Reporting Structures Mandated that the CEO and Board Review Process Safety and Risk

153.





154.    The Safety & Operations segment ("S&O") was a key component of OMS that BP utilized to achieve monitoring of process safety performance.   Before and during the Relevant Period, BP utilized the S&O function for a variety of reporting mechanisms, progress updates and metrics which allowed for the Executive and Board to monitor process safety performance.

155.    The Orange Book was a reporting format conceived of by Defendants Inglis and Hayward, to relay key safety information to GORC.  Ellis Armstrong, CFO of BP Exploration and Production, was involved in the process of creating the Orange Book.  Armstrong Dep. at 85:21-22.  Armstrong testified that the purpose of the Orange Book was to cull safety metrics across BP and regional business units, including E&P in the Gulf of Mexico that "had the same level of standing in the firm as financial information."  This information was reported on a quarterly basis to GORC and SEEAC in connection with the committees' safety monitoring roles. Armstrong Dep. at 86:4-11.

156. ██████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████

### 5. SEEAC Approved BP's Publications Regarding Safety

157.    As noted above, SEEAC responsibilities included: "[r]eviewing material to be placed before shareholders which addresses environmental, safety and ethical performance and make recommendations to the Board about their adoption and publication." ████████████

████████████████████████████████████████████████

██████████████████████████████████

158. ██████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████

159. ██████████████████████████████████████████

██████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████



160.

161.

162.    Also, BP's "Sustainability Reporting 2009 Safety" ("Sustainability Report") was

published on April 15, 2010.



\* \* \*

163.     Just weeks before the publication of the Sustainability Report, SEEAC met again,

and the top item on its agenda was commendation of the final draft form of the report.

\* \* \*

**6. Defendants Consciously Limited The Scope of Safety & Operations Audits So As Not To Apply To The Majority Of BP's Deepwater Drilling Fleet**

164.    Contrary to BP's representations that OMS was a systematic management framework that provided superior monitoring of safety, Defendants Hayward and Inglis made the decision to exclude some of the most lucrative – and the riskiest – of all BP operations from S&O audits.

165.    These S&O audits were especially critical because they tested rig and rig personnel's compliance with safety standards and risk management practices, including requirements set by OMS.

166.     Defendants Hayward and Inglis made a conscious decision to exclude these risky BP operations, which were responsible for drilling the vast majority of BP's deepwater wells in the Gulf of Mexico, from the scope of the S&O audit function.  Had such operations not been purposefully excluded, GORC and SEEAC (which received all S&O audits) would have received detailed information concerning the myriad process safety failures on the *Deepwater Horizon* (such as those identified throughout the Presidential Commission's Report).

167.

██████████████████████████████████████████████████

████████████████████████████████████ The decision to exclude Gulf of Mexico from

BP's S&O Audits belied BP's repeated public statements regarding a systematic framework for

improved process safety.

**B.    Defendants' Scienter Is Further Established By Their Disregard of Safety and Operational Concerns**

168.   ██████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████

169.   ██████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

███████████████████████████

170.   ██████████████████████████████████████████

██████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████

████████████████████████████████████████

1. **Defendants Knew of, or Recklessly Disregarded, Significant Process Safety Problems with Third-Party Rigs and, in Particular, Rigs Leased From Transocean**

171.    During the Relevant Period, Defendants knew of, or recklessly disregarded, significant process safety problems with rigs operated or owned by third parties.    These individuals knew of especially acute problems for Transocean-operated rigs.

172.   ████████████████████████████████████

████████████████████████████████████████

173.    On July 21, 2007, BP experienced a high-potential incident in the Gulf of Mexico. The incident involved Transocean rig operators dragging the BOP along the sea floor which almost severed underground pipelines.   ████████████████████████████

████████████████████████████████████████

174.   ████████████████████████████████████

████████████████████████████████████████



175. 

 As a result of these incidents, a joint safety improvement plan was to have been implemented to address rig-safety culture and joint standardization.

176.     Defendant Inglis himself expressed concerns that OMS standards were not being applied to contractor operated drilling rigs.  In an email to the Upstream Senior Leadership Team dated July 13, 2009, Defendant Inglis stated:

> One of the emerging findings from our analysis of incidents is that conformance with Control of Work (CoW) practices, on many of our contractor operated drilling rigs, falls short of BP expectations. I have asked Barbara [Yilmaz] to clarify the expectations we have of our contractors in the matter of CoW and the bridging requirements between contractor practice and BP's CoW Standard.

177. 

178. 

### 2.  Concerns about the Integrity of Safety Processes in Alaska

179.     On April 11-12, 2009, Marc Kovac ("Kovac"), a BP mechanic, welder and union representative, sent two emails to BP's Ombudsman's office — which was headed by the

Honorable Stanley Sporkin (a retired federal judge) — copying numerous BP Exploration Alaska

BPXA offices raising serious concerns about the integrity of pipelines in Alaska, overstretched

staff and contractors, and general problems with inspections of oil wells in the western part of

BP's Prudhoe Bay facilities. The first email noted that "it's getting back to a very dangerous

situation, too much overtime and too much responsibility and area to cover for each man.

Anything can happen when [well] pads are not monitored. Anything can happen when workers

work over 12 hours a day, every day. Things are not getting better." In a second email dated

April 12, 2009, Kovac listed a host of specific examples of overstretched staff, concluding that

the situation "sets us up for another major mishap. Who will they blame this time? This situation

is not acceptable."

180. Then, in June and August 2009, BP employees and representative members of the

United Steelworkers met with BP management in Alaska about various safety and pipeline

integrity issues and complaints about BP's culture making it difficult for employees to raise

safety issues. Minutes released from the United Steelworkers revealed that union representatives

raised detailed concerns to BP management about understaffing and excessive overtime (being

required to work 16-18 hour shifts) and noted that these issues caused an "increased . . . risk for

accidents."

181. This concern was underscored in October 2009 by Phil Dziubinski

("Dziubinski"), BPXA senior officer for HSSE. Dziubinski noted that a shift greater than 16

hours impeded workers' ability to make sound decisions, describing the impaired decision-

making ability as akin to "intoxication." He noted these conditions were persistent in BP's

operations before and throughout the Relevant Period. Further, he believed that the failure to

abate such work conditions would require BP to affirmatively acknowledge to HSE Committees,

the Board, the Ombudsman and Congress that this situation put "production ahead of safety." In late 2009, Dziubinski was asked to resign from his post in what he believes was retaliation for voicing his concerns.

182.    In the June and August 2009 meetings, union representatives also raised concerns about delayed replacement or repair of equipment and old, corroded pipelines, including gas leak detectors. (Faulty gas leak detection devices were among the problems that led to the ignition of flammable gases during the blowout and subsequent explosion on the *Deepwater Horizon.) "We have several lines ready to leak,"* the representatives are noted as stating. The minutes show union representatives urging BP not to simply "patch" pipelines: "These lines should be replaced."

183.    These were precisely the types of safety issues BP informed Plaintiffs it would address after the Baker Report was released and the types of safety issues that BP represented to Plaintiffs were − purportedly − already being addressed and remedied throughout the Relevant Period.

### 3.    Afraid-a-spill E-mail Raises Complaints about Alyeska's Operations

184.    In late 2009, another private employee "concern" was sent to the BP Ombudsman from an anonymous employee of BP-operated Aleyska, the BP-led consortium that operates the Trans-Alaska Pipeline in Alaska. The email was signed "Afraid-a-spill." The email raised a litany of complaints about Alyeska's operations, including serious safety and pipeline integrity concerns.

185.    Unidentified executives, the email stated, "told employees not to speak up or go against" the Alyeska CEO, Kevin Hostetler ("Hostetler"). The email stated that as a result of Hostetler's behavior, the work environment at Alyeska had degraded over several years to the point where: "*People are afraid to speak up on safety or integrity issues for fear of retaliation.*"

According to a subsequent investigation into the allegations by BP-retained lawyers with the law firm Morgan Lewis & Bockius, the subject of the email was communicated to BP senior leadership in early 2010, and Judge Sporkin, the Ombudsman, discussed it with BP leadership, which led to the firm being hired to carry out a further investigation. The results of the investigation still are not public.

186. Concerns about the risks of spills in BP's Alaska operations, and the inadequacy of BP's pipeline integrity and inspection programs, were not only being voiced internally or to the BP Ombudsman. BP also received enforcement letters sent to BP companies by the U.S. Department of Transportation's "Pipeline and Hazardous Materials Safety Administration" ("PHMSA"). PHMSA letters communicate regulatory violations, enforcement actions, orders to comply, and warnings relating to pipelines. In 2008 through 2010, BP related companies operating in the United States received 40 separate enforcement letters from PHMSA, a far higher number than those sent in the same period to peer companies Exxon Mobil, Conoco Philips, Chevron, or Shell. (During the same period, Shell received only six PHMSA letters.) One PHMSA letter was sent to BP on April 20, 2010, the very day the *Deepwater Horizon* blast occurred. In that letter, PHMSA communicated that it had found serious shortcomings with BP's pipeline inspection and anti-corrosion systems in Alaska, increasing the likelihood of a major spill.

187. These were precisely the types of safety issues BP informed Plaintiffs it would address after release of the Baker Report and the types of safety issues that BP represented to Plaintiffs were – purportedly – already being addressed and remedied throughout the Relevant Period.

#### 4. **Aftermath of BP's 2007 Criminal Plea**

188.    During the Relevant Period, Defendants Hayward and Inglis knew, or recklessly disregarded, that the recommendations of the Baker Panel were not being adequately instituted throughout the Company, especially in terms of improving its process safety practices.    In particular, as set forth below, between 2008 and 2010, the Environmental Protection Agency warned BP's General Counsel, among other senior BP executives, that EPA investigators found BP to be operating unsafely.

189.    As described above, BP pled guilty to a violation of the U.S. Federal Water Pollution Control Act in connection with the Alaska pipeline oil spill, admitting that its "criminal negligence" had caused the corrosion and thus the spill.    BP was sentenced to three years of probation, and fined $22 million.    In late 2008, BP attempted to obtain an early release from probation in Alaska, arguing to its federal probation officer, Mary Frances Barnes ("Barnes"), that the Company had made "significant progress" in relevant areas of maintenance and inspection.    Unbeknownst to investors, however, Barnes, found continuing safety issues and incidents with BP operations and denied BP's request.    In September 2010, due to continuing complaints that she received about safety and pipeline integrity issues in 2008 through 2010, Barnes requested that the court revoke BP's probation and that additional fines and penalties be levied against the Company.

190.    Also unknown to investors during the Relevant Period, BP was potentially facing serious disciplinary action by the EPA's Suspension and Debarment Division ("SDD"), in connection with past and ongoing misconduct in Alaska, Texas, and other states.    The SDD has the authority to prevent BP from being a party to any U.S. government or state contract or grant funded with federal funds, which would materially affect BP's revenues.

191.    Beginning in early 2008 and through early 2010, Jeanne Pascal ("Pascal"), the EPA SDD Debarment Counsel for Region 10 (West Coast and Alaska) who handled EPA debarment oversight activities on the BP Group in the greater United States, communicated repeatedly by telephone and email with senior BP officials, including senior BP executive and Defendant Doug Suttles, BP General Counsel Jack Lynch ("Lynch"), and BP's counsel at Vinson & Elkins, Carol Dinkins, among other persons. The BP Ombudsman, Judge Sporkin, also raised Pascal's concerns with the President of BP America, McKay. In her communications, Pascal noted that her office was in receipt of information from BP employees and from EPA inspectors in Alaska and Texas demonstrating that BP was *in a state of continuing non-compliance* with numerous applicable laws and civil settlement agreements; that BP was continuing to run many of its operations unsafely; and that BP was continuing to retaliate against workers and contractors who raised safety and environmental issues. Thus, on several occasions during the Relevant Period, Pascal stated that, because of the Company's continuing misconduct, the EPA was entitled to file a debarment complaint, to strip BP and its subsidiaries of the right to bid for U.S. government contracts and to bid for U.S. government oil and gas concessions.

192.    BP was also informed of significant problems with its process safety with respect to refineries. For example, in May 2010, it was revealed that between June 2007 and February 2010, BP received a total of 862 citations for OSHA violations relating to its refineries in Texas City and Toledo, Ohio, of which 760 were classified as "egregious willful" and 69 were classified as "willful." The willful violations accounted for over 97 percent of all willful violations found by OSHA in all U.S. refineries during the same period – BP's main

competitors' combined citations were 22. Center for Public Integrity, *OSHA Says BP Has "Systemic Safety Problem,"* May 16, 2010.

193.    These were precisely the types of safety issues BP informed Plaintiffs it was addressing after release of the Baker Report.

### C.    Defendants' Scienter Is Further Established By BP's Retaliation Against Individuals Who Raised Concerns About Its Operational Safety and Integrity

#### 1.  Whistleblower Retaliation in the Gulf of Mexico

194.    Throughout the Relevant Period, and contrary to BP's representations to its shareholders, BP engaged in continuous and systemic retaliation against employees who reported concerns about the safety and integrity of BP's operations. These whistleblowers provide further support of Defendants' knowledge or reckless disregard of the falsity and misleading nature of their Relevant Period statements.

195.    In August 2008, Kenneth Abbott ("Abbott"), a BP engineer working on design and blueprint management issues relating to the operations of BP's *Atlantis* rig (a major BP rig involved in drilling deepwater exploration and production wells in the Gulf of Mexico), began to raise concerns with BP managers about the Company's practices and policies for managing and updating designs and blueprints for its infrastructure and equipment on the *Atlantis*. One particular concern was that designs for critical units on the rig were not updated to reflect changes made during repairs, maintenance, or other modifications.

196.    On or around August 15, 2008, BP manager Barry Duff ("Duff"), who worked with Abbott, wrote to BP managers and corroborated Abbott's concerns, stating that a lack of properly-reviewed and approved designs could result in "*catastrophic operating errors*" and that "*currently there are hundreds if not thousands of Subsea documents that have never been finalized,*" a situation which Duff referred to as "*fundamentally wrong.*"

197.    Abbott continued to raise the above concerns from November 2008 through January 2009 when he was fired in retaliation for his whistle-blowing. Shortly after his termination, Abbott raised his concerns with the Company's Ombudsman. On June 17, 2010, Abbott was invited to testify before Congress to describe the circumstances that led him to initially report his concerns to senior BP management. During his testimony, Abbott stated, in part, that:

> *From my experience working in the industry for over 30 years, I have never seen these kinds of problems with other companies*. Of course, everyone and every company will make mistakes occasionally. *I have never seen another company with the kind of widespread disregard for proper engineering and safety procedures that I saw at BP and that we hear from the news reports about BP Horizon, or BP Texas City, or the BP's Alaska pipeline spills. BP's own investigation of itself,* by former Secretary of State James Baker, *reported that BP has a culture which simply does not follow safety regulations. From what I saw, that culture has not changed.*

198.    Among the documents sent to the BP Ombudsman, and forwarded to senior BP managers during the Ombudsman's investigation into Abbott's allegations in 2009 and early 2010, was a declaration by a safety engineer in Houston, Texas, Mike Sawyer, who independently reviewed Abbott's allegations, internal BP emails, and applicable regulations.

199.    The Sawyer affidavit affirmed that a "large portion of [the *Atlantis'*] subsea safety critical drawings, documents, specifications, and certificates were not in final, 'as-built' status," and warned: *"The lack of 'as-built' design documents is a violation of Federal requirements under the Department of Interior MMS Safety and Environmental Management Systems as specified in 30 CFR Part 250 [including] 30 CFR 250.903 and 905."* The Sawyer affidavit specifically warned that:

- Time is of the essence in avoiding an Outer Continental Shelf (OCS) environmental disaster, Atlantis production should be shut in until resolution of its design short comings is complete and a thorough inspection confirms that critical breaches have been satisfactorily resolved. . . . *It is inconceivable that BP could justify the risk of commissioning Atlantis production without*

> *completed design documentation reflecting the latest approved design version . . . .*

- The absence of a complete set of final, up-to-date, 'as-built' engineering documents, including appropriate engineering approval, introduces substantial risk of large scale *damage to the deepwater Gulf of Mexico (GOM) environment and harm to workers,* primarily because analyses and inspections based on *unverified design documents can not accurately assess risk or suitability for service. . . .*

- "The wide spread pattern of unapproved design, testing, and inspection documentation on the Atlantis subsea project creates a risk of a catastrophic incident threatening the GOM deepwater environment and the *safety* of platform workers. *The extent of documentation discrepancies creates a substantial risk that a catastrophic event could occur at any time.*

200.    In April 2010, BP's Ombudsman wrote to Abbott and affirmed that his allegations had been substantiated.    More specifically, Abbot received a letter from BP's Deputy Ombudsman, Billie Garde ("Garde"), on April 13, 2010, stating: "Your concerns about the [Atlantis] project not following the terms of its own Project Execution Plan were substantiated. . . . [BP] did not do a comprehensive documentation audit regarding the documentation issues on Atlantis. . . . *The concerns that you expressed about the status of the drawings upgrade project were... of concern to others who raised the concern before you worked there, while you were there, and after you left."*

201.    In addition, the Presidential Commission Report found that a contributory factor to the *Deepwater Horizon* explosion and the problems in attempting to trigger the BOP related to BP's practice of not updating designs and plans from their original schematics – much like the problems complained about with regard to the *Atlantis.*

202.    On the issue of retaliation, the Presidential Commission Report also noted that a survey conducted in March 2010 indicated that crew members working on the *Deepwater Horizon* feared retaliation.    The survey, which included workers on the *Deepwater Horizon* and three other rigs, was conducted between March 12 and March 16, 2010 – *i.e.,* approximately one

71

month prior to the *Deepwater Horizon* explosion.  According to the Presidential Commission, the survey found that: "Some 46 percent of crew members surveyed felt that some of the workforce feared reprisals for reporting unsafe situations, and 15 percent felt that there were not always enough people available to carry out work safely."

### 2. Whistleblower Retaliation in Alaska

203.    The BP Ombudsman conducted a robust investigation of Acuren, the company responsible for pipeline inspection and monitoring of BP's pipelines in Alaska, where BP contractor Marty Anderson ("Anderson") had worked until 2008 and who had begun to raise serious criticisms with his supervisors and BP intermediaries about BP's pipeline corrosion and inspection system in Alaska and Acuren's staffing for that program.  According to 2009 communications between the BP Ombudsman's office and Lynch, in 2007 Anderson began to cite "a significant quality control breakdown" in Acuren's and BP's testing procedures, "inadequate record keeping," and "unqualified inspectors in the field performing inspections." BP's Ombudsman's office stated that "[t]he concerns were serious, and although people try to downplay the significance of the issues, they reveal a complete breakdown."  According to the BP Ombudsman's office, the audit confirmed Anderson's claims.

204.    The matters concerning Anderson and pipeline inspections were serious enough for the BP Ombudsman's office to raise them with BP and BP North America officials, including Rick Cape, BP's Vice President for Compliance and Ethics, *specifically recommending to him that Anderson's concerns be reported to the BP Board of Directors and to Lynch.*  In addition, the Ombudsman himself, Judge Sporkin, communicated Anderson's concerns in 2008 with then-President of BP North America Bob Malone.  Garde wrote to Lynch about it in September 2009, and Anderson himself met with Lynch on August 3, 2009.  BP did not adequately address the continuing concerns that had been raised.  An internal email dated July 15, 2010, from Christine

Anastos, a BP Ombudsman Inspector, to other Ombudsman staff, stated that "many of the issues identified by Marty [Anderson] years ago appear to be persisting" [*i.e.,* into mid 2010] and "it is clear that, over time, root causes have not been identified and/or addressed . . . ."

205.   A 2008 BP Ombudsman "Workforce Briefing" containing an assessment of Acuren's "Work Environment" reported that a survey of Acuren employees by the Ombudsman's office found significant problems with workers' perceptions of potential retaliation for reporting safety or environmental concerns. A "key insight" in the presentation stated that "[a]ctions and events in the past 18 months [*i.e.,* during the period BP vowed to improve safety practices in Alaska in the wake of the 2006 spills] have had a decidedly chilling impact on worker attitudes." The section noted: "[p]roduction is viewed by very many workers as the primary focus," (*i.e.,* as opposed to safety). The presentation also noted that the "actual or perceived presence of HIRD [Harassment, Intimidation, Retaliation, Discrimination] is high in the Acuren organization. . . ." In fact, one in three employees believed "recent resignations" were due to HIRD, and 38 percent of employees – and 80 percent of the employees who worked on natural gas lines – indicated as the reason for not reporting safety concerns: "nothing seems to happen to reported items."

206.   The Ombudsman also noted that about one in ten Acuren employees said in the last 18 months that they had been asked to perform a job that was not in compliance with regulations or safety practices. (The number was even higher for workers who monitor BP natural gas pipelines: almost half of Acuren's workers indicated that they had been asked to perform "non-compliant work".)

207.   The 2008 presentation also included selected quotes from employees, including the following:

- "I've raised issues, now I'm labeled a troublemaker."

- "You get treated better when your supervisor doesn't hear from you."

- "[A] co-worker falsified production numbers and I brought it to my supervisor's attention with the result that I was ostracized, moved to a different shift, moved to the ghetto and told I should produce more in line with the guy who falsified the records."

- "Supervisors talk safety but when concerns are brought up they are viewed as irritating and just given lip service."

- "I have stopped jobs for safety reasons and they just hand it to the next guy till they find someone who will do it" [*i.e.*, the job that was stopped].

- "I was pressured to change my evaluation of some pipe which I deemed to be defective."

- "BP doesn't listen, they put too much emphasis on rules to look good but have no common sense when it comes to safety."

- "BP's support of safety comes off as lip service and seems to only be in place to lower their insurance rates. While superficially, BP delivers lip service about safety, their continually increasing demands accompanied by consistently decreasing resources create a 'results oriented' atmosphere where the ends justify the means."

- "BP creates the adverse and dysfunctional world we work in here. Many problems that occur are because they drive people too hard to perform with limited resources. . . ."

208. Furthermore, BP Ombudsman records from 2010 include numerous other examples of serious issues raised by Acuren employees. For instance, according to an article published by ProPublica on June 7, 2010, on December 9, 2009 a "Concerned Individual" at Acuren raised process safety concerns about other personnel "pencil whipping" test results (manipulating devices to change readings) and "falsified inspections." This individual's name is Stuart Sneed ("Sneed"). Sneed worked on BP's Alaska pipeline and stated that: "They [BP] say it's your duty to come forward . . . but then when you do come forward, they screw you. They'll destroy your life. . . . No one up there [in Alaska] is going to say anything if there is something they see is unsafe. They are not going to say a word."

**D.    Defendants' Scienter In Making Post-Spill Misrepresentations And Omissions To Congress, Law Enforcement, Emergency Responders, and Investors, Including Plaintiffs, About The Oil Flow Rate Into The Gulf Of Mexico From The Blown Macondo Well**

> **1.    Defendants' Publicly Stated Estimates Of Oil Spilling Into The Gulf Were Contradicted By Contemporaneous Internal BP Documents, Data, Estimates, and Calculations**

209.    Throughout the Relevant Period, BP, Rainey, Suttles, Hayward, McKay, and Dudley were aware or recklessly disregarded that their statements regarding estimates of the amount of oil spilling into the Gulf following the *Deepwater Horizon* explosion were not true and that their statements omitted material information concerning the true magnitude of the Macondo well oil spill.

210.    By way of example, at a time when the publicly reported oil flow rate from the blown well was only 1,000 barrels per day, an internal BP document dated April 26, 2010, revealed that the Company had actually estimated that 5,000 barrels per day were leaking into the Gulf (the following was linked to a May 27, 2010 article published in *The New York Times* entitled "Ruptured BP Well Tops Valdez as Worst U.S. Spill"):

> **2)   Estimated Present Volume Release Rate**
>
> *The following assumptions are used to make a release rate calculation. If any of them are changed, the answer could be significantly different.*
>
> The oil is leaking in a vertical plume from a hole approximately 40 cm. in diameter.
>
> The velocity of the material in the plume is estimated by visual observation to be between 7 cm/sec and 50 cm/sec.
>
> The plume itself contains gas bubbles, oil droplets, and entrained seawater.
>
> Assuming that 50% of the plume volume is oil and a rise velocity of 15 cm/sec, the oil released from this source would be roughly 5000 bbl/day, (approximately 200,000 gal/day) Other sources would contribute additional oil. This answer will be refined as additional information becomes available.

(emphasis in downloaded version).  As was later discovered, however, and as described in greater detail below, even the larger 5,000 barrels per day figure was knowingly and grossly insufficient.

211.   Another internal BP document (dated April 27, 2010), also linked to the *New York Times* article in the preceding paragraph, that was provided to BP's senior management revealed that the Company's low estimate of the oil spill was 1,063 barrels per day, the Company's best estimate was 5,758 barrels per day and the Company's high estimate was 14,266 barrels per day:



212.   As Chief Operating Officer for BP Exploration and BP's officer in charge of co-managing the spill response with the U.S. Coast Guard, Suttles knew the Company's estimated spill rate from the Macondo well, or was reckless in not knowing.  Indeed, as described below, he knew of at least six, and likely more, internal pieces of data, estimates, and calculations

76

indicating that oil spill flow rate was vastly larger than the figure being publicly reported. Nonetheless, on April 28, 2010, as reported by the *Huffington Post*, Suttles reiterated earlier estimates that *1,000 barrels* of oil from the Macondo well were spilling into the Gulf of Mexico each day. Then, on April 29, 2010, Suttles stated in interviews on *CBS's* "The Early Show" and other media outlets that "I think that somewhere between 1,000 and 5,000 barrels a day is probably the best estimate we have today" of the Macondo well spill rate.

213.    Thereafter, BP, Rainey, Suttles, Hayward, McKay, and Dudley made false and misleading misrepresentations and omissions, with scienter, throughout the rest of April and May 2010. As described below, in each such instance, they understated the then-stated oil flow rate, in the face of known facts to the contrary, including internal data, estimates, and calculations. These allegations are set forth in far greater detail in Section IX.X. and IX.HH. below, and provide additional, extensive evidence as to the scienter of BP, Rainey, Suttles, Hayward, McKay, and Dudley.

214.    In one particularly glaring example, as reported by the *Times-Picayune* on May 19, 2010, "[a]n engineering professor who has been monitoring the *Deepwater Horizon* disaster said . . . that *'there is scientifically no chance' that BP's estimate of a discharge of about 5,000 barrels of oil per day into the Gulf of Mexico is anything close to the actual number*. Steve Wereley, associate professor of mechanical engineering at Purdue University, told the House Energy and Environment Subcommittee that his own review indicates that a 1.2-inch hole is producing about 25,000 barrels of oil a day by itself, and overall the daily spill could amount to *something 'short of 70,000 barrels* to as high as 115,000 barrels.'"

215.    BP immediately went on the attack, ensuring that Professor Wereley's message was strongly refuted by the one entity who the Congress, law enforcement, Gulf residents and

business, and the investing public entrusted with knowing and conveying an accurate flow rate -
- BP itself.  In response to Wereley's estimates, "BP America Chief Executive Lamar McKay,
denied that his company is trying to obscure the size of the leak. 'This leak is not measurable
through technology we know,' he said.  He also told the House Transportation and Infrastructure
Committee that *anyone working on the spill would have a hard time believing the size is
anything close to the 70,000 barrels per day projected last week by Wereley*."

216.    As noted herein, roughly 60,000 barrels of oil per day leaked into the Gulf from
the blown Macondo well.  Coupled with the internal BP data, estimates, and calculations
received by the Defendants (as described  below) and Wereley's estimates (and the information
upon which Wereley based his work, to which BP had access), Defendants knew, or at a
minimum were reckless in not knowing, that their statements minimizing the spill rate were
materially misleading.  Here, the Defendants ignored, *inter alia*, contemporaneous reports
provided to them, from among other sources BP's own senior engineers, utterly undermining the
veracity of their public statements as to the oil flow rate of the Macondo well spill.

217.    The facts alleged herein have been previously found to support an inference of
scienter as to Hayward and Suttles. *See BP I*, 843 F. Supp. 2d at 782-84, 786-88.  In addition,
the facts alleged herein were the basis upon which BP pled guilty to, *inter alia*, felony
obstruction of Congress and agreed to pay the highest criminal penalty ever in U.S. history - $4
billion.  They were the basis upon which Defendant Rainey has been criminally indicted.  They
were also the basis upon which BP admitted its liability and settled the SEC's civil securities
fraud case for the third highest penalty in the SEC's history - $525 million.  Simply put, the facts
alleged herein overwhelmingly indicate that BP and the Individual Defendants, with scienter,
perpetrated a massive fraud on the investing public, including the Plaintiffs.

### 2. Defendants Misrepresented the Scope of the Leak in a Brazen Attempt to Whittle Down the Amount BP Would Owe in Fines

218.    Civil fines under the U.S. Clean Water Act are based on the number of barrels spilled.  According to the *Wall Street* Journal, the final government estimate of the amount of oil spilled was between 53,000 and 62,000 barrels of oil per day, or 4.9 million barrels spilled overall, which translates to $5.4 billion to $21 billion in fines, depending on whether investigators find that the company was grossly negligent.  Faced with that crude reality, Defendants were motivated to lie about the amount of oil gushing into the Gulf in order to skirt the amount of civil fines and penalties it owed under the Clean Water Act.

### 3. BP Agreed To Pay The Third-Highest Civil Fine In The SEC's History - $525 Million – To Settle The SEC's Well-Pled Allegations That It And Its Executives Hid From Investors, Including Plaintiffs, Critical Information About the Spill

219.    The facts alleged in Sections IX.X. and IX.HH. below, among others, gave rise to the SEC's securities fraud complaint against the Company filed on November 15, 2012.  On that same day, BP filed a Consent in the SEC action in which it agreed to entry of a Final Judgment and admitted that the allegations in the SEC's complaint were true.  In doing so, BP agreed to pay a $525 million penalty to settle with the SEC, thereby incurring the third-largest civil fine *ever* imposed by the SEC and a permanent injunction barring BP from violating the federal securities laws.  As described in far greater detail in Sections IX.X. and IX.HH., Defendants BP, Rainey, Suttles, Hayward, McKay, and Dudley all engaged in a massive fraud by knowingly fabricating and repeatedly asserting to the public an artificially low oil spill flow rate figure in April and May 2010, at times directly refuting scientists who dared challenge its veracity.  They did so despite internal knowledge of at least *sixteen* different sources of data, estimates, and calculations – many of them created by BP's own senior engineers – indicating that the spill was

greater by many orders of magnitude. Each of those sixteen was undisputedly known to BP and at least one (and likely all) of the Individual Defendants.

220.   At the announcement of the settlement, SEC officials were unambiguously harsh in their criticism of BP's conduct in misleading investors. For instance:

(a)   Robert Khuzami, Director of the SEC's Division of Enforcement said in an SEC press release:

> The oil spill was catastrophic for the environment, but by hiding its severity BP also harmed another constituency – its own shareholders and the investing public who are entitled to transparency, accuracy, and completeness of company information, particularly in times of crisis. Good corporate citizenship and responsible crisis management means that a company can't hide critical information simply because it fears the backlash.

(b)   Daniel M. Hawke, Director of the SEC's Philadelphia Regional Office and Chief of the Enforcement Division's Market Abuse Unit said in the same press release, "Without accurate critical flow rate data known only to BP, the company denied its shareholders and investors the opportunity to fairly assess BP's potential liabilities and true financial condition."

(c)   At a news conference, Mr. Khuzami further reprimanded BP's executives, the Defendants in the instant action, for standing behind an oil flow estimate of 5,000 barrels per day "despite an ever-growing body of evidence this estimate was unreasonably low," until "eventually, outside groups realized that the flow rate estimate was 10 times what BP had fraudulently communicated to investors." He summarized the SEC's case against BP:

> [T]he eyes of the world were on BP in the spring and summer of 2010. The company had an opportunity to provide fulsome, accurate disclosure about the facts needed by the public to make informed investment decisions. And, instead, BP chose to mislead the public.
>
> That is not what we expect from public companies and their management. In fact, it is exactly in times of crisis that the need for accurate information is most acute.

4. **BP Pled Guilty to Felony Manslaughter, Environmental Crimes and Felony Obstruction of Congress And Agreed to Pay The Largest Criminal Fine in U.S. History – $4 Billion – To Resolve A DOJ Investigation That Revealed Defendants' Concealment Of Critical Spill Information From Congress And The Public**

221.    On April 23, 2012, federal prosecutors filed criminal charges against BP engineer

Kurt Mix for obstruction of justice in connection with a criminal investigation of the *Deepwater*

*Horizon* disaster. In a press release issued the next day, the DOJ reported that "Mix worked on

internal BP efforts to estimate the amount of oil leaking from the well and was involved in

various efforts to stop the leak. Those efforts included, among others, Top Kill . . . . ." The

DOJ's April 24, 2012 press release also states the following:

> Mix allegedly deleted on his iPhone a text string containing more than 200 text messages with a BP supervisor. The deleted texts, some of which were recovered forensically, included sensitive internal BP information collected in real-time as the Top Kill operation was occurring, which indicated that Top Kill was failing . . . . Mix deleted a text he had sent on the evening of May 26, 2010, at the end of the first day of Top Kill. In the text, Mix stated, among other things, "Too much flowrate – over 15,000." Before Top Kill commenced, Mix and other engineers had concluded internally that Top Kill was unlikely to succeed if the flow rate was greater than 15,000 barrels of oil per day (BOPD). At the time, BP's public estimate of the flow rate was 5,000 BOPD – three times lower than the minimum flow rate indicated in Mix's text.

222.    The Wall Street Journal reported on May 28, 2012 that during DOJ's

investigation into whether BP's representatives lied to Congress about the oil flow rate of the

Macondo well spill, federal investigators examined an email by a BP engineer warning not to

share data "outside the circle of trust." In particular, the prosecutors uncovered a May 27, 2010

email written by a senior BP engineer, Rupen Doshi, in the midst of the first effort to stop the

leak, known as the "top kill," warning that "NO ONE is to get the data files from the Top Kill

method that is being pumped from yesterday or today except for Paul Tooms' group." Mr. Doshi

was referring to Paul Tooms, then head of upstream engineering at BP. "The purpose of the note

was meant to put a limit on the people outside the circle of trust getting the data," Mr. Tooms wrote in an email later that day.

223. On November 15, 2012, DOJ announced that BP E&P agreed to plead guilty to 11 counts of felony manslaughter, felony obstruction of Congress, and criminal violations of the Clean Water and Migratory Bird Treaty Acts. In its plea, BP agreed to pay a record **$4 billion** in criminal fines and penalties for its conduct regarding the *Deepwater Horizon* disaster and the ensuing coverup – the single largest criminal fine *ever* in U.S. history. In addition to the record monetary penalty, BP agreed to extensive monitoring and reforms. Among other things, BP must retain a process safety and risk management monitor and an independent auditor, who will oversee BP's process safety, risk management and drilling equipment maintenance with respect to deepwater drilling in the Gulf of Mexico. BP also must retain an ethics monitor to improve BP's code of conduct to ensure BP's future candor with the U.S. government. These unprecedented sanctions underscore the severity of BP's deception at issue in this case.

224. In the wake of BP's guilty plea, Assistant Attorney General Lanny A. Breuer of the Justice Department's Criminal Division put it bluntly: "***The explosion of the rig was a disaster that resulted from BP's culture of privileging profit over prudence.***" He added:

> As the oil spill continued, BP made a tragic situation worse: it began misleading Congress and the American people about how much oil was pouring out of the Macondo well. As BP now admits, in responding to Congress, the company lied and withheld documents, in order to make it seem as though less damage was being done to the environment than was actually occurring. Acknowledging those lies, BP has agreed to plead guilty to felony obstruction of Congress.

225. Among other things, DOJ's 14-count information details that BP, through Defendant Rainey, obstructed an inquiry by the U.S. Congress into the amount of oil being discharged in the Gulf while the spill was ongoing – the very facts at issue here. As part of the plea agreement, BP admitted that, through Rainey, it withheld documents and provided false and

misleading information in response to the U.S. House of Representatives' request for flow-rate information. BP admitted that, *inter alia*, Rainey manipulated internal estimates to understate the amount of oil flowing from the Macondo well and withheld data that contradicted BP's publicly stated estimate of 5,000 barrels of oil per day. BP also admitted that, while Rainey was preparing his manipulated estimates, BP's internal engineering response teams were using sophisticated methods that generated significantly higher estimates. All of this information was withheld not only from Congress, but also Plaintiffs and other BP investors.

226.    Pertinent here, DOJ's criminal information, with respect to which BP admitted its guilt, charged the following (as quoted from the information):

**Early Flow-Rate Estimates**

i.    The amount of oil leaking from the Macondo well was directly relevant to various efforts to stop the leak and also relevant to potential civil and criminal litigation, including the calculation of penalties.

ii.    On or about April 24, 2010, very soon after it was determined that the Macondo well was leaking oil and natural gas, Unified Command, with BP's input, issued a preliminary public estimate that the well was flowing at a rate of approximately 1,000 barrels of oil per day ("BOPD").

iii.    On or about April 26, 2010, a scientist at the National Oceanic and Atmospheric Administration ("NOAA") prepared a written flow-rate estimate of approximately 5,000 BOPD. The NOAA scientist's estimate, which was based in part on a very preliminary assessment of oil that had started to float to the surface of the Gulf, cautioned that the methodologies used were "highly unreliable" and that the estimate was accurate "to only an order of magnitude," such that the actual flow amount could exceed 5,000 BOPD by ten times. As a result of this NOAA estimate, on or about April 28, 2010, Unified Command raised its public estimate to 5,000 BOPD.

**Rainey's "Estimates"**

iv.    After learning of NOAA's preliminary and heavily-qualified 5,000 BOPD estimate, Rainey, an executive who had no prior experience in spill estimation, surfed the Internet for information about how to conduct oil-spill-volume estimates based on observations of oil

floating on the surface of a water body, known as "mass balance" estimates. Rainey's internet search led him to a website where he found a Wikipedia entry that described some generally accepted mass balance methodologies, including the American Society for Testing and Materials ("ASTM") method and the European "Bonn" method.

v. Between on or about April 26, 2010 and on or about April 30, 2010, despite having no experience performing mass balance estimates and despite knowing that BP had employees who were trained in generating such estimates, defendant BP, through Rainey, performed and caused to be performed daily estimates purportedly using the ASTM and Bonn methods,

vi. Defendant BP's Bonn estimates, prepared by Rainey, resulted in "best guess" estimates significantly higher than 5,000 BOPD and "high end" estimates of up to 92,000 BOPD. Defendant BP, through Rainey, withheld these Bonn estimates from individuals working on flow rate within Unified Command and, later, also withheld them from Congress.

vii. Defendant BP's "ASTM" estimates, prepared by Rainey, did not conform to ASTM standards but instead were manipulated to consistently arrive at or near a "best guess" of between 5,000 and 6,000 BOPD. In effect, defendant BP, through Rainey, conducted the estimates in a manner designed to reverse engineer results consistent with NOAA's preliminary 5,000 BOPD estimate. Defendant BP, through Rainey, labeled the estimates as "ASTM" estimates even though the estimates did not conform to the ASTM method.

viii. As described below, defendant BP, through Rainey and other BP executives, consistently maintained that 5,000 BOPD was the "best guess" estimate, without disclosing internal BP information suggesting the flow rate was considerably higher.

**Defendant BP's Actual Estimates**

ix. In its engineering response to the Macondo oil spill, defendant BP did not rely internally on Rainey's contrived and inaccurate flow-rate numbers. Instead, defendant BP and its affiliated companies had numerous expert teams assessing the flow rate using sophisticated methodologies that focused on the conditions at the seafloor where the oil and natural gas were gushing out. These teams were generating flow-rate estimates much higher than Rainey's purported "best guess" of between 5,000 and 6,000 BOPD.

x. For example, on or about April 22, 2010, BP subsurface engineers, including Kurt Mix, separately charged, estimated "various release

scenarios" with potential flow rates ranging from 64,000 to 146,000 BOPD (the "Subsurface Team Estimates").

xi. Also, on or about May 11, 2010, a team of BP engineers working under the direction of an engineering supervisor ("Engineer 1") prepared a series of possible flow rates that ranged from 14,000 BOPD to 82,000 BOPD depending on potential flow paths and other known and unknown variables (the "Engineer 1 Slide Deck").

**Defendant BP's Public Estimates Questioned**

xii. On or about May 13, 2010, a university professor with expertise in fluid mechanics measurement publicly estimated that the Macondo well was leaking oil at a rate of approximately 70,000 BOPD, based on a review of video footage of the leak that BP had recently released.

xiii. On or about May 14, 2010, defendant BP and its affiliated companies publicly rejected the university professor's work and continued defending 5,000 BOPD as the "best" estimate, even though 70,000 BOPD was within the range of Rainey's Bonn estimates and other internal BP engineering estimates, including the work of Engineer 1 described above.

xiv. On or about May 14, 2010, Engineer 1 sent an email to two executives at BP, including BP's then-Chief Executive Officer for Exploration and Production, expressing concern over BP's continued public embrace of the 5,000 BOPD number. The email stated:

I just read an article on CNN (May 14, 2010 1:00 p.m.) stating that a researcher at [a university] believes that the Macondo well is leaking up to 70,000bopd and that BP stands by a 5,000bopd figure. With the data and knowledge we currently have available, we cannot definitively state the oil rate from this well. **We should be very cautious standing behind a 5,000bopd figure as our modeling shows that this well could be making anything up to ~ 100,000 bopd** depending on a number of unknown variables, such as: flow path either through the annulus behind the production casing or through the production casing float shoe, the height of reservoir exposed, if drill pipe is suspended in the BOP and sealed by VBR rams, reservoir skin damage, choking effects and etcetera. We can make the case for 5,000 bopd only based on certain assumptions and in the absence of other information, such as a well test.

xv. Engineer 1's email caused concern within BP because it contradicted BP's public position regarding flow rate.

**The Rainey Memo**

xvi. On or about May 17, 2010, defendant BP, through Rainey, prepared a memorandum purporting to summarize the efforts that had been undertaken within Unified Command to estimate flow rate (the "Rainey Memo"). The Rainey Memo, which sought to justify BP's 5,000 BOPD estimate, was false and misleading in numerous respects, including:

a. Defendant BP, through Rainey, omitted Rainey's Bonn estimates, which were significantly higher than 5,000 BOPD.

b. Defendant BP, through Rainey, falsely labeled the estimates in the memorandum as "ASTM" calculations.

c. Defendant BP, through Rainey, omitted that the estimates included in the memorandum were premised on data and other inputs defendant BP, through Rainey, knew were inaccurate.

d. Defendant BP, through Rainey, omitted other documents relating to flow-rate estimates that contradicted defendant BP's 5,000 BOPD estimate, including, among others, the work performed by Engineer 1, the Subsurface Team Estimates, and a critique by another BP engineer ("Engineer 2") of the university professor's work that used different assumptions than those used by the professor and concluded that 15,000 BOPD was an appropriate assessment of the flow rate based on the same video footage of the spill.

e. Defendant BP, through Rainey, falsely stated that Rainey's estimates ranging from 5,000 to 6,000 BOPD "played an important part in Unified Command's decision [on April 28, 2010] to raise the estimate of flow rate from 1,000-5,000 barrels per day." In fact, as defendant BP, through Rainey, well knew, defendant BP had not yet provided these purported "ASTM" estimates to Unified Command by the time that Unified Command raised its estimated flow rate to up to 5,000 BOPD.

**The Flow Rate Technical Group**

xvii. On or about May 19, 2010, as a result of the growing concern that BP was understating the amount of oil spilling from the Macondo well, Unified Command announced the creation of the Flow Rate Technical Group ("FRTG"), made up of independent and government experts, to determine the flow rate. Later, following independent analysis, the FRTG announced on or about August 2, 2010, its conclusion that the flow rate after the blowout had initially been approximately 62,000 BOPD—over twelve times BP's public estimate of 5,000 BOPD—and

had been approximately 53,000 BOPD at the time the well was shut in on or about July 15, 2010. The FRTG concluded that a total of approximately 4.9 million barrels of oil had been released during the course of the spill.

**The Congressional Inquiry and Investigation**

xviii. The House Subcommittee on Energy and Environment (the "Subcommittee") was a subcommittee of the Committee on Energy and Commerce of the House of Representatives of the United States Congress. The Subcommittee had oversight authority over matters including the regulation of energy, drinking water and soil and water contamination. The Subcommittee's oversight authority included the authority to analyze the effectiveness of existing laws and to evaluate the need to propose new or additional legislation. The Subcommittee was a "Committee" for purposes of Title 18, United States Code, Section 1505.

xix. Following the Deepwater Horizon blowout, the Subcommittee commenced an inquiry and investigation of the blowout and oil spill, including the amount of oil flowing from the well. Congress's inquiry and investigation included, among other things, requests for information from BP.

xx. On or about May 4, 2010, in response to a Congressional request for a briefing of members and staff of Congress, defendant BP, through Rainey, falsely informed the Subcommittee that 5,000 BOPD was the most accurate flow-rate estimate. Defendant BP, through Rainey, further stated to Congress that, while defendant BP had calculated a hypothetical "worst case" scenario of 60,000 BOPD, the worst case scenario was not possible, in part because it assumed removal of the blowout preventer from the wellhead, which remained in place at that time. During the May 4 briefing, defendant BP, through Rainey, did not disclose any information that contradicted defendant BP's purported "best guess" of 5,000 BOPD, including the Bonn estimates and other BP internal information of which defendant BP, through Rainey, was aware indicating that the actual flow—not a hypothetical worst case scenario assuming the non-existent condition of the blowout preventer being removed—was much higher than 5,000 BOPD.

xxi. On or about May 14, 2010, the then-Chairman of the Subcommittee ("the Subcommittee Chairman") sent a letter to BP accusing BP of understating the amount of oil leaking from the well. The letter noted that BP had recently "reaffirmed the 5,000 barrels per day estimate" despite recent news reports that the "actual amount of oil being released into the Gulf of Mexico could be upwards of 70,000 barrels

per day." The letter further stated that Congress was concerned that an "underestimation of the flow may be impeding the ability to solve the leak and handle management of the disaster." The Subcommittee requested answers to fifteen questions relating to flow rate and requested that BP "update [its] response or provide additional documents at such time as such information becomes available." Among other things, the Subcommittee requested:

a. "What is the BP method and scientific basis for the estimate of 5,000 barrels per day? Was this estimate based solely on surface monitoring of the size of the spill?

b. "All documents created since the incident that bear on, or relate to, in any way, estimates of the amount of oil being released"; and

c. "BP's current estimate of the amount of oil flowing from the well, including the basis and methodology for that estimate, along with any uncertainty or error ranges for the estimate."

xxii. On or about May 21, 2010, defendant BP, through Rainey, began working on a response to the May 14 Congressional request. Rainey was the primary source of flow-rate information for defendant BP's eventual written response to Congress on or about May 24, 2010 (the "BP Response") that continued to embrace 5,000 BOPD as the "best guess" estimate. During the preparation of the BP Response, defendant BP, through Rainey, continued to receive information that contradicted a "best guess" of 5,000 BOPD, including that the amount of oil actually being collected via a riser insertion tube tool (the "RITT") confirmed that the flow rate was in excess of 5,000 BOPD and an email that "everyone" within the FRTG at that time agreed that "5,000 barrels/day was too low." Aware of this and other information contradicting the 5,000 BOPD estimate, defendant BP, through Rainey, withheld such information from other BP employees and from BP in-house and outside lawyers working on the BP Response. Defendant BP, through Rainey, also prepared false and misleading responses to the Congressional request, and provided false and misleading information to others working on the BP Response.

xxiii. On or about May 24, 2010, defendant BP, through Rainey, caused to be submitted to the Subcommittee the BP Response, which appended the false and misleading Rainey Memo and its attachments, which were selected by defendant BP, through Rainey. As a result of defendant BP's actions, through Rainey, in withholding information and also providing false and misleading information, the BP Response made false and misleading statements to Congress, withheld and concealed information, and otherwise impeded Congress's inquiry and investigation. For example:

88

a. The BP Response omitted all of Rainey's Bonn estimates, which contained estimates of oil spill up to 92,000 BOPD

b. The BP Response omitted key parts of Engineer 1's work, including flow-rate estimates up to 82,000 BOPD.

c. The BP Response omitted Engineer 1's email expressing concern about BP's public defense of the 5,000 BOPD estimate.

d. The BP Response falsely labeled Rainey's estimates as having been calculated using the "ASTM" method, when, in fact, the estimates did not conform to that method.

e. The BP Response omitted that Rainey's purported "ASTM" estimates were premised on data and other inputs Rainey knew were inaccurate.

f. The BP Response omitted that Rainey had manipulated his purported "ASTM" estimates to arrive near 5,000 BOPD.

g. The BP Response omitted Engineer 2's conclusion that a proper assessment of the video footage relied upon by the university professor resulted in an estimate of 15,000 BOPD—three times higher than the 5,000 BOPD estimate contained in the BP Response that Rainey asserted was the best estimate.

h. The BP Response omitted the Subsurface Team Estimates ranging from 64,000 to 146,000 BOPD.

i. The BP Response falsely stated that Rainey's purported "ASTM" estimates played an important part in Unified Command's decision to raise its early estimate from 1,000 to 5,000.

j. The BP Response omitted data Rainey received on or about May 22, 2010, that the amount of oil actually being collected via the RITT confirmed that the flow rate was in excess of 5,000 BOPD.

k. The BP Response omitted a May 23, 2010 email from the head of the FRTG to Rainey and others stating, among other things, that "everyone is at least comfortable with saying that the 5,000 barrels/day was too low."

227.   BP E&P (referred to in the Guilty Plea Agreement as "BP") plead guilty to making the following omissions and false and misleading statements in its May 24, 2010 response ("Markey Response") to the Committee on Energy and Commerce:

i.   BP, through a former vice president, withheld information and documents relating to multiple flow-rate estimates prepared by BP engineers that showed flow rates far higher than 5,000 BOPD, including as high as 96,000 BOPD.

ii.   BP, through a former vice president, withheld information and documents relating to internal flow-rate estimates he prepared using the Bonn Agreement analysis, that showed flow rates far higher than 5,000 BOPD, and that went as high as 92,000 BOPD.

iii.   BP, through a former vice president, falsely represented that the flow-rate estimates included in the Response were the product of the generally-accepted ASTM methodology.  At the time that this false representation was made, BP's former vice president knew that those estimates were the product of a methodology he devised after, among other things, a review of a Wikipedia entry about oil spill estimation.

iv.   BP, through a former vice president, falsely represented that the flow-rate estimates included in the Markey Response had played "an important part" in Unified Command's decision on April 28, 2010, to raise its flow-rate estimate to 5,000 BOPD.  At the time this false representation was made, BP's former vice president knew that those flow-rate estimates had not played "an important part" in Unified Command's decision to raise its flow-rate estimate and had not even been distributed outside of BP prior to that decision.

v.   BP falsely suggested, in its May 24, 2010 letter, that the Unified Command's flow rate estimate of 5,000 barrels of oil per day ("BOPD") was the "most scientifically informed judgment" and that subsequent flow rate estimates had "yielded consistent results."  In fact, as set forth above, BP had multiple internal documents with flow rate estimates that were significantly greater than 5,000 BOPD that it did not share with the Unified Command.

vi.   On or about June 25, 2010, in a BP letter to Congressman Markey, BP's former vice president inserted language that falsely stated that BP's worst case discharge estimate was raised from 60,000 BOPD to 100,000 BOPD after subsequent "pressure data was obtained from the BOP stack."  At the time this false representation was made, BP's former vice president knew that the 100,000 BOPD figure was not first derived after subsequent pressure data had been obtained, but instead,

he had been aware of a 100,000 BOPD worst case discharge since as early as on or about April 21, 2010.

228.    A separate indictment was also unsealed on November 15, 2012, charging Defendant Rainey with obstructing a Congressional investigation and making false and misleading statements to law enforcement officials.  Simply put, he is charged with lying about the very facts at issue in this case to authorities attempting to manage the worst ecological disaster in U.S. history as it was unfolding.

229.    When the DOJ criminal pleas, SEC securities fraud settlement, and resulting fines and penalties were announced on November 15, 2012, Defendant Dudley issued a statement stating, in part, "We apologize for our role in the accident, and as today's resolution with the U.S. government further reflects, *we have accepted responsibility for our actions*."  Plaintiffs, via this lawsuit, seek to hold BP to its word, by accepting responsibility for its lies and deceptions and those of its executives which caused Plaintiffs to suffer the losses alleged herein.

### 5.    The U.S. EPA Barred BP From New Contracts With The U.S. Government

230.    On November 28, 2012, in the wake of BP's guilty pleas, BP was barred from doing new business with the U.S. government.  The effects on BP were profound.  In a statement on its website, EPA stated, "EPA is taking this action due to BP's lack of business integrity as demonstrated by the company's conduct with regard to the Deepwater Horizon blowout, explosion, oil spill and response."  The U.S. Interior Department confirmed that the ruling temporarily barred BP from winning any new federal oil leases, including the roughly 20 million new acres of federal waters in the Gulf of Mexico that the Interior Department had opened for auction the same day.  BP was barred from bidding on any of those parcels.  The ban was expected to impact BP's extensive business with the U.S. military as well, including an estimated $1.35 billion in Defense Department fuel contracts.

231.     Following this announcement, analysts stated that a lengthy government contract ban could seriously impact BP's bottom line, particularly given BP's previously stated intent to ramp up U.S. production.

## VIII. THE MATERIALIZATION OF THE UNDISCLOSED RISKS – DEEPWATER HORIZON OIL SPILL AND ITS AFTERMATH

### A.     BP's Systematic Failures Caused the Explosion on and the Sinking of the *Deepwater Horizon Rig*

*BP Acquires the Rights to the Macondo Well and Began Its Preparation to Drill Despite Having an Inadequate and Error-Filled Oil Spill Response Plan*

232.     The tragedy of the Macondo well explosion was avertable, but BP's overarching culture of indefensible risk-taking prevailed. At every turn, BP's conduct evidenced a systematic departure from recognized industry safety practices. Thus, the Presidential Commission found that "*the cumulative risk that resulted from these decisions and actions was both unreasonably large and avoidable[.]*"

233.     In March 2008, BP paid approximately $34 million to acquire the exclusive drilling rights from the MMS for the Mississippi Canyon Block 252, a nine-square-mile plot in the Gulf of Mexico that encompasses the Macondo well. Although the Mississippi Canyon area has many productive oil fields, BP knew little about the specific geology of Block 252 and, in fact, the Macondo was the Company's first well on the new lease. BP planned to drill the well to 20,200 feet in order to learn the geology of the area and to determine whether the oil and gas reservoir would warrant installing production equipment. The Macondo well was located 47.6 miles off the coast of Louisiana. It was believed that the well could hold as much as fifty (50) million barrels (or 2.1 billion gallons) of producible oil.

234.     Throughout the Relevant Period, MMS required BP to prepare and file oil spill response plans demonstrating the Company's specific strategy and ability to respond to an oil

92

spill if one occurred while drilling in the Gulf of Mexico. MMS regulations required that an oil spill response plan include, *inter alia:* (i) an emergency response action plan; (ii) disclosure of the equipment available to combat an oil spill; (iii) any oil spill response contractual agreements with third-parties; (iv) calculations of the worst-case discharge scenarios; (v) a plan for dispersant use in case of a spill; (vi) an in-situ oil burning plan; and (vii) information regarding oil spill response training and drills. *See* 30 C.F.R. § 254.21.

235.   The first of these requirements, the "emergency response action plan," is the "core" of the overall operational response plan and required BP to disclose, among other things: (i) information regarding the Company's oil spill response team; (ii) the types and characteristics of oil at the facility; (iii) procedures for early detection of a spill; and (iv) procedures to be followed in the event of an oil spill. *See* 30 C.F.R. § 254.23.

236.   BP publicly filed its oil spill response plan for the Gulf of Mexico – entitled "Regional Oil Spill Response Plan – Gulf of Mexico" – with the MMS on December 1, 2000, and last revised the plan on June 30, 2009 ("BP's Regional OSRP for the GOM"). A regional oil spill response plan is designed to cover multiple facilities or leases of a lessee that have: (i) similar modeled spill trajectories and worst case discharge scenarios, (ii) the potential to affect the same ecological or socioeconomic resources, and (iii) are located in close enough proximity to be served by the same response equipment and personnel. BP's Regional OSRP for the GOM covers a massive area, including all of the United States' interests in the Gulf of Mexico. This area encompasses the coastal waters of Texas, Louisiana, Alabama, Mississippi, and Florida. BP has approximately 600 leases and operates roughly 70 oil wells in the Gulf of Mexico. BP's Regional OSRP for the GOM applied to all of these wells.

93

237. According to BP's Regional OSRP for the GOM, the *"TOTAL WORST CASE DISCHARGE" scenarios in the Gulf of Mexico ranged from a release of 28,033 barrels of oil per day to 250,000 barrels of oil per day.* More specifically, BP's Regional OSRP for the GOM stated: (i) an oil spill occurring less than ten miles from the shoreline could create a worst case discharge of 28,033 barrels of oil per day; (ii) an oil spill that occurred greater than ten miles from the shoreline could create a worst case discharge of 177,400 barrels of oil per day; and (iii) an oil spill caused by a mobile drilling rig that is drilling an exploratory well could create a worst case discharge of 250,000 barrels of oil per day. BP's Regional OSRP for the GOM explicitly states that the Company and its subcontractors *could recover approximately 491,721 barrels of oil per day* (or more than 20.6 million gallons) in the event of an oil spill in the Gulf of Mexico. Moreover, the Company claimed and provided certified statements to the MMS that BP and its subcontractors *"maintain the necessary spill containment and recovery equipment to respond effectively to spills."*

238. On March 10, 2009, the MMS deemed the Company's initial exploration plan for Mississippi Canyon Block 252 ("BP's EP") "submitted." BP's EP included the area encompassing the Macondo well.[1] In connection with the EP, BP sought a permit from the MMS to drill to a total depth of 19,650 feet at the Macondo Well. Following the sinking of the *Deepwater Horizon,* a BP crewman admitted that this depth had been misrepresented to the MMS, and that BP had in fact drilled in excess of 22,000 feet, in violation of its permit.

239. According to BP's EP, the worst case scenario of an oil spill occurring in Mississippi Canyon Block 252 would be the release of approximately *162,000 barrels of oil per day.*

---

[1] BP's Regional OSRP for the GOM and EP are collectively referred to herein as "BP's Oil Spill Response Plan."

240.    In BP's EP, the Company claimed it would have no difficulty responding to a worst case scenario while drilling the Macondo well:

*Since BP ... has the capability to respond to the appropriate worst-case scenario included in its regional OSRP ..., and since the worst-case scenario determined for our [EP] does not replace the appropriate worst-case scenario in our regional OSRP, I hereby certify that BP ... has the capability to respond, to the maximum extent practicable, to a worst-case discharge, or a substantial threat of such a discharge, resulting from the activities proposed in our [EP].*

\*\*\*

*[D]ue to the distance to shore (48 miles) and the response capabilities that would be implemented, no significant adverse impacts are expected.*

241.    Because the worst case scenario discharge figures in BP's EP – which BP calculated – fell below the threshold established in BP's Regional OSRP for the GOM, the Company was not required to submit a site-specific drilling plan for the Macondo well itself.

242.    In October 2009, the semi-submersible Transocean rig *Marianas* began drilling the Macondo well. However, operations were halted at approximately 4,000 feet below the sea floor due to damage caused to the rig by Hurricane Ida.

243.    The replacement rig, the *Deepwater Horizon,* arrived at the Macondo well on January 31, 2010. Although the rig was in place on that date, several steps needed to occur prior to beginning any drilling operation, including connecting the rig's BOP to the wellhead.  BP completed these steps by February 10, 2010 and the *Deepwater Horizon* began drilling shortly thereafter.

244.    Once the rig was connected to the BOP via the riser, BP inserted the drill bit and drilling pipe through the riser and BOP in order to reach the wellbore in the ocean floor.  As drilling progressed, so-called "drilling mud" was pumped down through the drilling pipe and emerged through holes in the drill bit.

245. Drilling mud is not mud in the traditional sense; it is a blend of synthetic fluids, polymers and weighting agents costing approximately $100.00 per barrel. Drilling mud accounts for as much as 10% of the total cost in drilling a deepwater well. Drilling mud is a critical part of the drilling process. For example, as it is circulated down the drilling pipe and back up the wellbore to the rig, drilling mud clears the wellbore of broken rock and other debris (referred to as "cuttings"), cools the drill bit and maintains stable pressure within the well, which is critical to the mechanical stability and integrity of the wellbore.

246. When drilling a deepwater well like the Macondo – which lies approximately 5,000 feet (or about 1 mile) below the ocean's surface and extends another 13,000 feet below the ocean floor – controlling pressure is a paramount concern. The inward or "pore" pressure (*i.e.,* the pressure exerted by the fluid in the surrounding rock formation on the wellbore) must be balanced with the outward or "fracture" pressure (*i.e.,* the pressure exerted by the drilling fluids in the wellbore on the surrounding rock formation). Following proper safety procedures is critical because uncontrolled well pressure can cause an explosion.

247. On April 9, 2010, the weight of the drilling mud being pumped into the Macondo well was too high and fractured the surrounding formation; drilling mud began flowing into the cracks in the formation. In an attempt to plug the fractures and stop the outflow of drilling fluid, BP circulated 172 barrels of thick, viscous fluid, referred to as a "lost circulation pill," into the wellbore. The lost circulation pill succeeded in staunching the outflow of drilling mud, but the episode underscored the sensitivity of the Macondo well. As noted by the Presidential Commission: "*BP's on-shore engineering team realized the situation had become delicate. They had to maintain the weight of the mud in the wellbore at approximately 14.0 pounds per gallon (ppg) in order to balance the pressure exerted by the hydrocarbons in the pay zone.*" Thus, BP's

engineers were on notice that they must be even more vigilant in monitoring and controlling the competing pressures within the wellbore.

### Casing and Cementing the Well

248.    Once the initial drilling of the well was complete, BP then needed to insert casing to seal off the walls of the wellbore to provide structural integrity. BP considered two casing methods: a long-string casing and a liner/tie-back casing. The long-string casing involves hanging a single continuous wall of steel from the wellhead on the ocean floor down to the bottom of the well over thirteen thousand feet below. The liner/tie-back method entails hanging shorter segments of casing to one another in order to form a stronger and less flexible piece of metal. A critical distinction between the two methods is that the long-string casing method provides two barriers to flow up the annular space (once cementing is complete) whereas the liner/tie-back casing provides four barriers to annular flow. This means that the liner/tie-back method provides twice the safety precautions as compared with the long-string casing method. In addition, BP knew that obtaining a reliable primary cement job with the long-string casing would be much more difficult.

249.    In fact, between April 14 and 15, 2010, the BP engineering team in Houston, Texas modeled the likely success of the cementing process using the two casing methods and determined that *the long- string method would fail in effectively cementing the Macondo well.*

250.    In light of this determination, the engineering team elected to proceed with the liner/tie-back method, but, according to the Presidential Commission, others at BP opposed the decision. In the end, despite the conclusion that the long-string method could not be cemented reliably, BP's view prevailed and the crew proceeded with the long-string casing method.

251.    The next step in the drilling process was to thread the long-string casing through the center of the wellbore down to the bottom of the well. Centering the casing is of vital

importance to obtaining a secure cement job. As the cement mixture flows out of the casing, it ascends through the annular space surrounding the casing. If the space around the casing is uneven (*i.e.,* there is more space on one side than on the other), the cement begins to fill in the annular space in an uneven manner, leaving channels of drilling mud in the cement. These channels are pathways through which highly pressurized hydrocarbons can flow.

252.    To ensure that the long-string casing will be centered, guides called "centralizers" are placed around the casing at regular intervals. For the Macondo well, BP decided that it would use only six centralizers because that was the amount currently available on the rig. It does not appear that the Company's reasoning was based on any scientific or engineering calculations. However, before BP could actually place the centralizers in the well, it needed Halliburton – who BP contracted for this cementing job – to verify that six centralizers would be sufficient.

253.    On or about April 15, 2010, Halliburton engineer Jesse Gagliano ("Gagliano") performed computer simulations to assess the likelihood of a satisfactory cement job using six centralizers. Gagliano's calculations demonstrated a high likelihood of channeling resulting in a cement failure if the Company used only six centralizers. Computer simulations showed that twenty-one centralizers were necessary – *i.e.*, almost four times as many as BP intended to use.

254.    After reviewing the modeling data himself, BP Drilling Team engineer Gregory Walz ("Walz") agreed with Gagliano's conclusions. On April 16, 2010, Walz wrote to other BP engineers and stated, in part, that the operation needs "to honor the ... modeling to be consistent with our previous decisions to go with the long string." Walz proceeded to make arrangements to obtain the additional centralizers.

255. However, BP Well Team Leader John Guide ("Guide"), who was also based in BP's Houston office, opposed using the additional centralizers because the installation would delay the team by approximately ten hours and would therefore cost BP money. Although BP ordered additional centralizers, when they arrived on the *Deepwater Horizon* it was determined that the centralizers were the wrong type. Despite the serious threat of channeling identified in the modeling data, however, Guide's view prevailed and only six centralizers were used to center the more than thirteen thousand foot long-string casing in the wellbore.

256. BP's culture of unreasonable, indefensible risk taking is echoed in an email by Brett Cocales (a drilling operations engineer in BP's Houston office), dated April 16, 2010, in which he stated:

> Even if the hole is perfectly straight, a straight piece of pipe even in tension will not seek the perfect center of the hole unless it has something to centralize it. *But, who cares, it's done, end of story, will probably be fine* and we'll get a good cement job.

257. On April 17, 2010, after learning that BP would proceed with only six centralizers, Gagliano re-ran the computer simulations and modeling using seven centralizers and the conclusion was the same: the well would have *"a SEVERE gas flow problem."* BP, however, continued to ignore its own expert's opinion.

258. On April 18, 2010, BP began lowering the long-string casing into the wellbore. To enable the drilling mud located in the wellbore to flow smoothly and distribute evenly as the long-string casing is lowered, two trap doors within the long-string casing, referred to as the "float collar," are propped open with a tube called an "auto fill tube."

259. On April 19, 2010, after the long-string casing reached the bottom of the wellbore, BP needed to dislodge the auto fill tube, converting the float collar from a two-way

valve to a one-way valve. Successfully converting the float collar insures that the pumped cement will only flow downward through the casing, a critical step in the cementing process.

260. Two events should have indicated to BP that the conversion of the float collar was not proceeding properly. First, the tube should be dislodged once the flow through the tube reaches six barrels of mud per minute (6 bpm), equivalent to six hundred pounds of pressure per square inch (600 psi). Yet, as the crew pumped drilling mud down the casing, pressure began to climb beyond the 600 psi threshold which should have converted the float collar, but still the crew was unable to establish flow. The pressure continued to rise, peaking at 3,142 psi (more than five times more pressure than should have been needed to convert the float collar) before suddenly dropping precipitously. It appears that BP assumed that this meant the float collars had converted. This is a scientifically indefensible position, however, because, as noted by the Presidential Commission: "[t]he auto fill tube was designed to convert in response to *flow-induced* pressure. Without the required rate of flow, an increase in *static* pressure, no matter how great, will not dislodge the tube."

261. Second, after the tube is dislodged and the float collar is converted to a one way passage, the amount of pressure needed to circulate drilling mud from the rig, down the drilling pipe and up the annular space to the rig again should have been 570 psi. Yet, as BP began the process of converting the float collars, the results differed considerably. After the spike and sudden drop in pressure, the circulation pressure was only 340 psi.

262. BP personnel on the rig erroneously ignored the mounting evidence that something was amiss, and proceeded to the next step in the well abandonment plan — mud circulation.

100

263. Correct mud circulation requires a complete circulation of drilling mud in the wellbore, referred to as "bottoms up" circulation. The process, which requires about 12 hours, allows workers on the rig to test the mud for gas influxes, safely remove any gas pockets, and evacuate any debris or other foreign matter that could contaminate the cement. Given the heightened challenges of cementing a long-string (as opposed to a liner/tie-back) casing, this step was critical. In addition, "bottoms up" circulation would allow the BP crew to test the mud at the bottom of the well for hydrocarbons, the presence of which would indicate a leak in the cement job at the bottom of the well.

264. In order to complete a "bottoms up" circulation, BP needed to circulate 2,760 barrels of drilling mud. Instead, as noted by the Presidential Commission, BP circulated only 350 barrels of mud – eight times less than the amount required to properly complete the "bottoms up" circulation of the well.

265. In cementing the Macondo well, BP used nitrogen foam, a cement with which it had little experience in the Gulf of Mexico. In February 2010, Gagliano conducted tests regarding the stability of the nitrogen foam cement. The tests showed that the mixture was unstable and therefore represented an additional risk of well failure. According to the Presidential Commission Report, these test results were communicated to BP personnel in Houston on March 8, 2010, however, the warnings were ignored and BP pumped nitrogen foam cement into the Macondo well.

266. BP's internal guidelines dictated that the top of the annular cement should be 1,000 feet above the uppermost hydrocarbon zone. For the Macondo well, BP injected just enough cement to extend the annular cement barrier half the distance, or only 500 feet above the uppermost hydrocarbon zone. According to the Presidential Commission Report, this deviation

reduced the safety margin for this procedure by 50% and meant that a total of sixty barrels of cement would be used to cement the well, which BP's own engineers recognized left absolutely no margin for error. Also according to the Presidential Commission Report, BP was also keenly aware that it was pumping the cement at an unsafe rate (four barrels per minute rather than six barrels per minute), further impeding the efficiency with which cement would be displaced from the annular space, and reducing its safety margin even further.

267. At 12:40 a.m. on April 20, 2010, the crew finished pumping the primary cement job. A team of outside technicians was on hand to conduct the battery of tests needed including, but not limited to, the "cement log," which was designed to evaluate and test the sufficiency of the cement job. The cement log is an acoustical test used to identify areas (if any) where the cement failed to channel up through the annular space in a uniform fashion. If cement channeling is uneven, pockets form, creating the possibility that hydrocarbons will enter the wellbore where they can ascend (and expand) rapidly.

268. The acoustical test was especially critical given BP's prior erroneous decisions regarding the construction of the Macondo well, which included, *inter alia:* (i) using the difficult-to-cement long-string casing method; (ii) foregoing the "bottoms up" mud circulation; (iii) failing to use twenty one centralizers as the Company's expert recommended; (iv) ignoring scientifically accepted data pertaining to the float collar conversion; (v) electing to use nitrogen foam cement deemed unstable in prior testing; (vi) pumping the cement at reckless rates; and (vii) halving the safety margin by setting the cement 500 (rather than 1,000) feet above the hydrocarbon bearing "pay zone." BP decided to forego the acoustical test and sent the team of technicians home by helicopter at 11:15 a.m. that morning. Forgoing the acoustical test saved

the Company approximately ten hours and $100,000. This decision was contrary to industry practice and the recommended safe practices of the American Petroleum Institute.

### BP Begins the Temporary Abandonment Process

269. The *Deepwater Horizon* rig is a drilling rig as opposed to a production rig. Once drilling operations are complete, the well is placed in "temporary abandonment" until the arrival of the production rig, which will connect to the well and begin pumping oil and gas from the site. Placing the well into temporary abandonment means that that the drilling rig will be removing its own BOP and riser from the wellhead. There are several key features in the temporary abandonment process to insure that the well is secure before the BOP and riser are removed. For one, a cement plug, which acts like a cap, is placed in the well. Typically this cap is placed at or near the mudline. The area in the well *beneath* the cap is filled in with heavy drilling mud, which applies additional downward pressure on the hydrocarbon bearing zone. If the cement plug is placed at a greater depth, this necessarily means that there will be less heavy drilling mud in the well underneath the cement plug. Finally, the crew will install a "lockdown sleeve" at the wellhead. Throughout this process, the well is monitored and a series of tests are performed to insure that the well is secure — *i.e.,* that no hydrocarbons are leaking into the well. According to the Presidential Commission, neither the BP Well Site leaders, nor any of the rig's crew, had seen the temporary abandonment plan for the Macondo well prior to 10:43 a.m. on the day abandonment procedure began. Indeed, the temporary abandonment plan had undergone numerous changes leading up to April 20, 2010, but, according to the Presidential Commission: "It does not appear that the changes to the temporary abandonment procedures went through any sort of formal review at all."

270. Prior to abandonment, the well must be tested to insure that there are no leaks. In part, this involves conducting a "negative-pressure test" to assess whether hydrocarbons are

flowing into the well. To conduct this test, BP needed to simulate the pressure conditions that would exist in the well once it was placed into temporary abandonment. As part of the negative pressure test, the crew removed 3,300 feet of mud from the wellbore.

271. To remove the drilling mud from the wellbore (and later the riser), BP pumped "spacer" through the drilling pipe followed by seawater. Spacer is a synthetic blend that acts as a barrier between the drilling mud and seawater. Although the use of spacer is a common and accepted practice, BP's spacer concoction was mixed on board the rig from leftover chemicals that would enable BP to save money and skirt environmental regulations. As explained by the Presidential Commission:

> While drilling crews routinely use water-based spacer fluids to separate oil-based drilling mud from seawater, *the spacer BP chose to use during the negative pressure test was unusual.* BP had directed . . . mud engineers on the rig to *create a spacer out of two different lost-circulation materials left over on the rig - the heavy, viscous drilling fluids used to patch fractures in the formation . . . .*
>
> *BP wanted to use these materials as spacer in order to avoid having to dispose of them onshore as hazardous waste pursuant to the Resource and Conservation Recovery Act*, exploiting an exception that allows companies to dump water-based "drilling fluids" overboard if they have been circulated down through a well. *At BP 's direction, the [mud engineers] combined the materials to create an unusually large volume of spacer that had never previously been used by anyone on the rig or by BP as a spacer, nor been thoroughly tested for that purpose.*

272. Testimony before the Presidential Commission indicates that this concocted, untested spacer may have clogged the BOP's kill line, interfering with the results of later testing designed to assess the integrity of the well.

273. After removing drilling mud from the wellbore, BP began a negative-pressure test to determine whether the well was sealed such that gas or liquid could not permeate into the well. This negative pressure test is the *only* test that assesses the integrity of the cement job at the bottom of the well. BP had no established procedure or protocol for conducting a negative pressure test.

274. To conduct the negative-pressure test, the crew "bled off" pressure from the drilling pipe until it was 0 psi. The pipe was then sealed and monitored. For a successful negative pressure test, the pressure within the drilling pipe must remain at 0 psi for a certain period of time. The BP crew went through this process *three* times – bleeding down the pressure and then sealing the pipe – and all *three* times the pressure within the drill pipe jumped, reaching 1400 psi on the third attempt. Thus, the pressure test failed three times, in identical fashion.

275. The negative-pressure test performed exactly as intended. It gave the clear, unequivocal warning that the integrity of the well was compromised. As noted by the Presidential Commission: "[B]ased on available information, *the 1400 psi reading on the drill pipe could only have been caused by a leak* into the well." In May 2010, BP admitted in Congressional testimony that these pressure test results clearly signaled a "very large abnormality" in the well. Yet, notwithstanding the unequivocal results of the negative pressure test and without communicating the results to safety experts in Houston, BP ignored the warnings and instead applied the same test to the "kill line," one of the pipes used to circulate fluids into and out of the well.

276. After conducting the negative-pressure test a *fourth* time (this time on the kill line), BP achieved what it considered to be a successful test result, and continued with the temporary abandonment process. During this last test, the crew was able to maintain 0 psi on the kill line, but the pressure on the drill pipe continued at 1400 psi. The Presidential Commission Report found that "BP used a spacer that had not been used by anyone at BP or on the rig before, that was not fully tested, and that may have clogged the kill line," leading to the so-called successful test result.

277.    As part of the negative-pressure testing of the well, the crew had already removed 3,300 feet of drilling mud below the sea floor from the well and replaced it with seawater. This decision was driven by BP's choice to place the "cement plug" at a depth of 3,000 feet. The cement plug is a three hundred foot cap, which is placed in the well as an additional safety measure to secure the well while it is in temporary abandonment. Placing the cement plug 3,300 feet below the ocean floor is not in accordance with accepted industry practice for performing this function. Indeed, placing the cement plug three *thousand* feet below the mud line was inconsistent with MMS regulations and required special dispensation.

278.    The associated risks were amplified by BP's decision: (i) to leave 3,300 feet of the well below the ocean floor filled with only seawater, rather than heavy drilling mud and (ii) to postpone placement of the cement plug in the well. As a result, once BP opened the annular preventers on the BOP to facilitate the removal of mud from the riser, the only remaining barriers between the rig and the highly pressurized hydrocarbons in the well were the drilling mud remaining in the bottom section of the well and, beneath that, the cement job at the very bottom of the well.

279.    At this stage, there was nothing to prevent leaked hydrocarbons (if present in the wellbore) from traveling up the riser to the rig. An influx of hydrocarbons is called a "kick" and is exceedingly dangerous due to the highly pressurized conditions. One gallon of gas at the bottom of the well is capable of expanding to 1,000 gallons by the time it reaches the rig on the ocean's surface. As the gas expands, it accelerates the kick. It is therefore imperative that the well be monitored closely for any evidence of a mounting kick.

280.    At 8:02 p.m. on April 20, 2010, BP began to remove the drilling mud from the riser. As operations proceeded, the drilling mud was returning to the rig, but BP failed to monitor

106

the rate of return. The returned mud should have been placed in a subset of the rig's mud pits, referred to as the "active mud pits," to facilitate monitoring. Instead, the returned mud was being dispersed over a number of pits and mud from other operations was being routed to the active mud pits. As a result, there was no way to know whether more mud was returning to the rig than was being pumped into the well, a fact that would have been evidence that a kick was in progress.

281.    At 9:01 p.m. on April 20, 2010, pressure measurements in the well signaled the impending crisis. Pressure in the well should have remained constant or decreased because the pumping pressure remained constant. However, the pressure in the drilling pipe slowly began to *increase,* signaling an influx of hydrocarbons into the well.

282.    The crew did not respond to the pressure reading until approximately 9:30 p.m., when driller Dewey Revette ordered a crew member to bleed pressure from the drilling pipe. Despite the strong evidence of a kick, BP and its crew took no steps to assess the cause of the pressure reading or to seal the well. In addition, no employee in BP's Houston office was monitoring the pressure in the Macondo well. As Fred Bartlit ("Bartlit"), a Presidential Commission investigator, made clear during a Commission presentation on November 9, 2010, drill pressure data was "available" in BP's office in Houston, but BP did not in fact monitor it the night of the *Deepwater Horizo*n blowout: "There was nobody in that B.P. Macondo well office that night," Bartlit said. "Everybody had gone home."

283.    Sometime after 9:40 p.m. on April 20, 2010, drilling mud began spewing onto the rig floor and, a few minutes later, the crew began its initial attempt to activate the BOP.

### *Explosion on the Deepwater Horizon*

284.    The crew initially attempted to activate the rig's BOP annular preventer, a doughnut-shaped rubber and steel seal that fits around the drill pipe and seals the hydrocarbons

107