

**Matthew L. Tuccillo**
Partner

December 19, 2018

**VIA ECF**

Honorable Keith P. Ellison
United States District Judge
Southern District of Texas
Bob Casey Federal Courthouse
515 Rusk Avenue, Third Floor, Room 3716
Houston, TX 77002

    Re:    *In re BP p.l.c. Sec. Litig.*, MDL 2185 Individual Actions

Dear Judge Ellison:

    My firm is on the Individual Action Plaintiffs' Steering Committee (the "Steering Committee") in MDL 2185 and serves as the sole Court-appointed Liaison with Defendants and the Court, pursuant to ¶13 of the Court's Order on Pretrial Coordination and Leadership of MDL 2185 Individual Actions, dated December 11, 2013 (Dkt. No. 721) (the "Leadership Order"). In those capacities, pursuant to Leadership Order ¶¶14-15, and in accordance with ¶4 this Court's Scheduling / Docket Control Order entered January 17, 2018 (Dkt. No. 1630) (the "Case Management Order" or "CMO"), I respectfully submit this letter, on behalf of the Steering Committee, with approval from Defendants' counsel, to provide the Court with an update, a proposed Order Concerning Depositions (the "Deposition Protocol Order" or "DPO"), attached hereto as Exhibit 1, and an explanation of the parties' positions on disputed terms in that order. As set forth below, we respectfully request that the Court schedule a status conference no earlier than January 3, 2019, to address these issues.

Relevant Background

    Leadership Order ¶14 expressly empowers the Steering Committee to oversee the conduct of pretrial discovery regarding the Individual Actions by, *inter alia*, deciding on behalf of all Individual Action Plaintiffs: whether deposition notices should be served, on which witnesses, and when; the order of examinations by Plaintiffs' counsel to be conducted during depositions; whether subpoenas should be issued, on which targets, and regarding what issues; and the format, substance, timing, and presentation of discovery disputes to the Court such as those presented herein.

    Pursuant to ¶1 of the CMO, attached hereto as Exhibit 2, all Individual Action Plaintiffs made an initial production of documents in accordance with the parties' letter agreement dated December 28, 2017 (the "12/28/2017 Letter Agreement"), attached hereto as Exhibit 3. Pursuant to CMO ¶¶2-3, the Defendants and the Steering Committee next identified 16 Individual Action Plaintiffs to serve as



Honorable Keith P. Ellison  
December 19, 2018

Page 2

"Representative" (or "Test-Case") Plaintiffs, which, pursuant to CMO ¶¶5-14 will proceed through full fact and expert discovery, dispositive motion practice, and pretrial motions. My letter to the Court dated September 28, 2018 (Dkt. No. 1708) identified the 16 Plaintiffs so chosen and indicated that the parties were working on a proposed deposition protocol order in accordance with CMO ¶4. I have provided roughly bi-weekly updates to the Court's Clerk thereafter as to our progress.

### Global Deposition Protocol

During a lengthy meet-and-confer process that included periodic updates provided to and input received from other affected firms, BP's counsel, another Steering Committee firm, and I discussed and negotiated how best to conduct Individual Action depositions. Those efforts resulted in the proposed DPO submitted herewith, which provides a framework for orderly conduct of depositions of Test-Case Plaintiffs, Defendants and other BP employees, and outside investment managers and other third parties. The Steering Committee and Defendants believe that the DPO's framework would promote the efficient, orderly, timely and effective advancement of the Individual Actions through depositions and other discovery, while providing clear guidance to parties and non-parties alike. This organization is crucial particularly as regards witnesses with overlapping relevance to these cases, such as certain outside investment managers. Significantly, all Individual Action Plaintiffs and all Defendants have authorized and signed off on the proposed DPO submitted herewith.

### Unresolved Issues Requiring Court Guidance

So as to minimize the burden on the Court, wherever possible, the proposed DPO includes agreed-upon language resulting from the meet-and-confer process. However, despite the parties' good faith efforts, the DPO reflects several contested issues where (i) the parties have proposed competing language or (ii) one side has proposed language that the other side opposes. Those disputes are numbered in the DPO, and the parties' positions on each are briefly set forth in the attached appendix.

### Request for Status Conference

The undersigned respectfully requests, on behalf of the Individual Actions Steering Committee and Defendants, that the Court schedule, no earlier than January 3, 2019, a telephonic status conference to discuss the proposed DPO and the disputed issues set forth herein.

Respectfully,

Matthew L. Tuccillo

cc: Marc De Leeuw via ECF  
All Counsel via ECF

**APPENDIX**

The Parties' Positions on DPO Disputes

**Dispute 1 (Draft DPO ¶ 2):**

*Plaintiffs' Position*:

In this MDL 2185, over 100 Individual Action Plaintiffs are pursuing claims to recover losses in BP investments managed by hundreds of Outside Investment Managers – a sprawling landscape that gave rise to three rounds of voluminous motions to dismiss over six years.  To streamline discovery, greatly reduce its burden and expense, and ensure that the Court can timely hear and resolve summary judgment motions, Plaintiffs negotiated and agreed to two-phase discovery as memorialized in the 12/28/2017 Letter Agreement and the CMO.

First, per CMO ¶1, all Plaintiffs agreed to produce, and did produce, certain materials described in the 12/28/2017 Letter Agreement, including e-mails and other electronically stored information. Their agreement to do so was contingent upon the understanding that further discovery would be limited to only a small set of bellwether plaintiffs from amongst their numbers.  At that point, 16 Test-Case (or "Representative") Plaintiffs were chosen per CMO ¶¶2-3.

Second, Plaintiffs ensured that further discovery by Defendants would be restricted to only the 16 Test-Case Plaintiffs.  CMO ¶5 unequivocally limits "fact discovery" to encompass only the Test-Case Plaintiffs, stating, "Fact Discovery will be completed concerning (a) the Representative Plaintiffs and (b) all Defendants" and "[f]act discovery for all Plaintiffs other than the Representative Plaintiffs ('Other Plaintiffs') will be deferred."  CMO ¶¶7-14 pertain to future pretrial phases after the close of fact discovery – expert reports and discovery, dispositive and non-dispositive motions, pretrial orders, and motions in limine – and likewise restricts them so as to expressly exclude issues relating solely to reliance, causation, and damages of the non-Test-Case Plaintiffs.  The 12/28/2017 Letter Agreement, at pp. 2-3, states, "The parties agree that any Plaintiffs that are not selected as a representative Plaintiff pursuant to [ ] CMO ¶¶2-3 shall have no further obligation to respond to discovery requests propounded by the Defendants" and "any additional discovery requests served in the future by Defendants during Fact Discovery set forth in [ ] CMO ¶5 shall be served only on those Plaintiffs selected to serve as representative Plaintiffs pursuant to [ ] CMO ¶¶2-3."

In this context, the language Plaintiffs propose to add to DPO ¶2 would permit deposition notices to be captioned only in the actions of the Test-Case Plaintiffs and would restrict deposition examinations only to subject matters relevant to the Test-Case Plaintiffs' claims.  This language would ensure that the DPO's terms are consistent with the restrictions of the 12/28/2017 Letter Agreement and CMO, so that the parties' prior agreements to limit discovery, on which Plaintiffs relied in agreeing to resolve discovery disputes and make their significant production of materials earlier in 2018, remain honored going forward.

Defendants' counter-position, articulated below, would reduce these protections to only a prohibition against depositions of non-Test-Case Plaintiffs themselves (as versus a multitude of non-party witnesses whose theoretical relevance extends only to claims of the 90+ non-Test-Case Plaintiffs'

claims, such as the hundreds of investment managers retained only by non-Test-Case Plaintiffs), contravening the plain limitations in the CMO and the 12/28/2017 Letter Agreement. Defendants' concerns are also unfounded. Any subjects of potential universal impact, such as Defendants' scienter or what the Defendants communicated to the market, would clearly relate to the Test-Case Plaintiffs' claims and could therefore be explored within the boundaries of Plaintiffs' proposed language. Similarly, under Plaintiffs' proposal, an Outside Investment Manager could be asked what occurred during a meeting with BP representatives (a topic where the answer for the Test-Case Plaintiff might happen to be the same for that manager's entire client base) or about the specifics of a Test-Case Plaintiffs' BP trades or investment approach, but could not be asked about the specifics of any non-Test-Case Plaintiffs' BP trades or investment approach since those issues are irrelevant to the claims of any Test-Case Plaintiff. It bears emphasizing that the permissible *use* of any such testimony is the subject of Dispute # 2 (regarding CMO ¶3), discussed below, and, significantly, Plaintiffs there have not proposed any restriction on the use of depositions of Defendants of BP witnesses (*i.e.* those deponents most pertinent to the issue of scienter).

   *Defendants' Position*:

   Plaintiffs are misstating the CMO and 12/28/2017 Letter Agreement. The CMO sets forth a schedule for discovery of *all* Individual Actions, deferring only certain limited discovery relating to Plaintiffs who have not been designated as "Representative [Test-Case] Plaintiffs" (referred to in the CMO as "Other Plaintiffs"). (CMO ¶¶ 5-10.) Specifically, the CMO and 12/28/2017 Letter Agreement defers discovery (i) of the Other Plaintiffs (*id*. ¶ 5; 12/28/2017 Letter Agreement at 2-3), and (ii) on issues "relating solely to reliance, causation, and damages of the Other Plaintiffs" (CMO ¶¶ 7-10). Indeed, the CMO explicitly requires that the parties proceed with "fact discovery . . . concerning . . . all Defendants" without limitation. (CMO ¶ 5.) Thus, aside from discovery of Other Plaintiffs or on issues "relating solely to reliance, causation, and damages of the Other Plaintiffs," discovery on *all* issues in *all* Individual Actions is to proceed.

   In other words, the discovery to be conducted pursuant to the CMO (and thus the depositions to be governed by the Deposition Protocol Order) are *not* limited to those "in the Individual Actions of the Test-Case Plaintiffs, regarding the claims being pursued by the Test-Case Plaintiffs" as Plaintiffs propose. This is important because it is quite possible — perhaps likely — that the discovery to be conducted under the CMO/DPO will involve issues that are relevant to Other Plaintiffs' claims against Defendants, such as (i) what occurred during meetings with BP representatives, (ii) what was communicated and/or important to the stock market at relevant times, and (iii) Defendants' scienter. Plaintiffs admit as much, stating that Defendants may ask questions at depositions that are relevant to an investment "manager's entire client base" (*i.e*., Other Plaintiffs). All of this discovery may potentially be used in *all* Individual Actions, not just those of the Test-Case Plaintiffs.

   In accordance with Paragraph 5 of the CMO and the 12/28/2017 Letter Agreement, Defendants have agreed in Paragraph 6 of the proposed Deposition Protocol Order that they will not seek depositions of Other Plaintiffs during the first stage of discovery. That does not mean, however, that Other Plaintiffs can simply ignore discovery on issues relevant to their cases. As discussed below with respect to Dispute #2, discovery that is relevant to claims of Other Plaintiffs should be admissible in

their cases as well. Thus, the parties should be free to issue deposition notices and/or subpoenas with captions that reference all of the Individual Actions, not just those of the Test-Case Plaintiffs.

**Dispute #2 (Draft DPO ¶ 3):**

*Plaintiffs' Position*:

As described above regarding Dispute #1, among other things, the CMO expressly defers discovery regarding all non-Test-Case Plaintiffs, and expressly exempts from future dispositive motions any issues relating solely to reliance, causation, and damages of the non-Test-Case Plaintiffs. These limitations are important protections for the non-Test-Case Plaintiffs, who agreed to produce materials in the first phase of discovery, often after resource-intensive searches of e-mails and other electronically stored information, only on the understanding that, under the CMO, their discovery obligations would end at that point and the elements of reliance, causation, and damages of their claims would not be litigated at summary judgment.

The 16 Test-Case Plaintiffs, alone, retained nearly 100 Outside Investment Managers, from across the globe. The testimony of these advisors is entirely irrelevant to the claims of other Plaintiffs (either Test-Case or non-Test-Case) who never retained them to manage their own BP investments. Similarly irrelevant to any one Test-Case (or non-Test-Case) Plaintiff is testimony by another Test-Case Plaintiff. The language Plaintiffs propose to add to DPO ¶3 would insulate all Plaintiffs, and particularly the 90 or so non-Test Case Plaintiffs, from having to expend the significant time and resources necessary to attend and cover such irrelevant depositions, during what promises to be a robust, international deposition schedule, out of concern that they would later be used against them, for instance in a summary judgment brief based on generalized arguments concerning causation or reliance.

Significantly, Plaintiffs' proposed language places no restrictions whatsoever on the use of depositions of Defendants and other BP witnesses. Instead, it merely sets as the default a restriction on use in any given Plaintiff's action of just two categories of depositions – those of other Test-Case Plaintiffs and those of Outside Investment Managers not retained by that Plaintiff to handle its BP investments. That said, it expressly permits any Plaintiff to consent to the use of such depositions regarding its claims, and Defendants are otherwise able to approach the Court with a motion under CMO ¶10 if they wish to use a deposition over any given Plaintiff's non-consent.

Defendants' arguments below misstate both the CMO and the practicalities. Under CMO ¶5, fact discovery currently is scheduled to end in summer 2019, not "years" from now. Extending the scope of permissible fact discovery from the 100 Outside Investment Managers who managed BP investments for only the 16 Test-Case Plaintiffs to the additional hundreds of Outside Investment Managers who managed BP investments for the 90+ non-Test-Case Plaintiffs will ensure that the parties will need to seek extensions of the current schedule. Such an extension entirely defeats the intent and benefits of the Test-Case process that Plaintiffs devoted such considerable efforts to negotiate. Moreover, on a practical level, the default has to be that Defendants bear the burden of filing a motion seeking to expand discovery to encompass a given Outside Investment Manager who was retained only by non-Test-Case Plaintiffs – as opposed to greenlighting Defendants to issue subpoenas to potentially

hundreds of such managers while placing the burden on the 90+ non-Test-Case Plaintiffs to file motions seeking protective orders and/or the managers themselves to file motions to quash. The resources of the parties and the Court will quickly be consumed litigating these discovery motions, instead of advancing discovery pertinent to the Test-Case Plaintiffs so that their claims can be timely and efficiently litigated at summary judgment. Plaintiffs never agreed to permit discovery on such a scale, which would completely defeat the purpose of having Test-Case Plaintiffs, including the important goal of achieving a streamlined and efficient path to summary judgment on the merits, and Defendants' attempts to contort the plain language of both the Letter Agreement and the CMO should be rejected. It seems they are retroactively second-guessing and attacking the Test-Case concept itself.

It also bears noting that Defendants have falsely trivialized the very substantial discovery efforts made by all Plaintiffs within 2018, which included, *inter alia*, searches through years of ESI and emails, requiring significant expenses of client and attorney time and resources over many months. In exchange for agreeing to do so, Plaintiffs secured important concessions as to the limitations of discovery, which they merely ask the Court to enforce now.

Last, Defendants overstate the gap between the end of fact discovery for Test-Case Plaintiffs under the CMO and any potential future discovery – whether for litigation or confirmatory purposes if a resolution is achieved – that might occur in the Non-Test-Case Plaintiffs' actions. Fact discovery for Test-Case Plaintiffs is currently scheduled to end in summer 2019. *See* CMO ¶5. Less than a year later, expert discovery will be completed and summary judgment will be fully briefed. *Id.* ¶¶6-12. The CMO does not include any trial schedule (indeed, trial for some actions will occur in transferee courts). These tight time frames are only viable if these milestones are intently focused on the Test-Case Plaintiffs and their ~100 Outside Investment Managers, per the terms of the CMO and the Letter Agreement. Whether and to what extent the parties might require formal discovery from the 90+ Non-Test-Case Plaintiffs and their hundreds of Outside Investment Managers, *e.g.*, to demonstrate reliance so as to litigate or resolve their claims, is best assessed after summary judgment is decided for the Test-Case Plaintiffs.

*Defendants' Position*:

Through this proposed addition, Plaintiffs seek to use the Deposition Protocol Order to preclude prematurely the use of evidence in many Individual Actions. As stated above, the CMO provides for a schedule for discovery of all Individual Actions. The purpose of that coordinated discovery program — like many such coordinated discovery programs in multidistrict litigations — is that discovery may be used (if relevant and admissible) in all constituent actions. There is no reason that Individual Action Plaintiffs should be permitted to use an administrative Deposition Protocol Order to obtain a blanket exclusion of potentially relevant deposition testimony. The desire of the Individual Action Plaintiffs who are not Test-Case Plaintiffs to skip depositions that may address topics relevant to their claims — such as what occurred during meetings with BP representatives and what was communicated and/or important to the stock market at relevant times — does not justify the exclusion of that relevant testimony.

None of this is unfair to any Plaintiffs, let alone the non-Test-Case Plaintiffs, and would not require an extension of discovery. Individual Plaintiffs have been able to proceed with their cases for many years while avoiding all but an initial and limited document production. Pursuant to the CMO and

4

DPO ¶ 6, Defendants have agreed that in the first stage of discovery they will not seek (i) depositions of any non-Test-Case Plaintiffs or (ii) discovery from third parties "relating solely to reliance, causation, and damages of the" non-Test-Case Plaintiffs.  But the parties agree that Defendants may seek discovery relevant to all Individual Actions (*e.g*., asking questions of an investment manager that is relevant to the "manager's entire client base").  When Defendants do so, that discovery should be admissible in all Individual Actions.

Plaintiffs' arguments that they "never agreed to permit discovery on such a scale" and about the "very substantial discovery efforts" of non-Test-Case Plaintiffs makes no sense.  In the absence of a Test-Case Plaintiff process, *all* Plaintiffs would be required to produce all their relevant documents, be deposed, and be present and participate in all depositions.  The Test-Case Plaintiff process substantially reduces that burden—the Non-Test-Case Plaintiffs are not producing all their relevant documents, will not be deposed, and will have limited or no interest in many depositions—but it does not allow non-Test-Case Plaintiffs to simply ignore discovery now that they have produced their limited set of documents.

Above, Plaintiffs argue that their proposal merely sets a "default . . . restriction" on the use of depositions and that Defendants could make a motion if Plaintiffs do not consent to the use of depositions in their cases later.  But if Plaintiffs' proposal is included in the DPO, the non-Test-Case Plaintiffs will rely on that provision in seeking exclusion of the deposition; they will argue (as Plaintiffs do now) that they had no reason to pay attention to these depositions because, as the DPO provided, they were being conducted only for the cases of the Test-Case Plaintiffs.  The whole point of a coordinated discovery program is to take discovery that can be used in all cases, and Plaintiffs should not be given a pass — now more than eight years after the *Deepwater Horizon* explosion — to ignore discovery entirely so that additional and duplicative discovery can be taken  years later (after the fact discovery, expert discovery, summary judgment and pretrial motions, and trial schedule set forth in the Test-Case CMO).

**Dispute #3 (Draft DPO ¶ 5):**

*Plaintiffs' Position*:

The language Plaintiffs propose to add to DPO ¶5 creates a reciprocal right by the Steering Committee and Defendants to postpone any deposition, without burdening one another or the Court, so as to permit additional time for document discovery relevant to such deposition to first occur, with postponements possible until two weeks after the document production deadline in DPO ¶5, which itself is 90 days before the fact discovery cutoff.  Plaintiffs believe that this clear language is a better, more efficient alternative to the language proposed by Defendants, which posits that the parties "may" agree to postpone depositions.  Defendants' language does not address how to handle the myriad (and likely) disagreements that might otherwise arise in the context of extensive party and third-party productions and depositions, and it leaves the door open for the parties to have to burden the Court to resolve their disagreements after what would presumably be time-consuming prior discussions and negotiations — if the parties' prior (good faith) efforts are any guide.

Defendants overstate their concern below that Plaintiffs' proposed language would "do away" with DPO ¶4, because they have overlooked that a postponement under the proposed language for DPO ¶5 is only permissible "to permit a reasonable time for document discovery…relevant to such deposition to be first obtained" and is only permissible until two weeks after the document production cutoff in CMO ¶5. Like Dispute #2, the goal now should be to set a clear-cut default, erring on the side that will generate the least amount of discovery motion practice. A setup that permits either side to postpone depositions, only under these enumerated circumstances, requires the side opposing the postponement to file a motion to compel, in which they would have to establish that the document discovery pertinent to that deposition has already been substantially completed. That approach is far less likely to spur a multitude of discovery motions than one in which depositions cannot be postponed unless the parties awaiting completion of document productions pursue motions for protective orders. Practically speaking, the delay provision must also be viewed in context – under the CMO, the document production deadline referenced in Plaintiffs' proposed language is currently scheduled to occur in May 2019. By the time the DPO enters, the discretionary postponements Plaintiffs propose will have a nearer expiration date than the time it would take, under Defendants' proposal, for disputes to emerge, discovery motions to be briefed, and decisions to be rendered by the Court.

*Defendants' Position*:

Defendants do not believe that either side — the Steering Committee for Plaintiffs or Defendants — should have the unilateral right ("exercisable in their separate discretion") to postpone depositions. This proposed addition would effectively do away with the deposition scheduling provisions set forth in Paragraph 4 if there is any pending document production issue, no matter how small or illusory. Defendants respectfully submit that, if there is a document production issue that arises, the Steering Committee and Defendants should confer; Defendants hope and expect that they can resolve any dispute about a scheduled deposition. In the unlikely event that such a dispute cannot be resolved, it can be raised with the Court.

**Dispute #4 (Draft DPO ¶ 6):**

*Plaintiffs' Position*:

Defendants concede that the 12/28/2017 Letter Agreement and the CMO preclude any depositions of non-Test-Case Plaintiffs. However, as discussed above regarding Dispute #1, the restriction is broader. Not only does CMO ¶5 defer discovery for all non-Test-Case Plaintiffs, CMO ¶¶7-14 also exempt issues relating solely to their reliance, causation, and damages from <u>all</u> pretrial phases under the CMO, including expert reports and dispositive motions. The 12/28/2017 Letter Agreement pp. 2-3 specify that non-Test-Case Plaintiffs have no further obligation to respond to discovery requests by Defendants, and that such further requests shall be served only on Test-Case Plaintiffs.

The language Plaintiffs propose to add to DPO ¶6 seeks to ensure that the DPO is similarly restricted, by precluding the deposition of any Outside Investment Manager not retained by at least one Test-Case Plaintiff. The Test-Case Plaintiffs alone engaged nearly 100 Outside Investment Managers.

The other 90 or so non-Test-Case Plaintiffs engaged <u>hundreds</u> more. Discovery of these third parties, who are wholly irrelevant to the Test-Case Plaintiffs' claims, must be expressly precluded in the DPO so that the parties can focus their efforts and resources on the timely pursuit of the evidence pertinent to the Test-Case Plaintiffs' claims. That is the entire point of having Test-Case Plaintiffs.

Plaintiffs' proposed language also seeks to ensure that when an Outside Investment Manager that was engaged by a Test-Case Plaintiff is deposed, the deposition is limited to only the claims being pursued by that Test-Case Plaintiff. Thus, the examination could cover generally-applicable topics of potential relevance beyond just the Test-Case Plaintiff's claims, such as the Outside Investment Manager's reliance or non-reliance on a specific misstatement (on behalf of all its clients), or the examination could cover the specifics of the Test-Case Plaintiff's investment approach or its BP securities trades. However, if the Outside Investment Manager was also retained by any non-Test-Case Plaintiffs, the examination would not be permitted to expand to cover matters solely relevant to the non-Test-Case Plaintiffs' claims, such as, for instance, the specifics of non-Test-Case Plaintiffs' investment approaches or BP trades.

Defendants ignore the limitations of CMO ¶5 and the 12/28/2017 Letter Agreement pp. 2-3, which, as discussed regarding Dispute #1 above, restrict fact discovery to just the Test-Case Plaintiffs. (Defendants instead focus on CMO ¶¶7-0, which concern *expert* reports, *expert* discovery, and *post-discovery* motions – <u>not</u> fact discovery.) Moreover, Plaintiffs' proposed language merely seeks to set a restriction as the default, so that the Court is not inundated – as will definitely occur absent this restriction – with future motions for protective orders by non-Test-Case Plaintiffs and/or motions to quash by third party Outside Investment Managers seeking to bar depositions of Outside Investment Managers with no connection to any Test-Case Plaintiffs. Given the provisions of the CMO and the 12/28/2018 Letter Agreement, it is more reasonable to place upon Defendants the burden of filing a motion with the Court under CMO ¶10 if and when the circumstance actually arises that a deposition of such an Outside Investment Manager might have some actual (not hypothetical) relevance to the parties' litigation of the Test-Case Plaintiffs' claims through summary judgment. This is the bargain that Plaintiffs struck, after extensive negotiations, and that led them to drop objections to Defendants' discovery requests, agree to resolve outstanding discovery disputes, and agree to produce extensive materials – including ESI and emails – earlier in 2018. Defendants' reference to the Federal Rules is a red herring. The parties agreed to a set of protections, memorialized in the Letter Agreement and the CMO, which Plaintiffs are merely seeking to enforce now by aligning the DPO's provisions.

*Defendants' Position*:

Through this proposed addition, Plaintiffs seek to use the Deposition Protocol Order to preclude depositions of investment managers who may have third-party testimony relevant to a particular Test-Case Plaintiff (such as what was communicated and/or important to the stock market at relevant times), simply because those investment managers also worked for non-Test-Case Plaintiffs. Such a blanket preclusion is especially inappropriate where Defendants have not yet received any discovery from third-party investment managers.

Defendants do not seek to depose investment managers about issues relating "to reliance, causation, and damages of the Other Plaintiffs" (CMO ¶¶ 7-10). However, if discovery reveals that a

particular investment manager is likely to have relevant testimony, a deposition of that witness should not be precluded solely because that investment manager worked for non-Test-Case Plaintiffs. Moreover, Plaintiffs' proposal would result in the inefficiency of Outside Investment Managers who were retained by Test-Case and non-Test-Case plaintiffs potentially being deposed more than once in these Actions.

Plaintiffs' argument that their proposed addition "seeks to set a restriction as the default" and that Defendants can make a motion if they seek a deposition turns the Federal Rules on their head. As in any case, Defendants should be allowed to seek third-party discovery from witnesses who they believe will provide relevant testimony; if Plaintiffs or the third party object, the parties can meet and confer, and a motion for a protective order filed (or joint letter outlining the issue sent to the Court) if the dispute cannot be resolved.

**Dispute #5 (Draft DPO ¶ 7):**

*Plaintiffs' Position*:

The DPO's agreed-upon provisions permit Plaintiffs to depose any of the Defendants in the Individual Actions, with just one exception, Defendant Suttles, the only Defendant previously deposed in the Class Action. The language Plaintiffs propose to add to DPO ¶7 seeks to permit his redeposition, and that of any other BP employees deposed in the Class Action, but *only* as regards topics not previously covered in their prior Class Action deposition. Such non-duplicative, supplemental examinations are appropriate under the circumstances. Plaintiffs' proposed language would also permit redeposition of Rule 30(b)(6) deponents and experts.

For instance, Defendant Suttles was a main participant in the alleged post-spill fraud. However, at summary judgment, the Class Action concerned only four alleged post-spill misstatements and six alleged post-spill corrective disclosures or events. By contrast, the Individual Action Plaintiffs alleged twenty post-spill misstatements – most by Suttles himself – and eighteen partial corrective disclosures or events arising throughout the post-spill time period. For instance, after repeating BP's false publicly-stated oil flow rate of 5,000 barrels per day throughout the post-spill period as recently as the day prior, on May 22, 2010, Defendant Suttles disclaimed flow rate estimates by scientists as high as 70,000 barrels per day. Defendant Suttles has never been questioned regarding these additional misstatements and corrective disclosures or events, including, *inter alia*, as to his scienter and those of other Individual Defendants in making them. Moreover, Suttles's deposition in MDL 2185 occurred on May 9, 2014, which was before this Court had decided the second and third round of motions to dismiss the Tranche 2 and 3 Plaintiffs' cases – at a time when the precise contours of the Individual Actions remained unsettled.

Thus, contrary to Defendants' argument, it is of no consequence that the Class Action's deposition protocol order permitted some, but not all, Individual Action Plaintiffs to request up to one hour (collectively) of examination time – an amount patently insufficient to cover the numerous statements and corrective disclosures/events uniquely at issue in Plaintiffs' actions. *See* Amended Unopposed Order Concerning Depositions, dated June 13, 2013 (MDL Dkt. No. 650) ("2013 Order"),

8

appended hereto as Exhibit 4, ¶9. Defendants' ignore that order's inherent limitations. The 2013 Order, by its express terms, governed <u>only</u> the Class Action. *See id.* at p.1 ("This Order is to govern the conduct of depositions noticed in the above-captioned consolidated ADS class action"). It was discussed, finalized, and entered before some Tranche 2 and all Tranche 3 Plaintiffs had even filed their actions, let alone weighed in on discovery issues. Not surprisingly, it lists (*see id.* at pp. 1-2) only certain earlier-filed Tranche 1 and 2 actions as ones whose "participation" it attempted to "facilitate."

Defendants' attempt to mischaracterize the 2013 Order as a governing standard for all depositions throughout all actions in MDL 2185 – rather than just the Class Action as per the express terms of its very first sentence – is simply wrong. Indeed, Defendants' own litigation tactics *prevented* the Individual Action Plaintiffs from meaningfully participating in the Class Action depositions. As the Court will recall, in December 2013, Defendants unexpectedly *expanded* their second round motion to dismiss to seek dismissal of the Individual Actions under the Securities Litigation Uniform Standards Act ("SLUSA"), an argument that was legally based on the proposed extension of SLUSA to English law claims (which the Court later rejected) and factually premised on the degree to which the Individual Action Plaintiffs coordinated their efforts. As the Court later held, "This not only introduced a novel issue for the parties to brief, but it forced the Tranche 2 Plaintiffs to avoid coordinating their litigation on any level, lest they be subject to further scrutiny under SLUSA." *See* Order, Dkt. No. 1359, at p. 4. Given that Defendants' second motion to dismiss, including their SLUSA argument, was not denied until September 30, 2014, Defendant Suttles's May 2014 deposition occurred at a time when, in the Court's words, Defendants had "forced" the Individual Action Plaintiffs "to avoid coordinating their litigation on any level" (*id.*) – a reality that clearly encompassed his deposition. Thus, Defendants' reference below to the negotiation of the 2013 Order, which was entered in June 2013, is misplaced. It was negotiated by the Class Action Plaintiffs for use in their own action. A few Individual Action Plaintiffs' counsel merely provided comments – before Defendants' raised their SLUSA argument and stifled coordination – with such comments including that the Plaintiffs ***refused*** to have the order captioned or entered in their Individual Actions. For that reason, the 2013 Order's caption does ***not*** state "This order relates to" before listing any Individual Action case numbers, and it was ***not*** entered on the individual case docket for any of the Individual Actions.

Defendants' arguments below understate the SLUSA dismissal risk. Just prior to then, they had engaged the Individual Action Plaintiffs, through Liaison Counsel, in negotiating a stipulation seeking to apply – as the Court had asked – its Tranche 1 motion to dismiss rulings to the Tranche 2 cases. Once that stipulation was done, without advance warning, Defendants filed their revised Tranche 2 motion to dismiss, including a SLUSA argument seeking dismissal of the Individual Actions for reasons that included the negotiation of that conforming stipulation. In that context, ***any*** participation by any Individual Action Plaintiff at a deposition in the Class Action would ***definitely*** have been used by Defendants as an additional factual basis for their arguments seeking SLUSA dismissal. Defendants' statement to the contrary below, that participation at Suttles's deposition would have "no bearing" on the SLUSA argument, is simply not credible. SLUSA operates to dismiss coordinated actions when there are more than 50 claimants on file – the class at issue in the Class Action readily satisfies this threshold. Indeed, Defendants made this argument in their opening and reply briefs in support of their expanded second motion to dismiss. *See* MDL Dkt. No. 718 (Opening Brief) at 12 n.7 (arguing, with case citation, that the members of a putative class are to be counted for SLUSA purposes); MDL Dkt No. 802 (Reply

9

Brief) at 8-9 (same).  Indeed, Defendants also expressly argued that "coordinating discovery with plaintiffs in the ADS class action" was a basis for SLUSA dismissal.  *See* MDL Dkt. No. 718 at 15.  In support, they argued that SLUSA dismissal should occur due to the mere *entry* of the 2013 Order, the fact that the Individual Action Plaintiffs merely had *access* to documents produced in the Class Action, and the *possibility* of "coordinated discovery" between the Individual Actions and the Class Action.  *See* MDL Dkt. No. 718 at 15; MDL Dkt. No. 802 at 11.  They went so far as to argue the mere *existence* of the Class Action alongside Plaintiffs' Individual Actions within MDL 2185 was sufficient to warrant dismissal. *See* MDL Dkt. No. 802 at 9.  Thus, Defendants' unsubstantiated claims of having "repeatedly urged" some unidentified Plaintiffs' counsel to participate in Suttles's deposition, even if true, can best be seen as their own self-serving attempt at that time to have Plaintiffs take more actions that could be used as factual support for a SLUSA dismissal.

Under these circumstances, not surprisingly, this Court entered an initial Scheduling / Docket Control Order on December 10, 2013 (Dkt. No. 720), appended hereto as Exhibit 5, in the Tranche 1 and 2 Individual Actions (including those listed in the 2013 Order's preamble) – five months *before* Suttles's Class Action deposition – that acknowledged the lack of coordination and expressly ordered that "A Proposed Deposition Protocol Order to govern the conduct of depositions to be noticed by the parties in the MDL 2185 individual actions must be submitted [ ]," a mandate repeated in the current CMO governing all Individual Actions.  Neither of these orders was conditioned on any deference to the 2013 Order or any other procedural order from the Class Action, nor should they have been so conditioned.

Finally, Plaintiffs were not privy to any negotiations, deposition-related or otherwise, between the Class Action Plaintiffs and Defendant Suttles that preceded his Class Action deposition, including those regarding its geographic location (a point of unclear relevance to the instant dispute), as Defendants reference below.  Being wholly unaware of such negotiations, and certainly not invited to participate in them, Plaintiffs cannot now be held to their terms.  All that said, consistent with DPO ¶10, Plaintiffs are willing to depose him in a location convenient to his residence in Canada.

Plaintiffs urge the Court to resolve this issue now.  After months spent negotiating this DPO provision in vain, the parties have staked out their positions, and the dispute is now ripe.  Plaintiffs want to depose Suttles on topics not addressed in his prior deposition, including, *inter alia*, his many alleged misstatements not addressed in that deposition, his scienter in making them, and his meetings and other direct communications with Plaintiffs and their investment advisors (*see, e.g.*, *IBM* First Amended Complaint, MDL Dkt. No. 1244 at ¶498).  Defendants will not agree to it.

*Defendants' Position*:

Plaintiffs' proposed additional language would be contrary to a previous order of the Court.  The Amended Unopposed Order Concerning Depositions, dated June 13, 2013 (MDL 2185 Doc. 650) ("2013 Order," attached as Exhibit 4) states (at ¶ 6) that "[n]o witness shall be deposed more than one time in both the Class Action and the Individual Actions combined, except by leave of Court for good cause shown."  There is no reason for a change to that Order, which was specifically designed to avoid the repeat of depositions now sought by the Individual Action Plaintiffs.

Plaintiffs contend that the 2013 Order "governed only the Class Action," relying on a quote from page 1 of that Order.  But the quote they provide the Court is incomplete; the full sentence states: "This

10

Order is to govern the conduct of depositions noticed in the above-captioned consolidated ADS class action *("Class Action") and to facilitate participation in such depositions by individual plaintiffs pursuing related actions (Individual Actions"), including the following actions:  [List of 12 Individual Actions]*."  (Ex. 4 at 1-2 (emphasis on language omitted by Plaintiffs).)  Indeed, the 2013 Order was negotiated with and agreed to by Individual Action Plaintiffs' counsel, precisely because all parties recognized that there were many Individual Actions that included allegations that overlapped substantially with the Class Action.

Plaintiffs argue that, because they allege additional misstatements and corrective disclosures, they should be allowed a second deposition of Doug Suttles.  But Plaintiffs (and all other parties) knew about those additional allegations when they negotiated and agreed to the MDL 2185 Deposition Order.  Relying in part on that Order, Mr. Suttles — who no longer works for BP and now lives and works in Canada — agreed to be deposed in New York.  It would be manifestly unfair to him to alter the rules pursuant to which he was deposed.

Indeed, although Individual Action Plaintiffs now contend that the 2013 Order "governed only the Class Action," they previously requested—and received—a postponement of Mr. Suttles' deposition, which was then scheduled for December 2013, pursuant to that same Order.  Individual Action Plaintiffs were then silent until five days before Mr. Suttles' rescheduled deposition on May 8, 2014, at which point they requested an additional delay, claiming a need for additional time to take discovery specific to Mr. Suttles.  After that request was declined as untimely and unnecessary, Individual Action Plaintiffs, with one exception, then chose not to participate in Mr. Suttles' deposition.  The one Individual Action Plaintiff who chose to question Mr. Suttles at that deposition, however, asked about statements made by Mr. Suttles in May 2010 that Plaintiffs contend support another deposition.

In any event, all of the additional alleged misstatements and corrective disclosures to which Plaintiffs refer relate to statements about a single subject:  the rate of oil flowing into the Gulf of Mexico.  That is the subject about which Mr. Suttles was deposed extensively in May 2014.  But more fundamentally, the fact that Mr. Suttles was not asked about specific statements at issue in the Individual Actions was the choice of Individual Action Plaintiffs, all but one of whom chose not to question Mr. Suttles in May 2014.  Nor did the Individual Action Plaintiffs need to "coordinate" their questioning; any counsel could have asked whatever questions they wished (and, in fact, Defendants' counsel repeatedly urged Individual Action Plaintiffs to do so).  Any such uncoordinated questioning of Mr. Suttles would have had no bearing whatsoever on Defendants' SLUSA argument, which as Plaintiffs acknowledge was based on the existence of the 2013 Order rather than specific deposition questioning.

The 2013 Order requires Plaintiffs to show "good cause" for a second deposition.  Plaintiffs should not be allowed to use the Deposition Protocol Order to alter that previously agreed-to limitation.  Contrary to Plaintiffs' argument above, this issue is not "now ripe."  If and when Plaintiffs seek to depose Mr. Suttles a second time, they can present what they believe to be "good cause," and counsel can confer about that request.  If a resolution cannot be reached, Plaintiffs can present that issue to the Court at that time, with Plaintiffs specifying exactly the amount of time they seek to depose Mr. Suttles and on what topics and Defendants having the ability to respond on those specifics.  Plaintiffs should not be permitted to use an administrative order like the Deposition Protocol Order to obtain premature

11

substantive relief on this issue, which implicates the rights of an individual defendant who lives and works outside the United States.

**Dispute #6 (Draft DPO ¶ 8):**

*Plaintiffs' Position*:

The DPO's agreed upon provisions permit the deposition of a Rule 30(b)(6) deponent for longer than seven hours. The language Plaintiffs propose to add to DPO ¶8 would permit over-length depositions for non-corporate Defendants as well. None of the Defendants in the Individual Actions, except for Suttles, were previously deposed in the Class Action. Thus, no examination has been undertaken of them regarding the alleged fraud at issue in this MDL 2185, and no deposition record exists as to most of the 50+ misstatements alleged by Plaintiffs, with respect to which they bear the burden of establishing both falsity and the intent-based elements of scienter (for Exchange Act claims) and intent to induce reliance and intent to deceive (for English law claims). Likewise, no deposition record exists as to the scores of meetings and direct communications between Defendants and the Individual Action Plaintiffs and their Outside Investment Managers. Moreover, while every effort is being made to coordinate, given the multitude of Individual Action Plaintiffs and their counsel, it is both reasonable and likely that over-length depositions of the non-corporate Defendants will be needed.

As with Dispute #5, Defendants' reference to the 2013 Order entered in the Class Action is wholly misplaced. As discussed above, the 2013 Order entered before most Individual Action Plaintiffs had filed their claims and/or had their claims survive a motion to dismiss. It concerned depositions taken in the Class Action, and merely "facilitated" "participation" by some (but not all) Individual Action Plaintiffs, who were nevertheless – in the Court's words – "forced…to avoid coordinating their litigation on any level" for another 15 months after its entry. Moreover, it bears emphasizing that the Class Action raised only Exchange Act claims subject to the fraud on the market theory of reliance. By contrast, the Individual Actions are proceeding primarily under English law, where Plaintiffs bear the burden of proving unique elements including intent to deceive, intent to induce reliance, and reliance and must resort to a broader universe of evidentiary support including scores of meetings and direct communications between Defendants and both Plaintiffs and their Outside Investment Managers.

By labeling this dispute "premature," Defendants seek only to forestall resolution of obvious disagreements to a future time when the parties are further into full discovery and facing steeper time pressures. The parties have consulted in good faith for months over the disputes discussed herein. They are ripe for guidance by the Court.

Finally, Defendants' reference to their place of residence / employment being outside the U.S. is a red herring. DPO ¶10 requires the parties to schedule depositions at a time and place convenient for deponents, with the default being their place of residence.

*Defendants' Position*:

Plaintiffs' proposed additional language is contrary to the 2013 Order. That Order states (at ¶ 7) that, "[e]xcept for good cause shown, no witness other than a 30(b)(6) deponent shall be deposed for more than one seven-hour day." There is no reason to change that agreed-upon restriction now.

Plaintiffs argue that they should be allowed more than seven hours with all Individual Defendants because of the number of alleged misstatements and multiple counsel. Again, this is a subject that was known when the parties agreed to the 2013 Order. In any event, many of the Individual Defendants are alleged to have made very few alleged misstatements and have limited involvement in other matters. More generally, Plaintiffs' conclusory argument is not a basis for departing from the Federal Rules (which provide for a presumptive limit of seven hours, *see* Fed. R. Civ. P. 29(d)(1)) or the 2013 Order. If there are disputes that cannot be resolved concerning specific witnesses, those issues can be raised with the Court at the appropriate time (rather than on a global basis as Plaintiffs now request). Again, Plaintiffs should not be permitted to obtain premature substantive relief under the guise of an administrative deposition protocol order, especially with respect to the rights of Individual Defendants, some of whom live and work outside the United States.

**Dispute #7A (Draft DPO ¶ 13):**

*Plaintiffs' Position*:

Plaintiffs bear the burden of establishing all elements of their claims, including reliance. Given that nearly all Plaintiffs hired Outside Investment Managers to manage their BP investments at issue, in most instances, reliance will be proven mostly, if not entirely, by reference to the documents and testimony of Outside Investment Managers retained during the time period at issue (late 2006/early 2007 through mid-2010). While they acted as Plaintiffs' agents in managing the BP investments at issue, these Outside Investment Managers are third parties in the context of this litigation, and many of them ceased to be retained by Plaintiffs after the events at issue. It is wrong to presume any uniform level of access to these entities by Plaintiffs, whether at earlier phases of this litigation or at present.

Thus, the Test-Case Plaintiffs require the majority of examination time in deposing their Outside Investment Managers, so as to get the evidence they need to meet their burden at summary judgment and at trial. There are roughly 50 alleged misstatements at issue, and countless instances of meetings or direct communications between the Outside Investment Managers and BP. Plaintiffs must be afforded most of the deposition time to conduct a direct examination on these facts and thereby to build their affirmative case, which will largely be litigated at summary judgment based on deposition transcript excerpts and at trial based on presentation of videotaped testimony.

These realities are appropriately reflected in Plaintiffs' proposed language for the first two blanks in DPO ¶13, whereby Plaintiffs would get five hours of examination time. Plaintiffs anticipate that most of their examination time would be spent questioning each Outside Investment Manager as to its investment approach, its meetings and direct communications with Defendants, and its reliance on the alleged misstatements at issue. Under Plaintiffs' proposal, Defendants would have ample time thereafter

13

– two hours – to cross-examine the witness. Significantly, this generous sharing of time dwarfs the time that Defendants were provided under the Class Action's deposition protocol order, which afforded Defendants only 30 – 45 minutes of examination time. *See* 2013 Order at ¶9. This fourfold increase in Defendants' time allocation more than suffices for them to cross-examine the Outside Investment Manager deponents, once the bulk of the examination time has been spent by Plaintiffs eliciting the affirmative reliance evidence. It is illogical for Defendants to claim entitlement to significantly more time in the Individual Actions, where *Plaintiffs* bear the burden of proof on reliance, than they had in the Class Action, where reliance was presumed and *Defendants* had the burden to rebut the presumption.

Defendants' reference to whatever information some Plaintiffs may previously have obtained from some Outside Investment Managers is based on speculation. It ignores many realities, including that, absent subpoena power, any assistance provided was voluntary in nature and dictated in quality and scope by the third party Outside Investment Managers themselves. Plaintiffs have not received any evidence provided under oath of the kind that will be governed by the DPO. Defendants' proposal ignores that *Plaintiffs* bear the burden of proof on reliance, such that it would be manifestly prejudicial for *Defendants*, as they propose, to conduct a "pure 'discovery' deposition," *i.e.*, the affirmative direct examination seeking to elicit the foundation for reliance, as well as their traditional "cross-examination."

Defendants are also wrong to imply that the parties could confer and simply agree to extend the deposition of third party Outside Investment Managers. The managers themselves would have to agree to such an extension, and it is far more likely that they will strongly oppose one. (For that reason, the DPO expressly reserves their right to do so.)

*Defendants' Position*:

As Plaintiffs have informed the Court in the past, Plaintiffs' counsel has obtained relevant evidence from their outside investment managers outside of the discovery process. This is not surprising, as the outside investment managers had (and in some cases still have) contractual and/or fiduciary duties to Plaintiffs. It would not be surprising if this continued; thus, (i) depositions of outside investment managers may be taken after Plaintiffs' counsel has had multiple conversations with the deponent and/or her counsel, and/or (ii) Plaintiffs may be obtain the consensual attendance of outside investment manager witnesses at trial.

In contrast, Defendants' counsel has no means of obtaining information or evidence from outside investment managers outside of the discovery process. Thus, Defendants anticipate that depositions of outside investment managers will involve both (i) a pure "discovery" deposition in which Defendants seek relevant information and (ii) "cross-examination" of the managers designed to rebut Plaintiffs' claims that they relied on Defendants' statements. In light of this, Defendants expect they will need most of a full day to depose each investment manager.

Although Defendants are willing to agree to less than the usual 7 hours, and here propose 5 hours, anything less would substantially hinder their ability to take discovery on critical issues in these cases. Of course, if there are particular witnesses for whom that is not so, or the parties believe that more than 7 hours combined is necessary, they can confer and raise any unresolved disputes with the Court.

Plaintiffs' argument about the length of time allotted to Defendants' questioning of investment managers in the Class Action (*see* 2013 Order ¶ 9) makes no sense: In the Class Action, Plaintiffs invoked the fraud-on-the-market presumption of reliance, and thus individual reliance was not at issue. In the Individual Actions (all of which assert English law claims), that presumption is not available and thus individual reliance is a critical issue on which Defendants must question deposition witnesses.

**Dispute #7B (Draft DPO ¶ 13):**

*Plaintiffs' Position*:

Plaintiffs' proposed language for the end of DPO ¶13 seeks to establish, up-front, an orderly procedure for depositions and to minimize and hopefully avoid future disagreements as to their conduct. It posits that if either side has the majority of allocated examination time, that side shall examine the witness first and shall reserve no more than 25% of its time for use following the opposing side's examination. Here, too, the Class Action's deposition protocol order provides some context. There, Plaintiffs collectively were granted between 6.25 and 6.5 hours of examination time, along with the right to examine the witness first, while Defendants were granted just 30 – 45 minutes of time "after" examination by the Plaintiffs. *See* 2013 Order at ¶9. Plaintiffs believe that clarity in the DPO now will avoid future disputes and lessen the chance that the parties will require Court intervention or guidance during the conduct of depositions.

Defendants' proposals are non-sensical, highly prejudicial, and will only lead to additional disputes requiring Court intervention. In the context of third-party Outside Investment Managers, it does not matter who serves a subpoena/notice first. What matters is who gets the bulk of time to do the direct examination, which as discussed regarding Dispute #8A should be Plaintiffs. Under Defendants' approach, Defendants could simply wait for Plaintiffs (who bear the burden of providing reliance and therefore must elicit testimony) to issue subpoenas on the Outside Investment Managers, which would thereby require Plaintiffs to start the deposition and be forced to do the entire direct examination in just two hours, while Defendants could then use the next five hours to cross-examine the deponent. The same imbalance would ensue if Defendants issued the subpoena (and therefore had to go first), but could reserve as much time as they want. In that case, they could ask 10 minutes worth of questions, force Plaintiffs to expend their two hours attempting to elicit the affirmative reliance case, then use nearly five hours cross-examining the deponent. These proposals are facially prejudicial to Plaintiffs.

By contrast, Plaintiffs propose to have five hours of examination time and to proceed first, irrespective of who issues the subpoena on the Outside Investment Manager. They could only reserve 25% of their time, or one and one-quarter hours, for redirect after Defendants spend their two hours cross-examining the deponent. This fair approach appropriately reflects Plaintiffs' burdens of proof and balances it against Defendants' desire to undermine the reliance testimony at deposition. There is nothing arbitrary about Plaintiffs' proposals. To the contrary, their implementation would ensure that depositions proceed in an orderly, predictable fashion, while minimizing the need to expend even more resources hashing and rehashing basic deposition procedural disputes.

*Defendants' Position*:

Defendants do not believe that Plaintiffs' proposed additional language is appropriate. Depositions of non-parties should be handled in the ordinary fashion for discovery: The party who first serves a subpoena/notice should start the deposition, followed by other parties (pursuant to a cross-subpoena and/or as cross-examination), followed by re-direct and re-cross as appropriate. The duration of these examinations may vary depending on the witness. For example, Defendants may ask a particular investment manager questions about only a few focused subjects, but then need more time for cross-examination after Plaintiffs' examination. There is no reason for the arbitrary division of time proposed by Plaintiffs.

Plaintiffs' stated concern that they might proceed with their "entire direct examination" after which Defendants take more time to cross-examine the witness is exactly the point. As at trial, it is often the case that cross-examination takes longer than a rehearsed direct examination of a friendly witness. Moreover, as at trial, Defendants may not know the subjects about which they will need to cross-examine the witness until they have heard the "direct" testimony elicited by Plaintiffs.

Finally, as with Dispute #8A, Plaintiffs' analogy to the 2013 Order (¶ 9) is inapt. In the Class Action (unlike the Individual Actions), Plaintiffs invoked the fraud-on-the-market presumption of reliance rather than seeking to prove individual reliance.